GIBSON, DUNN & CRUTCHER LLP
THEODORE J. BOUTROUS, JR., SBN 132099
  tboutrous@gibsondunn.com
THEANE D. EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
HEATHER RICHARDSON, SBN 246517
  hrichardson@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

JOSHUA S. LIPSHUTZ, SBN 242557
  jlipshutz@gibsondunn.com
1050 Connecticut Avenue, N.W.
Washington D.C. 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539


Attorneys for Defendant UBER TECHNOLOGIES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS COLOPY, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>                    Defendant. | CASE NO. 19-cv-06462<br><br><br>**Hearing:**<br>Date: Nov. 21, 2019<br>Time: 1:30 p.m.<br>Place: Courtroom 5<br>Judge: Honorable Edward M. Chen<br>Action Filed: October 8, 2019<br>Trial Date: none set |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

PAGE

I.    INTRODUCTION ............................................................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ...................................................... 3

      A.    The Uber App Connects Riders And Drivers. ................................................... 3

      B.    Plaintiff Thomas Colopy And His Claims. ....................................................... 4

III.  ARGUMENT ................................................................................................................. 6

      A.    Colopy's Claims Do Not Merit Preliminary Injunctive Relief. ....................... 6

            1.    Colopy Cannot Demonstrate Irreparable Harm. .................................. 6

            2.    Colopy Has Not Demonstrated That The Law And Facts *Clearly Favor*
                  His Position. .......................................................................................... 9

                  a)    Colopy Cannot Even State A Claim For Relief Let Alone Meet
                        The Demanding Standard Required For Entitlement To A
                        Mandatory Preliminary Injunction. ........................................... 9

                  b)    Colopy Is Unlikely To Succeed In Demonstrating That Uber
                        Must Classify Drivers As Employees Under Any Test. .................. 11

            3.    Colopy Cannot Demonstrate That The Balance Of Equities Favors An
                  Injunction, Or That An Injunction Is In The Public Interest. .......................... 16

                  a)    The Balance Of Equities Tips In Uber's Favor. ................................ 16

                  b)    An Injunction Is Not In The Public Interest. ..................................... 16

      B.    This Court Should Reject Colopy's Effort To Litigate The Merits On Behalf
            Of A Class Before Class Certification. ........................................................... 17

            1.    Colopy Can Only Represent Himself Before Class Certification. .................. 17

            2.    Deciding Colopy's Preliminary Injunction Now Would Invite
                  Impermissible One-Way Intervention. ............................................... 18

      C.    Colopy's Putative Class Largely Consists Of Drivers Bound To Individually
            Arbitrate Their Claims And Whose Claims Cannot be Resolved By This Court. ...... 19

            1.    Colopy Is An Atypical And Inadequate Class Representative Because
                  The Vast Majority Of The Class, Unlike Colopy, Is Required To
                  Individually Arbitrate Their Claims. .................................................. 20

            2.    Colopy Cannot Rely On *McGill* Because He Seeks Private, Not Public,
                  Injunctive Relief. ................................................................................. 20

            3.    The FAA Section 1 Exemption Does Not Apply. ............................... 22

1

IV.     CONCLUSION ................................................................................................................ 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adtrader, Inc. v. Google LLC*,
   2018 WL 1876950 (N.D. Cal. Apr. 19, 2018) ............................................................................17

*All. For The Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011)..............................................................................................................9

*Am. Pipe & Constr. Co. v. Utah*,
   414 U.S. 538 (1974) ............................................................................................................................3

*Amalgamated Ass'n St. Elec. Ry. & Motor Coach Emps. of Am., Local Div. 1210 v.
   Penn. Greyhound Lines*,
   192 F.2d 310 (3d Cir. 1951)...............................................................................................................24

*Arizona Dream Act Coalition v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014)..............................................................................................................7

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011).....................................................................................................19, 21, 23

*Avilez v. Pinkerton Gov't Servs., Inc.*,
   596 F. App'x 579 (9th Cir. 2015) ....................................................................................................20

*Blair v. Rent-A-Center, Inc.*,
   928 F.3d 819 (9th Cir. 2019)......................................................................................................21, 22

*Brown v. Rawson-Neal Psychiatric Hosp.*,
   840 F.3d 1146 (9th Cir. 2016)..........................................................................................14, 15, 16

*Bruns v. Mayhew*,
   750 F.3d 61 (1st Cir. 2014) ................................................................................................................7

*Bruster v. Uber Techs., Inc.*,
   188 F. Supp. 3d 658 (N.D. Ohio 2016)............................................................................................19

*Butler v. Dowd*,
   979 F.2d 661 (8th Cir. 1992)............................................................................................................17

*Carey v. Uber Techs., Inc.*,
   2017 WL 1133936 (N.D. Ohio Mar. 27, 2017) ...............................................................................19

*Cavallo v. Uber Techs., Inc.*,
   2017 WL 2362851 (D.N.J. May 31, 2017) ......................................................................................19

*Circuit City Stores, Inc. v. Adams*,
   532 U.S. 105 (2001)....................................................................................................................22, 23

Gibson, Dunn &
Crutcher LLP

*Congdon v. Uber Techs., Inc.*,
    226 F. Supp. 3d 983 (N.D. Cal. 2016) ........................................................................19

*Cotter v. Lyft, Inc.*,
    60 F. Supp. 3d 1067 (N.D. Cal. 2015) ...................................................................13, 15

*Davis v. Romney*,
    490 F.2d 1360 (3d Cir. 1974) ....................................................................................17

*Disney Enters., Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017) .......................................................................................6

*Doe v. Fed. Dist. Court*,
    467 F. App'x 725 (9th Cir. 2012) ...............................................................................11

*Dynamex Operations W. v. Superior Court*,
    416 P.3d 1 (2018), *reh'g denied* (June 20, 2018) ..............................2, 11, 12, 14

*Epiq Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) ................................................................................................19

*Feldman v. Ariz. Sec'y of State's Office*,
    843 F.3d 366 (9th Cir. 2016) .......................................................................................6

*Fireside Bank v. Superior Ct.*,
    155 P.3d 268 (Cal. 2007) ............................................................................................18

*Fogerty v. Poor Boy Prods., Inc.*,
    1997 WL 579175 (9th Cir. Sept. 12, 1997) .................................................................2

*Garcia v. Border Transp. Grp, LLC*,
    239 Cal. Rptr. 3d 360 (2018) ................................................................................11, 15

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ....................................................1, 6, 9, 15, 16

*Gonzales v. San Gabriel Transit, Inc.*,
    2019 WL 4942213 (Cal. Ct. App. Oct. 8, 2019) ................................................12, 14

*Guan v. Uber Techs., Inc.*,
    236 F. Supp. 3d 711 (E.D.N.Y. 2017) .......................................................................19

*Gunn v. Uber Techs., Inc.*,
    2017 WL 386816 (S.D. Ind. Jan. 27, 2017) ..............................................................19

*Henderson v. Equilon Enters.*,
    2019 WL 4942458 (Cal. Ct. App. Oct. 8, 2019) .......................................................12

*Hill v. Rent-A-Center, Inc.*,
    398 F.3d 128 (11th Cir. 2005) ...................................................................................24

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    273 F. Supp. 3d 1099 (N.D. Cal. 2017), *aff'd and remanded*, 938 F.3d 985 ................................8

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    938 F.3d 985 (9th Cir. 2019)........................................................................................8, 16

*HR Staffing Consultants LLC v. Butts*,
    627 Fed. App'x. 168 (3d Cir. 2015) ..............................................................................16

*Iowa Utils. Bd. v. FCC*,
    109 F.3d 418 (8th Cir. 1996)........................................................................................16

*Jean-Baptiste v. District of Columbia*,
    958 F. Supp. 2d 37 (D.D.C. 2013) ...............................................................................17

*Kowaleski v. Samandarov*,
    590 F. Supp. 2d 477 (S.D.N.Y. 2008)...........................................................................23

*Lamour v. Uber Techs., Inc.*,
    2017 WL 878712 (S.D. Fla. Mar. 1, 2017) ...................................................................19

*Landers v. Quality Commc'ns, Inc.*,
    771 F.3d 638 (9th Cir. 2014)........................................................................................10

*Lathan v. Uber Techs., Inc.*,
    266 F. Supp. 3d 1170 (E.D. Wisc. 2017) ......................................................................19

*Lawson v. Grubhub, Inc.*,
    302 F. Supp. 3d 1071 (N.D. Cal. 2018) ..................................................................13, 15

*Lee v. Uber Techs., Inc.*,
    208 F. Supp. 3d 886 (N.D. Ill. 2016) ............................................................................19

*Lenz v. Yellow Transp. Co.*,
    431 F.3d 348 (8th Cir. 2005)........................................................................................25

*Levin v. Caviar, Inc.*,
    146 F. Supp. 3d 1146 (N.D. Cal. 2015) ........................................................................22

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)....................................................................................................10

*Lydo Enters., Inc. v. City of Las Vegas*,
    745 F.2d 1211 (9th Cir. 1984)........................................................................................7

*M.R. v. Dreyfus*,
    697 F.3d 706 (9th Cir. 2012)........................................................................................17

*Magana v. DoorDash*,
    Inc., 343 F. Supp. 3d 891 (N.D. Cal. 2018) .............................................................21, 22

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
 571 F.3d 873 (9th Cir. 2009) .................................................................................6

*Martin v. Walt Disney Internet Grp.*,
 2009 WL 10699004 (S.D. Cal. Dec. 14, 2009), *aff'd*, 373 F. App'x 794 (9th Cir.
 2010) ........................................................................................................................7

*McGill v. Citibank, N.A.*,
 2 Cal. 5th 945 (2017) .....................................................................................20, 21

*Meyer v. T-Mobile USA Inc.*,
 836 F. Supp. 2d 994 (N.D. Cal. 2011) ..................................................................20

*Micheletti v. Uber Techs., Inc.*,
 213 F. Supp. 3d 839 (W.D. Tex. 2016) .................................................................19

*Missud v. California*,
 2012 WL 5350263 (N.D. Cal. Oct. 29, 2012) .......................................................18

*Mohamed v. Uber Techs., Inc.*,
 848 F.3d 1201 (9th Cir. 2016) ..........................................................................3, 19

*Morales v. Trans World Airlines, Inc.*,
 504 U.S. 374 (1992) ................................................................................................7

*Mumin v. Uber Techs., Inc.*,
 239 F. Supp. 3d 507 (E.D.N.Y. 2017) ..................................................................19

*Munaf v. Green*,
 553 U.S. 674 (2008) ............................................................................................6, 9

*Nat'l Ctr. for Immigrants Rights, Inc. v. I.N.S.*,
 743 F.2d 1365 (9th Cir. 1984) ..............................................................................18

*Noe v. Superior Ct.*,
 237 Cal. App. 4th 316 (2015) ................................................................................10

*O'Connor v. Uber Techs., Inc.*,
 904 F.3d 1087 (9th Cir. 2018) ....................................................................3, 19, 20

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
 762 F.2d 1374 (9th Cir. 1985) ................................................................................8

*Okereke v. Uber Techs., Inc.*,
 2017 WL 6336080 (D. Mass. June 13, 2017) .......................................................19

*Olivares v. Uber Techs., Inc.*,
 2017 WL 3008278 (N.D. Ill. July 14, 2017) .........................................................19

Gibson, Dunn &
Crutcher LLP

*Omaha & Council Bluffs St. Ry. Co. v. Interstate Commerce Comm'n*,
      230 U.S. 324 (1913) ...................................................................................................24

*Peng v. Uber Techs., Inc.*,
      237 F. Supp. 3d 36 (E.D.N.Y. 2017) ........................................................................19

*Penn. Greyhound Lines v. Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps.*
      *of Am., Div. 1063*,
      193 F.2d 327 (3d Cir. 1952) ......................................................................................24

*People v. Sangiacomo*,
      129 Cal. App. 3d 364 (Cal. Ct. App. 1982) ........................................................18, 19

*Perficient, Inc. v. Priore*,
      2016 WL 1716720 (D. Mass. Apr. 26, 2016) ..............................................................8

*Razak v. Uber Techs., Inc.*,
      2018 WL 1744467 (E.D. Pa. Apr. 11, 2018) .........................................................13, 15

*Richemond v. Uber Techs., Inc.*,
      263 F. Supp. 3d 1312 (S.D. Fla. 2017) .......................................................................19

*Rimel v. Uber Techs., Inc.*,
      246 F. Supp. 3d 1317 (M.D. Fla. 2017) .....................................................................19

*S. G. Borello & Sons, Inc. v. Department of Industrial Relations*,
      769 P.2d 399 (1989) ..................................................................................................15

*Scaccia v. Uber Techs., Inc.*,
      2019 WL 2476811 (S.D. Ohio June 13, 2019), *report and recommendation*
      *adopted*, 2019 WL 4674333 (S.D. Ohio Sept. 25, 2019) ............................................23

*Schwarzschild v. Tse*,
      69 F.3d 293 (9th Cir. 1995) .......................................................................................19

*Sebago v. Boston Cab Dispatch, Inc.*,
      28 N.E.3d 1139 (Mass. 2015) ...............................................................................12, 13

*Sena v. Uber Techs., Inc.*,
      2016 WL 1376445 (D. Ariz. Apr. 7, 2016) .................................................................20

*Sharpe v. Cureton*,
      319 F.3d 259 (6th Cir. 2003) .....................................................................................17

*Sierra Forest Legacy v. Rey*,
      577 F.3d 1015 (9th Cir. 2009) .....................................................................................6

*Singh v. Uber Techs. Inc.*,
      939 F.3d 2010 (3d Cir. 2019) ...............................................................................22, 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn & Crutcher LLP

vii

*Smith v. Bayer Corp.*,
    564 U.S. 299 (2011) ....................................................................................................18

*Stanley v. Univ. of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994) ........................................................................................1

*Suarez v. Uber Techs., Inc.*,
    2016 WL 2348706 (M.D. Fla. May 4, 2016), *aff'd*, 688 F. App'x 777 (11th Cir.
    2017) ............................................................................................................................19

*Tan v. GrubHub, Inc.*,
    171 F. Supp. 3d 998 (N.D. Cal. 2016) ........................................................................10

*Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am. (U.E.) Local 437*,
    2017 F.2d 450 (3d Cir. 1953) ......................................................................................24

*Theede v. United States*,
    2011 WL 2531238 (E.D. Cal. June 23, 2011) .............................................................11

*In re Uber FCRA Litig.*,
    No. 14-cv-05200-EMC (N.D. Cal. Jun. 29, 2017) ......................................................15

*Varon v. Uber Techs., Inc.*,
    2016 WL 1752835 (D. Md. May 3, 2016) ...................................................................20

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008) ..........................................................................................................6

*Yaakov v. ACT, Inc.*,
    987 F. Supp. 2d 124 (D. Mass. 2013) .........................................................................18

*Zawada v. Uber Techs., Inc.*,
    2016 WL 7439198 (E.D. Mich. Dec. 27, 2016), *aff'd*, 727 F. App'x 839 (6th Cir.
    2018) ............................................................................................................................19

*Zepeda v. I.N.S.*,
    753 F.2d 719 (9th Cir. 1985) ...................................................................................2, 17

*Zhenhua Logistics (Hong Kong) Co. v. Metamining, Inc.*,
    2013 WL 3360670 (N.D. Cal. July 3, 2013) .................................................................7

**Statutes**

9 U.S.C. § 1 ...........................................................................................................................22, 24

Cal. Labor Code § 2750.3(i)(3) ..................................................................................................11

Cal. Labor Code § 2750.3(j) (2020) ...........................................................................................16

Cal. Labor Code § 2802 ...........................................................................................................4, 5

Cal. Labor Code § 17200 *et seq.* ...........................................................................................4

Motor Carrier Act of 1935, Pub. L. No. 74-255, § 203(b), 49 Stat. 543, 545 (1935)..........................23

**Other Authorities**

Assemb. B. 5 § 2, 2019-2020 Reg. Sess. (Cal. 2019) (to be codified at Cal. Labor
    Code § 2750.3(a)(1)).....................................................................................................11

U.S. Dep't of Labor, Opinion Letter FLSA2019-6, WL 1977301 (April 29, 2019)...........................13

# I.    INTRODUCTION

Three times in the past six years, Thomas Colopy has filed putative class actions in California state and federal courts, alleging that Uber has misclassified, as independent contractors rather than as employees, all drivers who use the Uber App to connect with riders.[1]  *See* Evangelis Decl. ¶¶ 2–4.  Not once did he allege any irreparable harm or seek a preliminary injunction.  And Colopy has continued to use the Uber App.  Just last month, after years of "contentious litigation," this Court approved a class settlement in which Colopy *released all of his misclassification-based claims* through the end of the settlement period while leaving unresolved the underlying dispute whether drivers should be classified as employees.  *See* Order Granting Pls.' Mot. for Final Approval ("Final Approval") at 1, *O'Connor*, No. 3:13-cv-03826-EMC, Dkt. 964.  The settlement provides for both monetary and programmatic relief for the class as well as changes to Uber's business.  Thousands of drivers participated in the *O'Connor* settlement; only two opted out and three objected—a "class reaction" that this Court described as "overwhelmingly favorable." *Id.* at 5–6, 11.  Further, both the Court and Colopy's counsel recognized "that the risk of litigation [to Plaintiffs] was significant." *Id.* at 12.  Yet now, just months after acquiescing in the *O'Connor* settlement, Colopy filed a new misclassification lawsuit, with allegations mirroring those in *O'Connor*.  In this proceeding, however, Colopy inexplicably asks this Court to issue a preliminary injunction ordering Uber to reclassify him and all other drivers who use the Uber App in the State of California as employees.  This "mandatory injunction. . . goes well beyond simply maintaining the status quo" and "is particularly disfavored."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994)  ("When a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party." (citation and quotation omitted)).  Colopy insists that, despite his litigation history to the contrary, he is at risk of "irreparable harm" due to his alleged misclassification; that there is no adequate remedy at law except to enjoin Uber; and that his likelihood of success on the merits of his claim is "indisputable."  Mot. at 5–6.

---

[1]  *See* Compl. ¶ 49, Dkt. 1; Class Action Compl. and Jury Demand at ¶ 40, *O'Connor v. Uber Techns., Inc.*, No. 3:13-cv-03826-EMC (N.D. Cal. Aug. 13, 2016), Dkt. 1; Compl. ¶ 29, *Colopy v. Uber Techns., Inc.*, No. CGC-16-54996 (Cal. Super. Ct., San Francisco Cty. Jan. 4, 2016), *attached to* Evangelis Decl. as Ex. 1.

But the fact that Colopy has *already released* misclassification-based claims in a settlement that did not reclassify drivers as employees makes clear that any harm he faces in the absence of an injunction is *not* irreparable as it was already "remedied" through monetary payments to the settlement class members. *See, e.g.*, *Fogerty v. Poor Boy Prods., Inc.*, 1997 WL 579175, at *3 (9th Cir. Sept. 12, 1997) (reversing grant of a preliminary injunction and noting plaintiff's "numerous statements during the period leading up to this action that he would accept a monetary settlement . . . seriously undermine[d] his claim of irreparable injury").

Moreover, Colopy cannot even plead basic elements of his claims, let alone demonstrate that the law and facts *clearly favor* his position such that he has a likelihood of success on the merits. *See* Mot. to Dismiss at 5–18. Colopy has alleged no harm that he personally experienced. *Id.* And no court has *ever* found that drivers who use the Uber App are Uber's employees under any standard, including the "ABC test," which has been either judicially or statutorily on the books in numerous jurisdictions for over a decade. In settling *O'Connor*, Colopy and the other class members expressly acknowledged the risks they faced to prevail under the new ABC test in California—the risk was so great that Colopy's counsel assigned no value to the claims (minimum wage and overtime) covered by the ABC test under *Dynamex Operations W. v. Superior Court*, 416 P.3d 1 (2018), *reh'g denied* (June 20, 2018). Colopy therefore cannot meet the high bar to show that the meager facts he presents so clearly favor his position that this Court should issue a mandatory preliminary injunction requiring Uber to treat drivers as Uber employees.

Nor are the equities in Colopy's favor—while Colopy's purported injury can be remedied with damages, Uber by contrast would be forced to change its entire business model. Finally, Colopy's request does not serve the public interest, but rather only his own.

Colopy's request for relief on behalf of an as-yet uncertified class is also improper. Because a class has not yet been certified, those absent persons are not yet before this Court and Colopy cannot seek an injunction on behalf of individuals who are not parties to this proceeding. *See Zepeda v. I.N.S.*, 753 F.2d 719, 728 (9th Cir. 1985) ("Relief cannot be granted to a class before an order has been entered determining that class treatment is proper." (citation omitted)). Also, granting relief to such absent parties would encourage one-way intervention, creating a perverse incentive for potential class

members to sit out of class litigation that may have an unfavorable result.  *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974).  Moreover, the vast majority of the absent persons that Colopy seeks to represent have entered into binding agreements to individually arbitrate their disputes with Uber; therefore, for this reason and others, Colopy's alleged class cannot be certified.  See Mot. to Dismiss at 20–24; *see also O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094–95 (9th Cir. 2018); *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir.  2016).

Colopy asks this Court to ignore six years' worth of litigation and precedent and dramatically change the status quo by requiring Uber to reclassify drivers as employees.  This is precisely the opposite of what the preliminary injunction remedy was intended to do.  This Court should deny Colopy's motion.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

Uber developed a smartphone application (the "Uber App") that connects individuals in need of transportation ("riders") with individuals who use the Uber App as drivers.  Sinha Decl. ¶ 4.  An individual who wishes to use the Uber App to generate "leads" for his business may do so by executing a Technology Services Agreement with Uber.  *Id.* ¶ 16.   The Technology Services Agreement is periodically revised and reissued to drivers and includes an Arbitration Agreement.  *Id.*

### A.     The Uber App Connects Riders And Drivers.

Uber is a technology company, and therefore operates no vehicles and provides no tools or equipment.  *Id.* ¶ 4.  Drivers and riders use the Uber App to create a business connection based on the rider's transportation needs, and they pay Uber a fee for using the App.  *Id.* ¶¶ 8–9, 13.  On the Uber App, riders can submit a ride request through products in the App tailored to the size and type of vehicle requested.  *Id.* ¶ 8.  Once a rider makes a request, the Uber App algorithm uses GPS tracking to identify nearby available online drivers using the App.  *Id.* ¶ 9.  Drivers are notified of ride requests based on their location, as identified through the App's location algorithm.  *Id.*  If the driver accepts a ride request, the driver travels to the rider's location, the rider confirms the desired end location for the trip, and together they decide the best route to arrive at the destination.  *Id.*  The driver has complete discretion to engage in independent business activities.  *Id.* ¶ 12.  Drivers may accept or reject ride requests as they see fit—Uber does not require a driver to accept a particular trip.  *Id.* ¶ 10; Sinha Decl.

Ex. 1 §§ 2.3, 2.4.  Even after drivers accept a ride request, they can cancel.  Sinha Decl. ¶ 10.  Uber does not ensure that riders receive rides, and at times there may be no available drivers willing to accept the ride request.  *Id.*

Drivers may elect to receive fares through a third-party vendor each week, or up to five times on a daily basis.  *Id.* ¶ 11; Sinha Decl. Ex. 1 § 4.1.  Riders pay Uber a booking fee for use of the Uber App, and drivers pay Uber a licensing or service fee.  Sinha Decl. ¶ 13; Sinha Decl. Ex. 1 § 5.1.  The licensing fee is a percentage of the fare for each completed trip.  Sinha Decl. ¶ 13; Sinha Decl. Ex. 1 § 4.4.

**B.    Plaintiff Thomas Colopy And His Claims.**

Plaintiff Thomas Colopy has used the Uber App as a driver since March 24, 2013.  Sinha Decl. ¶ 15.  Before using the Uber App, Colopy entered into the Rasier Technology Services Agreement (an agreement with Uber and its subsidiaries in which he acknowledged that Uber "provides lead generation to independent providers of rideshare or peer-to-peer (collectively, 'P2P') passenger transportation services using the Uber services").  Sinha Decl. Ex. 1.  Colopy agreed that the Agreement with Uber was "for the purpose of accessing and using the Uber Services."  *Id.*  He acknowledged that the Agreement was "not an employment agreement" and did not "create an employment relationship."  *Id.* § 13.1.  Rather, his provisioning of delivery services to riders "create[d] a direct business relationship" between him and the rider.  *Id.* § 2.3.  The Agreement also states, "[f]or the sake of clarity," that Colopy "retain[ed] the complete right to[:] (i) use other software application services in addition to the Uber Services; and (ii) engage in any other occupation or business."  *Id.* § 2.4.  Colopy agreed to the updated Technology Services Agreement and validly exercised his right to opt out of the arbitration provision in that agreement.  Sinha Decl. ¶¶ 16–17.

On August 16, 2013, Colopy filed a class action complaint, claiming, *inter alia*, that Uber had misclassified drivers as independent contractors, had failed to reimburse them for necessary expenses (Cal. Labor Code § 2802), and had engaged in unfair business acts or practices (Cal. Labor Code § 17200 *et seq.*).  *See* Class Action Compl. and Jury Demand ¶¶ 40- 41, *O'Connor*, No. 3:13-cv-03826-EMC, Dkt. 1.  Subsequently, on January 4, 2016, Colopy filed another complaint, again claiming, *inter alia*, that Uber had misclassified drivers as independent contractors and had therefore violated

California law and, notably, not seeking any preliminary injunctive relief or identifying any alleged irreparable harm.  *See*  Compl. ¶ 29, *Colopy*, No. CGC-16-54996.  Three years later, Colopy agreed to participate in a class action settlement covering "all Drivers in California . . . who have used the Uber App at any time since August 16, 2009, up to and including February 28, 2019, and who have validly opted out of arbitration."  *See* Class Action Settlement Agreement and Release ("Settlement") ¶ 96, *O'Connor*, No. 3:13-cv-03826-EMC (March 20, 2019), Dkt. 926; Final Approval at 1, *O'Connor*, No. 3:13-cv-03826-EMC, Dkt. 964.  In doing so, he acknowledged that the settlement was not an admission of wrongdoing or a determination that drivers using the Uber App should be classified as employees. Settlement ¶ 33, *O'Connor*, No. 3:13-cv-3826-EMC, Dkt. 926.  In exchange for the release of "all claims related to the alleged misclassification of drivers as independent contractors," Colopy, along with other class members, received the option to claim monetary consideration.  The agreement also included programmatic relief in the form of changes to certain aspects of Uber's business practices. Final Approval at 2- 3, *O'Connor*, No. 3:13-cv-03826-EMC, Dkt. 964.   Importantly, the settlement did not reclassify drivers as employees.  *See* Pls.' Mot. for Prelim. Approval of Class Settlement at 4, *O'Connor*, No. 3:13-cv-03826-EMC, Dkt. 915) (urging that the settlement was "eminently fair, adequate, and reasonable" even though it did "not resolve the misclassification question").

Colopy has continued to drive intermittently using the Uber App following the settlement.  He has rejected or canceled over 33% of the ride requests he has received. Sinha  Decl. ¶ 19. Colopy has often gone several weeks at a time without using the Uber App at all.  In fact, he connected with a rider on the App only one time this past summer, on July 5, before beginning to provide rides using the App again around mid-September.  *Id.*  He initiated this putative class action on October 8, 2019, within weeks of this Court's final approval of the *O'Connor* class action settlement.

Colopy alleges (as he did twice before in 2013 and 2016) that Uber willfully misclassified drivers as independent contractors, and asserts that he will suffer irreparable harm unless this Court "enjoin[s] Uber from misclassifying" drivers and "order[s]" Uber to classify drivers as employees. Mot. at 3.  He alleges that Uber violated California's Labor Code by failing to reimburse drivers for business expenses (Labor Code § 2802), pay overtime premiums and minimum wage (*id.* §§ 510, 554, 1182.12, 1194.2, 1197.1, 1198, 1199), and provide accurate itemized pay statements (*id.* §§ 226(a),

226.3), as well as by "willful[ly] misclassify[ing]" drivers (*id.* § 226.8).  Compl. ¶¶ 47−56.  He also alleges that Uber engaged in unfair business practices by violating the Labor Code.  *Id.* ¶ 57.

### III.     ARGUMENT

Colopy has failed to satisfy the "stringent" requirements for the "extraordinary" remedy of a preliminary injunction.  *Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 375 (9th Cir. 2016) (citation omitted).  To obtain such relief, a plaintiff must establish that (1) he is likely to succeed on the merits of his claim; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) a preliminary injunction is in the public interest. *Disney Enters., Inc. v. VidAngel, Inc*., 869 F.3d 848, 856 (9th Cir. 2017) (citing *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)).

"A preliminary injunction is an extraordinary and drastic remedy,"  *Munaf v. Green*, 553 U.S. 674, 689 (2008) (citation and quotation omitted), the sole purpose of which "is to preserve the status quo" until a final judgment on the merits can be rendered.  *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009) (citation omitted).  Because Colopy asks this Court to *require* Uber to act— namely, to *order* Uber to classify drivers who use the Uber App as employees—Colopy is seeking a "mandatory injunction," which "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored."  *Garcia*, 786 F.3d  at 740 (citation omitted).  As such, his burden is "doubly demanding."  *Id.*  Such relief is "not granted unless extreme or very serious damage will result and [is] not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation omitted).  To warrant a mandatory injunction, Colopy also "must establish that the law and facts *clearly favor* h[is] position, simply that []he is likely to succeed."  *Garcia*, 786 F.3d  at 740.

### A.     Colopy's Claims Do Not Merit Preliminary Injunctive Relief.

#### 1.     Colopy Cannot Demonstrate Irreparable Harm.

Colopy's request for a preliminary injunction is doomed at the outset because he cannot establish irreparable harm.  He has already agreed with regard to his prior similar claims that monetary relief is an adequate remedy, and "[i]t is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable

injury if denied equitable relief." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (citation and quotation omitted).  Aside from the likelihood of success on the merits, the likelihood of irreparable harm is the other "most important" factor in the preliminary injunction "calculus." *Bruns v. Mayhew*, 750 F.3d 61, 65 (1st Cir. 2014); *Zhenhua Logistics (Hong Kong) Co. v. Metamining, Inc.*, 2013 WL 3360670, at *2 (N.D. Cal. July 3, 2013) (Chen, J.) ("[T]he element of irreparable harm is particularly important").  Here, except for conclusory allegations of irreparable harm to drivers generally, Colopy fails to allege any facts regarding concrete harm to himself let alone irreparable harm.[2]  Colopy argues that drivers generally are in a "fragile socioeconomic position . . . further heighten[ing] the irreparable nature of the harm."  Mot. at 9.  But all of the sources of his alleged injury are economic, *see, e.g.*, *id.* at 8 ("Uber drivers will continue to hemorrhage money daily, paying for their necessary business expenses, and engage in an endless chase to make enough to cover these costs"); *id.* at 5 (Uber will "put the onus on the State of California to provide a financial safety net for its drivers"), and economic injury alone does not justify a preliminary injunction.  This is because "[p]urely monetary injuries are not normally considered irreparable" because they can be remedied by "adequate compensatory or other corrective relief . . . at a later date."  *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (citation and quotation omitted).  The fact that Colopy previously released misclassification claims against Uber in a monetary settlement that did not entail re-classification demonstrates that he has an adequate remedy and that he faces no irreparable injury. *See, e.g.*, *Martin v. Walt Disney Internet Grp.*, 2009 WL 10699004, at *6 (S.D. Cal. Dec. 14, 2009) (finding no proof of irreparable harm because plaintiff "was clearly willing to settle the lawsuit for money" based on a cease-and-desist letter sent to defendants), *aff'd*, 373 F. App'x 794 (9th Cir. 2010).

By contrast, if this Court were to dictate how Uber should classify the drivers who use the Uber

---

[2]  Colopy argues that "Uber's misclassification scheme also fuels a race to the bottom, . . . diminish[ing] labor standards and wages of its drivers."  Mot. at 8, 10.  He states that the "[l]oss of professional opportunities" was held to constitute irreparable harm for Deferred Action for Childhood Arrivals ("DACA") recipients in *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  Mot. at 9 n.10.  There is simply no parallel between the DACA lawsuit and allegations raised by Colopy.  The DACA recipients faced the immediate inability to obtain driver's licenses, significantly limiting opportunities to earn any income.  *Arizona Dream Act Coalition*, 757 F.3d at 1068.  And DACA involved a request to suspend government action that changed the status quo, which is not the case here.

App, the Court would be redefining Uber's entire business model.  In similar cases, courts have held that a party facing such massive and fundamental change is the one that faces irreparable harm. *Perficient, Inc. v. Priore*, 2016 WL 1716720, at *7 (D. Mass. Apr. 26, 2016) (company makes adequate showing of irreparable harm due to "potentially destructive effect on Perficient's underlying business model, even assuming damages are ultimately awarded").  In *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 992 (9th Cir. 2019), the defendant LinkedIn used technical measures to bar the plaintiff, a data collection company, from scraping publicly available data off of LinkedIn member websites.  As hiQ's "entire business depend[ed] on . . . access [to] public LinkedIn member profiles," the Ninth Circuit found a sufficient "likelihood of irreparable harm absent a preliminary injunction." *Id.* at 993–94.  Despite LinkedIn's claim that hiQ could collect its own data through employee surveys, the court noted that "hiQ [wa]s a data analytics company, not a data collection company," and "that hiQ's current business could not survive without access to LinkedIn public profile data." *Id.* at 993.  In much the same way, the relationship between Uber and the drivers who use its technology is fundamental to its business model.  As with the other new "gig economy" companies, requiring Uber to classify drivers as its employees would fundamentally change the nature of its business.  Rather than preventing irreparable harm to either party, an injunction either forbidding Uber from continuing to maintain its current business model or affirmatively forcing it to adopt a new one would *cause* irreparable harm.

As in *hiQ*, Colopy's position also leaves much to be desired in terms of immediacy.  In *hiQ*, the district court noted that LinkedIn provided no explanation as to "why suddenly it has now chosen to revoke its consent (or at least tolerance)" of the data scraping.  *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1107 (N.D. Cal. 2017), *aff'd and remanded*, 938 F.3d 985; *see also Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").  Although Colopy urges his entitlement to a preliminary injunction is "heightened with the passage of AB 5," Mot. at 7, that law does not go into effect, if ever, until January 1, 2020.  In any event, AB 5 affects only the standard that governs alleged misclassification and has no bearing on whether Colopy personally has suffered any irreparable harm.  Nor does Colopy point to any change in circumstances that would suggest a different outcome from his prior suits, much less provide the requisite urgency to support a preliminary

injunction now.  Indeed, the Supreme Court of California already adopted the ABC test in *Dynamex* almost two years ago, well before Colopy ever settled his claims against Uber earlier this year.  *See* Final Approval at 2, *O'Connor*, No. 3:13-cv-03826-EMC, Dkt. 964.

Colopy continued to use the Uber App even after the *O'Connor* settlement, knowing he would not be classified as an employee.  Colopy cannot now credibly claim any urgency sufficient to justify the "extraordinary and drastic" remedy of a preliminary injunction—let alone a mandatory injunction. *Munaf*, 553 U.S. at 689.

> ## 2. Colopy Has Not Demonstrated That The Law And Facts *Clearly Favor* His Position.

Because Colopy cannot even satisfy basic pleading standards, he certainly cannot meet the "doubly demanding" burden of establishing that the facts and law "clearly favor" his position such that he is entitled to a mandatory injunction.  *Garcia*, 786 F.3d at 740.  And even if Colopy could make a strong showing on the other preliminary injunction factors (he cannot), his claims do not even raise "serious questions" on the merits.  *See All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).  This is particularly so given that no court in the country has ever found that drivers who use the Uber App have been misclassified under any standard, despite dozens of lawsuits asserting that claim.

> ### a) Colopy Cannot Even State A Claim For Relief Let Alone Meet The Demanding Standard Required For Entitlement To A Mandatory Preliminary Injunction.

Here, Colopy brings claims for "expense reimbursement" (Count II), "willful misclassification" (Count III), minimum wage (Count IV), overtime (Count V), failure to provide accurate itemized pay statements (Count VI), and unfair business practices (Count VII), but he fails to plead sufficient facts supporting those claims, and one of his claims (willful misclassification) has no private cause of action. *See id.* at 5- 18.

*Expense Reimbursement (Count II), Minimum Wage (Count IV), and Overtime Claims (Count V).*  Colopy fails to allege even the most basic facts required for his claims.  *See* Mot. to Dismiss at 5- 8 (detailing deficiencies in expense reimbursement claim); *id.* at 10- 14 (failure to state a claim for minimum wage violations); *id.* at 14- 16 (failure to state a claim for overtime premiums).  For example,

he never alleges that he specifically incurred expenses for which he was not reimbursed or that he was not paid minimum wage. *See id.* at 5, 12. Colopy's failure to allege any injury-in-fact to himself deprives him of Article III standing and dooms his claims out of the gate. *See id.* at 5 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). And a plaintiff asserting a claim for overtime payments must allege that he worked more than forty hours in a given workweek without being compensated for the overtime hours. *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 644-45 (9th Cir. 2014).[3] But Colopy's pleading provides no information on "the length of [his] average workweek," "the average rate at which [he] was paid, [or] the amount of overtime wages [he] believes [he] is owed," falling far short of the requirements to state a claim. *See id.* at 645 (rejecting as insufficient pleading alleging only that "the named plaintiff . . . worked more than 40 hours per week for the defendants, and the defendants willfully failed to make said overtime and/or minimum wage payments"); *see also* Mot. to Dismiss at 14–16. This is unsurprising: Colopy's counsel assigned zero value to the minimum wage and minimum value to the overtime claim in the *O'Connor* settlement precisely because of "the difficulty in proving what time would be compensable (on a classwide basis)" after "several attempts at amendment." *See* Liss-Riodan Decl. at 19–20, *O'Connor*, No. 3:13-cv-038260-EMC, Dkt. 916. In fact, Colopy's counsel acknowledged that this Court had dismissed Plaintiffs' overtime and minimum wage claims in the *Yucesoy* case based upon the "significant hurdle[s]" in proving what time would be compensable. *Id.*

*Willful Misclassification (Count III) and Itemized Pay Statements (Count VI).* Colopy's willful misclassification claim and claims based on unidentified itemized wage statements and unfair business practices fare no better. There is no private right of action for willful misclassification. *See* Mot. to Dismiss at 8-10 (citing *Noe v. Superior Ct.*, 237 Cal. App. 4th 316, 338 (2015) and detailing deficiencies in willful misclassification claim). And Colopy fails to identify a single incorrect wage statement, let alone any harm that he suffered as a result of it. *See id.* at 16.

Colopy cannot show that the law and facts clearly favor his position such that he is likely to succeed on the merits, or even that he raises a "serious question" on the merits, when his Complaint is

---

[3] *Landers* involved FLSA claims, but its reasoning applies to California state law claims as well. *See, e.g.*, *Tan v. GrubHub, Inc.*, 171 F. Supp. 3d 998, 1006 (N.D. Cal. 2016).

so fundamentally—and irreparably—deficient.  *See Doe v. Fed. Dist. Court*, 467 F. App'x 725, 728 (9th Cir. 2012) ("Because [plaintiff's] complaint was insufficient to survive a motion to dismiss for failure to state a claim, she could not show a strong likelihood of success on the merits."); *Theede v. United States*, 2011 WL 2531238, at *6 (E.D. Cal. June 23, 2011) (complaint "does not raise serious questions" if it "fail[s] to state a claim upon which relief can be granted").

> **b)**   **Colopy Is Unlikely To Succeed In Demonstrating That Uber Must Classify Drivers As Employees Under Any Test.**

In light of Colopy's failure to state a claim, let alone demonstrate a clear likelihood of success on those claims (*see supra*), Uber's alleged misclassification of him is irrelevant.  Misclassification is merely a predicate to his substantive claims, and there is no freestanding claim for misclassification under California law.  But even if it were necessary to address those allegations, Colopy cannot demonstrate a likelihood of success under any test.  Colopy argues only that he is likely to succeed on his contention that Uber has misclassified him because of *Dynamex* and the passage of AB 5, even though *Dynamex* was decided almost two years ago and AB 5 does not go into effect until January 1, 2020.  *See* Mot. at 4,7.  But *Dynamex's* ABC test upon which Colopy relies applies only to his claims for minimum wage and overtime[4]—claims for which, as explained above, Colopy is lacking even the most basic facts.  The claims are so weak that Colopy's counsel assigned them no value in the *O'Connor* settlement.  In any event, Colopy fails to establish a likelihood of success under *Dynamex*.

There, the California Supreme Court adopted the "ABC test" used in Massachusetts and some other states, which "distinguish[es] between employees and independent contractors" with regard to California's wage orders:

---

[4]   *See Dynamex*, 416 P.3d at 7 & n.5 ("express[ing] no view" on whether *Borello* applies to non-wage order claims); *Garcia v. Border Transp. Grp, LLC*, 239 Cal. Rptr. 3d 360, 370–71 (2018) (finding non-wage order claims should be assessed under *Borello*, not *Dynamex*).  AB 5 will expand the scope of the ABC test to all claims under the Labor Code, rather than simply wage orders, but that provision will not come into effect until January 1, 2020 (and does not apply retroactively).  Assemb. B. 5 § 2, 2019-2020 Reg. Sess. (Cal. 2019) (to be codified at Cal. Labor Code § 2750.3(a)(1)), *available at* https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB5 (adopting ABC test "[f]or purposes of the provisions of this code"); *id.* (to be codified at Cal. Labor Code § 2750.3(i)(3)) (provisions outside of the wage orders "shall apply to work performed on or after January 1, 2020").

(1) placing the burden on the hiring entity to establish that the worker is an independent contractor who was not intended to be included within the wage order's coverage; and (2) requiring the hiring entity, in order to meet this burden, to establish *each* of the three factors embodied in the ABC test—namely (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed.

*Dynamex*, 416 P.3d at 42.

Colopy focuses only on prong B, asserting that Uber cannot show that he "performs work that is outside the usual course of the hiring entity's business." Mot. at 6. But Colopy cannot demonstrate a likelihood of success on this element. When analyzing whether a driver's services are "outside the usual course of the hiring entity's business," courts consider such factors as whether "a worker provides services which are comparable to work performed by the hiring entity's employees," *Henderson v. Equilon Enters.,* 2019 WL 4942458, at *9 (Cal. Ct. App. Oct. 8, 2019), and whether the work performed is "merely incidental to [the company's] business" or "is an integral part of that business," *Gonzales v. San Gabriel Transit, Inc.*, 2019 WL 4942213, at *10 (Cal. Ct. App. Oct. 8, 2019) (citation and quotation omitted); *see also Sebago v. Boston Cab Dispatch, Inc.*, 28 N.E.3d 1139, 1149, 1152 (Mass. 2015) (applying Massachusetts' ABC test and focusing on "a purported employer's own definition of its business" and "whether the service the individual is performing is necessary to the business of the employing unit or merely incidental" (citation omitted)).

The majority of Uber's approximately 25,000 employees work in "engineering, product development, marketing, and operations." Sinha Decl. ¶ 5. Their work involves improving the properties of the App and expanding its uses through conducting mapping work, traffic flow analysis, negotiations with cities and local government, and testing the App's capabilities in new locations. *Id.* They also adapt the Uber App for use by other individuals seeking different services, or design different software programs to that end. *Id.* ¶ 6. Uber employees thus developed UberEATS, an App that connects individuals with participating restaurants and partners to deliver food. *Id.* Uber's technology platform extends to a number of other lines of business unrelated to ride-sharing, such as New Modalities, which connects users with e-bikes and e-scooters, and the Uber Freight business, which

connects motor carriers with shippers.  *Id.*  Not one Uber employee's job description includes using the App to pick up individuals in need of a ride.

Transporting riders is simply not "an integral part" of Uber's business.  Indeed, Uber has succeeded in demonstrating that it maintains a distinct business from the drivers who use the Uber App, because "[t]he core of Uber's business is the technology provided through its app."  *See* Order on Pet. to Confirm Arbitration Award at 30, *Uber Techs., Inc. v. Dorr*, No. BS172342 (Super. Ct. Cal. Mar. 9, 2018).  And courts have repeatedly rejected workers' attempts to have themselves classified as employees simply because gig companies' business models facilitate their work.  *See, e.g.*, *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1076, 1081 (N.D. Cal. 2015) (denying drivers summary judgment based on *Borello* factors ); *Razak v. Uber Techs., Inc.*, 2018 WL 1744467, at *1 (E.D. Pa. Apr. 11, 2018) (granting Uber's motion for summary judgment that drivers did not meet their burden to prove they were employees under the FLSA); *Lawson v. Grubhub, Inc.*, 302 F. Supp. 3d 1071, 1072 (N.D. Cal. 2018) (finding after a bench trial that Grubhub driver was an independent contractor under *Borello*); *see also* U.S. Dep't of Labor, Opinion Letter FLSA2019-6, WL 1977301, at *6 (April 29, 2019) (gig economy company "does not receive services from service providers, but empowers service providers to provide services to end-market consumers," so as a "matter of economic reality," the service providers "are working for the consumer, not [the gig economy company]").

Drivers are expected to pay Uber a service or licensing fee for use of the App; they are not paid by Uber for transporting riders.  Sinha Decl. ¶ 11.  Regardless, the payment method used by a putative employer (especially when the alleged employee is, in fact, paying its putative employer in the form of service or licensing fees) is not outcome determinative.  *See Sebago*, 28 N.E.3d at 1149, 1152 (applying Massachusetts' ABC test and finding that "[t]he revenue flowing to the radio association through the voucher program is directly dependent on the drivers' work of transporting passengers," but nevertheless finding radio association not in the business of transporting passengers for fares).

While Colopy does not even address the other two prongs of the ABC test, the "A" prong (Uber's "control" over drivers) and "C" prong (whether drivers are customarily engaged in a similar, but independent business), further refute Colopy's claim of employee status.  With regard to the "A" prong, drivers generally control the circumstances and means by which they offer riders transportation

services.  Sinha Decl. ¶ 12.  They use their own vehicles and tools, oversee their own appearance and manner of serving riders, and determine their own driving routes and other aspects of the rides they give customers.  *Id.* ¶¶ 4, 9–12.  Drivers are responsible for their own vehicle insurance, as well as maintenance of all legal requirements in the state.  *Id.* ¶ 12.  Other than to meet federal, state, and local laws and regulations and to ensure safety for users of the Uber App, Uber does not exert control over the manner and means of drivers' work.  *Id.*  The entire Uber "experience" enables drivers to be available to work at the push of a button, and to stop work just as easily.  Drivers are passive recipients of information about trip opportunities and can accept or decline trip requests as they please.  *Id.* ¶ 9.  As these facts demonstrate, Colopy is "free from control and direction in connection with the performance of the service."  *Dynamex*, 416 P.3d at 7.  And he presents no evidence at all to the contrary.  In fact, he does not argue that he succeeds under this prong at all and has therefore waived that argument.  *See Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1149 (9th Cir. 2016).

With regard to drivers' operation of independent businesses (prong C), the facts also make Colopy's non-employee status clear.  Under prong C, "the inquiry is whether the worker '*independently* has made the decision to go into business for himself or herself.'"  *Gonzales v. San Gabriel Transit, Inc.*, 2019 WL 4942213, at *11 (Cal. Ct. App. Oct. 8, 2019) (quoting *Dynamex*, 416 P.3d at 39).  In answering that question, the court considers whether the worker "takes the usual steps to establish and promote his or her independent business—for example, through . . . advertisements [and] routine offerings to provide the services of the independent business to the public or to a number of potential customers."  *Dynamex*, 416 P.3d at 39.  Individual drivers can self-advertise and subcontract with other drivers to form a company.  Sinha Decl. ¶ 14.  Owners of livery companies contract with Uber to use the App to deploy drivers for their businesses.  *Id.*  Drivers also are often simultaneously "multi-apping"—using other gig company apps such as Lyft, Grubhub, and others at the same time as using the Uber App.  *Id.* ¶ 12.  As a result, drivers can, and do, transition to other gig economy platforms with the swipe of a finger.  *Id.*  Again, Colopy does not even attempt to show that he is not "customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed."  *Dynamex*, 416 P.3d at 39.  In any event, again, Colopy makes no

1  attempt to argue that prong C of the ABC test supports his alleged employee status.  *See Brown*, 840

2  F.3d at 1149.

3        Because *Dynamex* applies *only* to wage order claims, *Garcia*, 239 Cal. Rptr. 3d at 370–71

4  (finding non-wage order claims should be assessed under *Borello*, not *Dynamex*), to demonstrate a

5  likelihood of success on his claim for expense reimbursements, Colopy would need to show that he is

6  an employee under the test in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 769

7  P.2d 399 (1989).  No court has found that drivers who use the Uber App are employees under *Borello*,

8  and several have reached the opposition conclusion.  *See, e.g.*, Order on Pet. to Confirm Arbitration

9  Award at 20, *Dorr*, No. BS172342 (finding similar driver did not provide services to Uber);  *Razak*,

10  2018 WL 1744467, at *1 (granting Uber's motion for summary judgment that drivers did not meet their

11  burden to prove they were employees under the FLSA); *Lawson*, 302 F. Supp. 3d at 1072 (finding after

12  bench trial that driver using Grubhub app was an independent contractor under *Borello*); *Cotter*, 60 F.

13  Supp. 3d at 1076 (denying drivers summary judgment based on *Borello* factors).  Indeed, this Court

14  has previously noted that whether drivers are employees under *Borello* is a "difficult factual question."

15  *In re Uber FCRA Litig.*, No. 14-cv-05200-EMC, at *10–11 (N.D. Cal. Jun. 29, 2017) (Chen, J.).

16        Under *Borello*, whether the principal "has the right to control the manner and means of

17  accomplishing the result desired" is the most important factor in identifying an employee.  769 P.2d at

18  404 (citation omitted).  This factor is easily met as discussed above (*see supra*):  the drivers control the

19  circumstances and means by which they offer riders transportation services; use their own vehicles and

20  tools; maintain their own insurance; provide for their own maintenance; oversee their own appearance

21  and manner of providing service; and determine their own routes, as well as other aspects of the ride

22  they provide.  Sinha Decl. ¶¶ 4, 9–12.  Uber does not exert control over the manner and means of

23  drivers' work, except as required to meet federal, state, and local laws and regulations to ensure safety.

24  *Id.*  Uber provides drivers with information about ride requests, and they can accept or decline trip

25  requests as they please.  *Id.* ¶ 9.  Colopy has not pleaded any other facts that demonstrate that Uber has

26  the right to control the manner or means by which drivers provide their services.  Drivers who use the

27  Uber App are therefore not employees under *Borello*, and Colopy has not demonstrated that the law or

28  facts clearly favor his position such that he is likely to succeed on the merits of his claims or even that

there is a "serious question" as to the merits warranting an injunction here.  *See Garcia*, 786 F.3d at 740.  And again, Colopy makes no argument on this point and has thus waived it entirely.  *See Brown*, 840 F.3d at 1149.[5]

### 3.   Colopy Cannot Demonstrate That The Balance Of Equities Favors An Injunction, Or That An Injunction Is In The Public Interest.

#### a)   The Balance Of Equities Tips In Uber's Favor.

As to the third factor, in order to prevail, Colopy must prove that the balance of hardships tips drastically in favor of Uber.  As discussed *supra*, if his request for a preliminary injunction is denied, Colopy will at most suffer monetary harm.  In contrast, if the preliminary injunction is granted, Uber will suffer serious and irreversible harm.  Granting the motion would require Uber to fundamentally alter its entire business model to convert virtually every driver who uses its technology in California into an employee—forcing Uber to expend significant time and resources to implement necessary changes.  *See, e.g.*, *hiQ Labs*, 938 F.3d at 993 ("[S]howing a threat of 'extinction' is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable."); *HR Staffing Consultants LLC v. Butts*, 627 Fed. App'x. 168, 173- 74 (3d Cir. 2015) ("[M]oney will not remediate the injury if [the plaintiff's] business model is destroyed.").  This "threat of unrecoverable economic loss . . . qualif[ies] as irreparable harm."  *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996).  Moreover, there are multiple gig economy companies using the same business model as Uber.  *See* Sinha Decl. ¶ 7.  If Uber's competitors are not enjoined at the same time, Uber will suffer a tremendous competitive disadvantage.  *See id.*

#### b)   An Injunction Is Not In The Public Interest.

Colopy posits that a preliminary injunction would serve the public interest, Mot. at 11, but the California Legislature has never authorized a single employee to sue and enjoin a company based solely on alleged misclassification of its employees.[6]  In fact, in AB 5, the Legislature had an opportunity to

---

[5]  Finally, with regard to AB 5, it is not yet the operative law.  Uber reserves the right to present arguments—if and when AB 5 takes effect and becomes relevant—that under AB 5, Colopy (and the putative class of drivers he seeks to represent) are not its employees.

[6]  *See* Assemb. B.  5 § 2 (to be codified at Cal. Labor Code § 2750.3(j) (2020)) ("[A]n action for injunctive relief to prevent the continued misclassification of employees as independent

do so, but instead limited the ability to seek such relief to the State Attorney General and certain city attorneys.  Because the Legislature restricted the authority to pursue a freestanding misclassification claim, Colopy cannot credibly maintain that his suit advances the public interest.[7]

### B.    This Court Should Reject Colopy's Effort To Litigate The Merits On Behalf Of A Class Before Class Certification.

Even assuming, *arguendo*, that Colopy's claims meet the high standard for a preliminary injunction (they do not), this Court cannot grant relief to the putative but as-yet-uncertified class, who are not parties before this Court.  Doing so would also impermissibly encourage one-way intervention, where potential class members can sit out class litigation that may have an unfavorable result.

### 1.    Colopy Can Only Represent Himself Before Class Certification.

Courts universally agree that "[r]elief cannot be granted to a class before an order has been entered determining that class treatment is proper." *Zepeda*, 753 F.2d at 728 (citation omitted).[8]  Thus, any injunction awarded by this Court could be awarded only as to Colopy, not to any of the drivers he ostensibly represents.  *See M.R. v. Dreyfus*, 697 F.3d 706, 738-39 (9th Cir. 2012) (en banc).  Other circuits agree.  *See, e.g.*, *Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003) (finding injunction overbroad when "the injunction grants class-wide relief to all Knoxville firefighters, despite the fact that the firefighters never sought nor received class certification"); *Butler v. Dowd*, 979 F.2d 661, 674 (8th Cir. 1992) (en banc); *Davis v. Romney*, 490 F.2d 1360, 1366 (3d Cir. 1974); *see also Jean-Baptiste*

---

contractors may be prosecuted against the putative employer in a court of competent jurisdiction by the Attorney General or by a city attorney of a city having a population in excess of 750,000, or by a city attorney in a city and county or, with the consent of the district attorney, by a city prosecutor in a city having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of a board, officer, person, corporation, or association.").

[7]  Colopy claims that "[w]ere this Court not to enjoin Uber's conduct, it would present a free pass to any employer accused of misclassifying its employees as independent contractors (or of any wage violations) and engaging in an end run around *Dynamex*."  Mot. at 11.  This warning makes little sense.  Regardless of whether an injunction issues, Uber is still subject to California law, including *Dynamex*.

[8]  The limited exception to this rule does not apply here.  "For example, class-wide relief may be necessary to ensure that the named plaintiffs receive complete relief or if there is a constitutional violation that has become sufficiently pervasive."  *Adtrader, Inc. v. Google LLC*, 2018 WL 1876950, at *6 (N.D. Cal. Apr. 19, 2018).  But Colopy is not entitled to request relief on behalf of the other drivers prior to class certification.

---

*v. District of Columbia*, 958 F. Supp. 2d 37, 50 (D.D.C. 2013) ("[I]njunctions should be narrowly tailored and should generally apply only to the plaintiff where a class has not been certified."); *Yaakov v. ACT, Inc.*, 987 F. Supp. 2d 124, 131 (D. Mass. 2013) ("[A]s a class was never certified in [the] case, Plaintiff may only seek the injunction on behalf of itself").

As a result, because his proposed class has not yet been certified, the Court should reject his attempt to seek relief on behalf of absent persons. *See also Nat'l Ctr. for Immigrants Rights, Inc. v. I.N.S.*, 743 F.2d 1365, 1371 (9th Cir. 1984) ("[I]n the absence of class certification, the preliminary injunction may properly cover only the named plaintiffs."); *Missud v. California*, 2012 WL 5350263, at *2 (N.D. Cal. Oct. 29, 2012) (Chen, J.) ("The Ninth Circuit has held that injunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification." (citations and quotations omitted)); *see also Smith v. Bayer Corp.*, 564 U.S. 299, 307 (2011) (rejecting the notion that "a nonnamed class member is a party to the class-action litigation *before the class is certified*" and could thus be bound by a court's ruling (citation omitted)).

## 2. Deciding Colopy's Preliminary Injunction Now Would Invite Impermissible One-Way Intervention.

Because this Court has not yet addressed class certification in this case, deciding whether Colopy has a strong likelihood of success on his misclassification claims would violate Uber's due process rights by allowing one-way intervention. *See Order Granting in Part Defs.' Mot. for Admin. Relief at 1–2, Yucesoy v. Uber Techs., Inc.*, No. 3:15-cv-00262-EMC (Apr. 13, 2015), Dkt. 46 (finding "pre-class certification" summary judgment motion "premature" in light of "one-way intervention rule"). "One-way intervention" results when potential class member can "elect whether to join in the action depending upon the outcome of the decision on the merits." *People v. Sangiacomo*, 129 Cal. App. 3d 364, 366 (Cal. Ct. App. 1982). It "le[aves] a defendant open to 'being pecked to death by ducks. One plaintiff could sue and lose; another could sue and lose; and another and another until one finally prevailed; then everyone else would ride on that single success." *Fireside Bank v. Superior Ct.*, 155 P.3d 268, 274 (Cal. 2007). To prevent this, courts have found that a defendant in a class action "*has a due process right* to secure a determination of the issues relating to the suitability of the action as a class matter as well as the composition of the class and the form of notice to the members, prior to

determination of the merits of the action." *Sangiacomo*, 129 Cal. App. 3d at 366 (emphasis added) (citation omitted); *see also Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995) ("[O]ne-way intervention" is "unfair to the defendant" because it "giv[es] collateral estoppel effect to the judgment of liability in a case where the estoppel was not mutual."). "Determination of the merits of an action *includes* issuance of a preliminary injunction." *Sangiacomo*, 129 Cal. App. 3d at 367 (emphasis added). The Court should deny Colopy's motion for a preliminary injunction because it impermissibly requires this Court to take a searching look at the merits while potential class members sit on the sidelines deciding whether to join, thereby inviting impermissible one-way intervention.

### C.   Colopy's Putative Class Largely Consists Of Drivers Bound To Individually Arbitrate Their Claims And Whose Claims Cannot be Resolved By This Court.

The vast majority of the putative class members Colopy purports to represent are bound to individually arbitrate their claims, and therefore cannot obtain any relief in this putative class action. *See* Mot. to Dismiss at 23. The Supreme Court repeatedly has held that arbitration agreements requiring individual arbitration must be enforced. *See Epiq Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344–46, 352 (2011). Dozens of courts across the country, including the Ninth Circuit, have enforced Uber's arbitration agreement under the FAA. *See, e.g., O'Connor*, 904 F.3d at 1094–95 (holding that drivers bound by arbitration agreements must arbitrate their claims on an individual basis and decertifying class); *Mohamed*, 848 F.3d at 1208 (enforcing Uber's arbitration agreement).[9] Plaintiff offers no reason to depart from this consensus.

---

[9]   *See also Okereke v. Uber Techs., Inc.,* 2017 WL 6336080, at *6 (D. Mass. June 13, 2017); *Zawada v. Uber Techs., Inc.,* 2016 WL 7439198, at *10 (E.D. Mich. Dec. 27, 2016), *aff'd,* 727 F. App'x 839 (6th Cir. 2018); *Suarez v. Uber Techs., Inc.,* 2016 WL 2348706, at *4 (M.D. Fla. May 4, 2016), *aff'd,* 688 F. App'x 777 (11th Cir. 2017); *Lathan v. Uber Techs., Inc.,* 266 F. Supp. 3d 1170, 1174 (E.D. Wisc. 2017); *Olivares v. Uber Techs., Inc.,* 2017 WL 3008278, at *3 (N.D. Ill. July 14, 2017); *Cavallo v. Uber Techs., Inc.,* 2017 WL 2362851, at *9–10 (D.N.J. May 31, 2017); *Rimel v. Uber Techs., Inc.,* 246 F. Supp. 3d 1317, 1325–26 (M.D. Fla. 2017); *Carey v. Uber Techs., Inc.,* 2017 WL 1133936, at *8 (N.D. Ohio Mar. 27, 2017); *Mumin v. Uber Techs., Inc.,* 239 F. Supp. 3d 507, 522–26 (E.D.N.Y. 2017); *Guan v. Uber Techs., Inc.,* 236 F. Supp. 3d 711, 727–33 (E.D.N.Y. 2017); *Peng v. Uber Techs., Inc.,* 237 F. Supp. 3d 36, 52–58 (E.D.N.Y. 2017)*; Lamour v. Uber Techs., Inc.,* 2017 WL 878712, at *13–14 (S.D. Fla. Mar. 1, 2017); *Richemond v. Uber Techs., Inc.,* 263 F. Supp. 3d 1312, 1317 (S.D. Fla. 2017); *Gunn v. Uber Techs., Inc.,* 2017 WL 386816, at *4 (S.D. Ind. Jan. 27, 2017); *Congdon v. Uber Techs., Inc.,* 226 F. Supp. 3d 983, 986–87 (N.D. Cal. 2016); *Micheletti v. Uber Techs., Inc.,* 213 F. Supp. 3d 839, 845–49 (W.D. Tex. 2016); *Lee v. Uber Techs., Inc.,* 208 F. Supp. 3d 886, 891–94 (N.D. Ill. 2016); *Bruster v. Uber Techs., Inc.,* 188 F. Supp. 3d

1.  **Colopy Is An Atypical And Inadequate Class Representative Because The Vast Majority Of The Class, Unlike Colopy, Is Required To Individually Arbitrate Their Claims.**

Because Colopy's putative class includes "drivers who entered into agreements to arbitrate their claims" and who "waive[d] their right to participate in a class action with regard to those claims," Colopy cannot proceed on its behalf.  Mot. to Dismiss at 20 (*quoting O'Connor*, 904 F.3d at 1094). Even if Colopy wished to challenge the arbitration agreement, he would lack standing to do so because he opted out.  *See* Order Granting Defs.' Mot. for an Order Denying Class Certification at 9, *Tan v. Grubhub Inc.*, No. 3:15-cv-05128-JSC (N.D. Cal. July 19, 2016), Dkt. 65 (holding that plaintiff "has no standing to challenge the applicability or enforceability of the arbitration and class action waiver provisions . . . in light of his decision to opt out" of those provisions); *Meyer v. T-Mobile USA Inc.*, 836 F. Supp. 2d 994, 1003 (N.D. Cal. 2011) (finding that because "[p]laintiff has not shown how the modification clause has been applied to her," she "thus lacks standing to challenge the provision"); *see also Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579, 579 (9th Cir. 2015) (concluding that because plaintiff's "arbitration agreement does not contain a class action waiver," "[t]o the extent the classes and subclasses include individuals who signed class action waivers, [plaintiff] is not an adequate representative and her claim lacks typicality" (citation omitted)).  As such, Colopy may seek preliminary relief only as to himself and may not purport to represent other drivers who are subject to arbitration.  *See* Chan Decl. ¶ 5, Dkt. 12.

2.  **Colopy Cannot Rely On *McGill* Because He Seeks Private, Not Public, Injunctive Relief.**

Colopy nonetheless attempts to challenge the arbitration agreements that bind the vast majority of the putative class on grounds that he allegedly seeks public rather than private injunctive relief, and that an individual cannot be required to arbitrate claims for "public injunctive relief" under *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 962 (2017).  *See* Mot. at 7–8.  But Colopy's request for an injunction is primarily for his own benefit, and allowing Colopy to proceed in court on behalf of the class he seeks

658, 663–64 (N.D. Ohio 2016); *Varon v. Uber Techs., Inc.*, 2016 WL 1752835, at *6 (D. Md. May 3, 2016); *Sena v. Uber Techs., Inc.,* 2016 WL 1376445, at *3–7 (D. Ariz. Apr. 7, 2016).

Gibson, Dunn & Crutcher LLP

to represent under the guise of a "public injunction" would thwart the arbitration procedure that Uber and most drivers mutually agreed upon and undermine the "liberal federal policy favoring arbitration." *Concepcion*, 563 U.S. at  346 (citation omitted).

"[W]hen a plaintiff seeks public injunctive relief, the benefits by and large do not accrue to that party, but to the general public in danger of being victimized by the same practices that the plaintiff suffered." *Magana v. DoorDash*, Inc., 343 F. Supp. 3d 891, 901 (N.D. Cal. 2018).  The California Supreme Court has defined public injunctive relief as "injunctive relief that has the primary purpose and effect of prohibiting unlawful acts that threaten future injury *to the general public.*" *McGill,* 2 Cal. 5th at 951 (emphasis added).  *McGill* made clear that "public injunctive relief" is fundamentally different from "[r]elief that has the primary purpose or effect of redressing or preventing injury to an individual plaintiff—or to a group of individuals similarly situated to the plaintiff." *Id.* at 955.

The latter form of relief—which is private, not public—is precisely what Colopy seeks here. Mot. at 8.  Colopy's misclassification claim, if resolved in his favor, would result in his classification as an employee—relief that flows directly to him only.  Even Colopy's requested preliminary injunction requiring Uber to treat all drivers as employees primarily benefits only other individual drivers.  *See Magana*, 343 F. Supp. 3d at 901 (finding injunction is not public when "plaintiff's operative complaint and proposed amended complaint both seek injunctive relief only for his California Labor Code claims," which "have the primary purpose and effect of redressing and preventing harm to DoorDash's employees").  Colopy asserts his injunction "is not solely for the benefit of himself and other Uber drivers," Mot. at 8, but references only general benefits, such as fulfilling the public's interest in enforcing the law, *id*. at 11, and increasing payroll and other taxes, *id*. at 9.  Such benefits are "derivat[ive] of and ancillary to the benefit" to Colopy, *Magana*, 343 F. Supp. 3d at 901 (citing "the company's increased tax payments and employees' possible decreased dependence on assistance from the state government"), and as a result Colopy does not seek "public injunctive relief."

And in any event, the "*McGill* rule . . .does not prohibit[] the arbitration of public injunctions. It merely prohibits the waiver of the right to pursue public injunctive relief in any forum." *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 827 (9th Cir. 2019).  The Arbitration Agreement here does not

prevent Plaintiff from "pursu[ing] public injunctive relief in any forum," *id.*; as a result, *McGill* is not implicated.  *See* Sinha Decl. Ex. 1 (Technology Services Agreement with arbitration provision).

### 3.      The FAA Section 1 Exemption Does Not Apply.

Colopy also asserts—in a footnote with little support—that "drivers who transport passengers *may be* exempt from the [FAA] under the transportation worker exemption."  *See* Mot. at 7 n.8 (emphasis added).  Citing the Third Circuit's decision in *Singh v. Uber Techs. Inc.*, 939 F.3d 2010 (3d Cir. 2019), he suggests that this is an "additional argument as to why Uber's arbitration clause cannot be enforced."  *See* Mot. at 7 n. 8 (emphasis added).  To the extent the Court considers this argument, it should be rejected.  Numerous courts in this district have declined to apply the Section 1 exemption to local drivers like Colopy.  *Magana*, 343 F. Supp. 3d at 900; *see also Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1152 (N.D. Cal. 2015).  Contrary to Colopy's assertion, the narrow exemption for interstate transportation workers does not apply to drivers who transport passengers rather than goods, and who do so within a single local community, for at least two reasons.

First, Colopy is not a seaman or railroad employee, and does not fall within the "other class of workers" to which the Section 1 exemption applies because he transports *passengers*, not *goods*.  9 U.S.C. § 1.  In *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121 (2001), the Supreme Court explained that the Section 1 exemption reflected "Congress' demonstrated concern with transportation workers and their necessary role *in the free flow of goods*."  This conclusion is supported by the FAA's text, history, and purpose.  The placement of the term "other class of workers" following seamen and railroad employees "calls for the application of the maxim *ejusdem generis*."  *Id.* at 14.  While ships and railroads *may* also carry passengers, they were focused instead on commercial shipping when the FAA was enacted in 1925, and are far afield from the passenger-car service that Colopy offers.

Moreover, the Section 1 exemption was crafted to exempt from the FAA specific classes of workers for whom *other*, *industry-specific* arbitration regimes had been fashioned.  The Court observed that "Congress excluded 'seamen' and 'railroad employees' from the FAA for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering [those] specific workers."  *Id.* at 121.  Crucially, *no* federal arbitration regime covering workers like Colopy was in place or even imminent when the FAA was enacted.  And when Congress did pass legislation

respecting motor carriers ten years later, it specified that "[n]othing in this part . . . shall be construed to include . . . taxicabs, or other motor vehicles performing a bona fide taxicab service . . . on a regular route or between fixed termini."  Motor Carrier Act of 1935, Pub. L. No. 74-255, § 203(b), 49 Stat. 543, 545 (1935).  Applying the Section 1 exemption to workers like Colopy would immunize these workers from all federal arbitration laws—unlike seamen and railroad employees, who were exempted from the FAA only because they were governed by a *different* federal arbitration regime.[10]

It is therefore unsurprising that nearly every court to consider whether the Section 1 exemption applies to workers who transport only passengers, has answered in the negative.  For example, in *Kowaleski v. Samandarov*, 590 F. Supp. 2d 477, 483–84 (S.D.N.Y. 2008), the Southern District of New York compelled plaintiff "Black Car" drivers to arbitrate claims against their dispatcher, "find[ing] the involvement of physical goods to be an indispensable element to being 'engaged in commerce in the same way that seamen and railroad workers are,'" and "reject[ing] Plaintiffs' implicit contention that transporting passengers across state lines as part of a car service constitutes being a 'worker[] engaged in foreign or interstate commerce.'"  *Id.* (citation omitted).  The Southern District of Ohio recently endorsed this distinction in compelling a driver to arbitrate claims against Uber: "When driving with Uber, Plaintiff transported passengers to and fro, sometimes in interstate commerce, but he did not transport goods in interstate commerce.  Such work places him outside 'any other class of workers engaged in . . . interstate commerce' described in the FAA's § 1 exclusions from mandatory arbitration."  *Scaccia v. Uber Techs., Inc.*, 2019 WL 2476811, at *4 (S.D. Ohio June 13, 2019), *report and recommendation adopted*, 2019 WL 4674333 (S.D. Ohio Sept. 25, 2019).

Colopy points to the Third Circuit's decision in *Singh*, which is the only court to hold that the Section 1 exemption is not categorically limited to workers who transport goods.  Mot. at 7 n.8.  But this holding cannot be reconciled with the Supreme Court's decision in *Circuit City* and was premised on three Third Circuit decisions from the early 1950s that the panel interpreted as having already

---

[10] This sweeping expansion of Section 1 would contravene "[t]he 'principal purpose' of the FAA" to "ensur[e] that private arbitration agreements are enforced according to their terms."  *Concepcion*, 563 U.S. at 344 (citation and quotation omitted).  "[T]he fact that the [Section 1 exemption] is contained in a statute that seeks broadly to overcome judicial hostility to arbitration agreements" "further compel[s] that the § 1 exclusion be afforded a narrow construction."  *Circuit City*, 532 U.S. at 118 (citation and quotation omitted).

resolved this question, even though they pre-date *Circuit City*.  *See Singh*, 939 F.3d at 220 (citing *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am., (U.E.) Local 437*, 2017 F.2d 450, 452 (3d Cir. 1953); *Amalgamated Ass'n St. Elec. Ry. & Motor Coach Emps. of Am., Local Div. 1210 v. Penn. Greyhound Lines*, 192 F.2d 310 (3d Cir. 1951); *Penn. Greyhound Lines v. Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am., Div. 1063*, 193 F.2d 327 (3d Cir. 1952) (per curiam)).  There is no such caselaw in the Ninth Circuit (or in any other Circuit).

Second, even if Plaintiff fell within the "other class of workers" covered by Section 1, the exemption still does not apply because he is not "engaged in foreign or interstate commerce."  9 U.S.C. §1. To be sure, it is possible that some drivers who use the Uber App occasionally cross state lines in the course of transporting passengers within a single municipal area, *cf. Singh*, 939 F.3d at 232 (Porter, J., concurring in part and concurring in the judgment) (noting that the plaintiff "drove passengers from the Newark Airport to New York"), but that fact is not enough to trigger the Section 1 exemption.  *See id.* at 227–28 (holding that such an allegation alone was not enough to bring the driver within Section 1's exemption and remanding for further proceedings); *see also Omaha & Council Bluffs St. Ry. Co. v. Interstate Commerce Comm'n*, 230 U.S. 324, 336 (1913) (holding that when "street railroads carry passengers across a state line [while serving the use of a single community] they are, of course, engaged in interstate commerce, but not the commerce which Congress had in mind when legislating . . . that carried on by railroads engaged in hauling passengers or freight between states, between states and territories, between the United States and foreign countries" (citation and quotation omitted)).

For many of the same reasons that the Section 1 exemption does not apply to workers who transport only passengers, the exemption also does not apply to workers who cross state lines only within a "single community."  *See* Sinha Decl. ¶ 9.  Such work is nothing like the inherently interstate work performed by seamen and railroad employees.  And extending the Section 1 exemption in this way would create serious procedural and evidentiary problems, effectively requiring a court to hold a mini-trial every time a plaintiff (or somebody who performs the same job as a plaintiff) crosses a state line even once to determine whether that plaintiff is a member of a "class of workers engaged in . . . interstate commerce."  9 U.S.C. § 1; *cf. Hill v. Rent-A-Center, Inc.*, 398 F.3d 128, 1289–90  (11th Cir. 2005) (determining the Section 1 exemption did *not* apply to the plaintiff, "who as part of his job duties

transport[ed] merchandise across the Georgia/Alabama border" because "[t]here is no indication that Congress would be any more concerned about the regulation of the interstate transportation activity incidental to Hill's employment as an account manager, than it would in regulating the interstate transportation activities of an interstate traveling pharmaceutical salesman who incidentally delivered products in his travels, or a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town." (quotation omitted)); *Lenz v. Yellow Transp. Co.*, 431 F.3d 348, 351 (8th Cir. 2005) ("'The emphasis [of the § 1 exclusion, therefore,] was on a class of workers in the transportation industry, rather than on workers who incidentally transported goods interstate as part of their job in an industry that would otherwise be unregulated.").

Here, the interstate transportation (if any) performed by drivers like Colopy is also wholly "incidental" to their predominantly intrastate work and, in any event, is still "local" and confined to a "single community."  The Technology Services Agreement limits drivers' provision of transportation services to "the city *or metro areas* in which [the driver is] enabled by the Driver App to receive requests for Transportation Services."  Sinha Decl. Ex. 1 § 1.10 (emphasis added).  Accordingly, this work falls outside the Section 1 exemption.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction should be denied.


DATED:  October 29, 2019                    GIBSON, DUNN & CRUTCHER LLP


                                            By:  _____/s/ *Theane Evangelis*_____
                                                       Theane Evangelis

                                            Attorneys for Defendant UBER TECHNOLOGIES, INC.