# EXHIBIT 16



# Uber's Worst Nightmare

Diana Kapp | Photo: Justin Kaneps | May 18, 2016

**Shannon Liss-Riordan just put a $100 million dent in the sharing economy giant. She's out for a lot more than that.**



**The most reviled** woman in Silicon Valley was badly in need of some coffee.

It was 8:40 a.m. on the Friday before Super Bowl Sunday, and Shannon Liss-Riordan had just arrived in the café of the Westin St. Francis, one arm pulling a rolling suitcase, the other carrying a still-warm laptop. Wearing a black blazer, black pants, and black leather boots, the attorney stood out among the throngs of jersey-clad football fans overtaking the lobby—an all-business peregrine falcon among so many colorful squawking parakeets. "Don't ask," she exhaled apologetically, having rolled up 25 minutes late. "You wouldn't believe how many motions we've filed in the last 48 hours."

That morning's stupor, like so many before it, would prove worthwhile. After months of drafting briefs into the wee hours, cramming for the California bar exam (necessary because she wasn't yet licensed to practice law in the state), and continuous, body-clock-wrecking cross-country flights, Liss-Riordan would soon win the largest settlement of her career: $100 million for 385,000 Uber drivers in California and Massachusetts who'd sued the company for misclassifying them as freelancers rather than employees. Ultimately, the deal, which was announced on April 21, came together secretly and hurriedly, in a flurry of meetings over two weeks in April. While legal pundits are still debating the settlement's winners and losers (the New York Times chalked up a victory for Uber; Mother Jones called it for the workers), one thing

is certain: By preempting the scheduled June 20 trial, Uber avoided having to face off against Liss-Riordan, who was eager to go for the jugular.



When I met her on Super Bowl Friday, Liss-Riordan was brimming with confidence that she could convince a San Francisco jury that Uber's drivers were not independent contractors, as the company contended, but in fact employees, highly controlled by management and due a host of protections conferred by decades of hard-fought labor battles. Now, two months later, she is almost rueful about the resolution. "I was so looking forward to this trial," she tells me on the Saturday after news of the settlement broke.

For months before its climax, Liss-Riordan's class action lawsuit had taken on bellwether status in Silicon Valley. Many onlookers believed that the ruling would finally resolve the worker-classification debate looming scythe-like over the head of the new sharing economy. Some predicted that, should Liss-Riordan prevail, the suit could cripple Uber, kill other startups in their cradles, and, hell, maybe even end the whole trendy "gig economy" sector as a whole. That the suit didn't slay Uber once and for all doesn't mean that it didn't inflict major pain on it. Asked to list the most important reforms assured by the $100 million settlement, Liss-Riordan touts the deal's ability to bolster drivers' job security; to force Uber to implement a more favorable tipping policy; and to give workers the means to organize as a group, granting them representation "akin to what unions provide."

But that's not everything she was gunning for, I suggest—drivers still won't be considered employees under the settlement. "I only settled, and I would only settle," she responds, "because I believe what we achieved is a significant achievement in the lives of drivers." (This contention was strongly disputed earlier this week by several lawyers pursuing their own class-action cases against Uber. "She has single-handedly stuck a knife in the back of every Uber driver in the country," one of them told Bloomberg.) But more to the point, Liss-Riordan says, she's far from finished with Uber and its myriad cousins. The round-one bell may have dinged, but the attorney intends to continue her crusade on behalf of workers, calling large corporations to the mat and wringing major concessions and siphoning huge sums from them when necessary.

Independent contractors, a class of worker that is expected to characterize 40 percent of all U.S. laborers by 2020, are due no benefits, guarantee of hours, or minimum wage, enabling the enterprises that employ them to keep labor costs low. But if this galaxy of free agents suddenly has to be treated like employees, with all the expensive benefits that the status conveys—well, let's just say that Silicon Valley offers Liss-Riordan a wealth of opportunity. In fact, when I called her to talk about the Uber settlement, she told me she had just selected the last of the furniture for her new Geary Street office. That's right, the first annex of Liss-Riordan's Boston-based firm will soon open in San Francisco. It'll be located right off of Union Square.

When I visited her in January in Boston's Back Bay neighborhood, where her firm, Lichten & Liss-Riordan, PC, is headquartered, Liss-Riordan stood outside her office and gestured at the businesses lining the block. Dunkin Donuts, Boston Cab, Lord & Taylor, Starbucks—at one time or another, she has sued all of them for labor violations. "Yes," she laughed, "it gets pretty hard avoiding all my companies."

Uber came into Liss-Riordan's sights in 2012 when, during a dinner in San Francisco, a friend whipped out his phone to show off a cool new app. She saw the cars crawling around his screen and immediately grokked the model—back in Boston, she was representing cab drivers who wanted the benefits allotted to employees. Seeing the glint in her eye, her friend blurted, "Don't you dare. Do not put them out of business!"

Liss-Riordan sealed a major victory on December 9 of last year, when the class action lawsuit she had filed on behalf of 8,000 California Uber drivers in 2013 was upgraded by a San Francisco judge to include basically every single Uber driver in California—more than half of the company's current U.S. workforce. Suddenly, the Wall Street Journal was calling her "one of the most influential and controversial figures in Silicon Valley," and her lawsuit was threatening the very existence of the world's largest privately held company (current valuation: approximately $68 billion, greater than Ford, Honda, and GM).

The crux of her case was whether the sharing economy habit of using contractors rather than fully vested employees violates basic labor laws. It was a question that could potentially affect the fortunes of dozens of would-be and actual unicorns in Silicon Valley, including Google Express, Postmates, Handy, Caviar, Instacart, GrubHub, DoorDash, Jolt, and Lyft, all of which Liss-Riordan is in some stage of suing. Indeed, the attorney could throw a stone at any car driving down Post Street, and chances are that she would hit a vehicle delivering food or passengers or packages for one of the new-economy businesses that she is after.

True to her nickname, Sledgehammer Shannon—bequeathed to her by the American Airlines skycaps she represented in a 2008 tip-skimming case—Liss-Riordan, 47, has been smashing up corporate America through rapid-fire class action lawsuits for a decade and a half (she currently has some 80 suits in motion). Beyond what's visible outside her firm's front door in Boston, her victims include Federal Express, Harvard University, almost every major U.S. airline, and the strip joint Centerfolds. Her newest clients are teachers for testing giant Kaplan, who claim they are being deprived of overtime pay, and stage actors working for studios "owned by people like Danny DeVito and Tim Robbins." Broadly, she is out to advance the wage-and-hour corner of labor law, basically everything related to compensation for hourly-wage Americans, who, she believes, are faring worse than ever. "I'm not feeling good about the big picture," she says. "The labor movement has obviously been in sharp decline, which has seriously impacted worker welfare. It's very important to push back against this rollback."

Over the years, Liss-Riordan's firm, which typically takes one-third of what it wins and charges nothing when it loses, has pulled in more than $200 million for its class action clients. And in the process, Liss-Riordan has achieved a kind of celebrity unseen in the legal world since Ralph Nader sued General Motors. At a three-day Department of Labor "Future of Work" symposium last December in Washington, D.C., attendees in the hallways were leaping into Liss-Riordan's orbit to take selfies with her. This is not normal for plaintiff's attorneys in the wage-and-hour racket. "She hadn't spoken on a panel," says the National Employment Law Project's Cathy Ruckelshaus, who was at the conference. "She was just recognized."

Liss-Riordan's path to legal stardom began with the renowned feminist labor activist and congresswoman Bella Abzug, who hired her soon after she graduated from Harvard. She had no special connections to Abzug, or to anyone else, but simply copied the number of every New York–based women's organization out of the phone book and started dialing. "I loved [Abzug's] big ideas, and her big hats," she reminisces. The office photographs of Abzug marching in union protests moved Liss-Riordan. "It was inspiring to see her have an idea and make it happen," she says. "That's what made me desire law school, so I could do something bigger."

Her progressive leanings, though, had been baked in long before that. The progeny of socialists (her maternal great-grandfather organized unions with Samuel Gompers), Shannon Liss grew up in Meyerland, Texas, the daughter of a Reagan Democrat dad and a liberal mother. At age five she professed that when she married, she would hyphenate her last name "because it was the only way that made any sense." (Her husband and three children all use Liss-Riordan.) She excelled in math and science, starting a math club in high school that wound up being voted "most organized in the country." ("I never knew there was such a contest," she says. "I was just doing my thing.")

In 1992, she left Abzug to stage a conference featuring Anita Hill, fresh from the carnival of the Clarence Thomas harassment hearings. Through this work, she met Gloria Steinem, who introduced her to Rebecca Walker, a Yale student whose treatise on modern-day feminism, "Becoming the Third Wave," had just appeared in Ms. magazine. Over burritos in the Village, the pair hashed out how to turn Walker's ideas into action. First up was Freedom Summer 1992, a cross-country bus tour to register women voters. Hillary Clinton blew them off after committing to meet the bus in Little Rock, which partly explains why Liss-Riordan is now feeling the Bern. Ultimately, though, she yearned to fix the system from within, while Walker wanted to stay outside of it. Laws needed to be changed. People needed to be held accountable. So in 1993, Liss-Riordan headed to Harvard Law School to work on just that.

She opened Lichten & Liss-Riordan, PC, in 2009, breaking off, along with one of her mentors, Harold Lichten, from an established labor-law firm. "I work for her now," laughs Lichten, a messy professor type who, at 18, quit the University of Pennsylvania basketball team rather than get the required crew cut. Clearly, the two bond over heeding their first principles. Liss-Riordan bought a Cambridge pizza joint in 2012 after she won a back-pay lawsuit for the employees, which helped push the restaurant into bankruptcy. After purchasing it, she made most of the employees part-owners and renamed the pizzeria the Just Crust.

The day I shadowed her in Boston, Liss-Riordan was a whirl of motion. At one point, while we were chatting in her office, the reception desk buzzed and she disappeared down an exposed-brick stairwell hung with vintage photos of workers—seamstresses, a 1930s-era stripper. She returned with a redheaded woman in jeans, whom she motioned to sit at the conference table.

"I was very interested in what you sent me," Liss-Riordan said, plopping down beside her. The woman was a massage therapist at Harvard University's Center for Wellness. "Were you able to do any snooping around to see if there were other pockets [of contractors] around campus with similar setups?" the attorney asked. The woman said not yet. Liss-Riordan followed with a run of questions: How many hours do you work? Thirty a week. Who sets your schedule? Management. Who buys your equipment? They do. Do you pay for your own insurance? Yes. If there was a client you had before that you didn't like, could you say you'd rather not take them again? The woman shook her head: No way. Liss-Riordan glanced through the documents the

woman had slid her. "There is a good argument that you have been misclassified as a contractor," she said, then suggested they go after sick and holiday pay, and perhaps benefits like free Harvard courses.

"Didn't you go to Harvard?" the woman inquired timidly. "I read that on your website." Liss-Riordan responded with a laugh: "I've sued Harvard twice before. They gave me two degrees, so I'm not sure they appreciate it." (She roomed there with YouTube CEO Susan Wojcicki.) The woman asked if she would lose her job. "I'm scared," she said. "No, no way," Liss-Riordan retorted. "It's scary, but you are doing the right thing. Actually, that it's Harvard protects you. They know they can't get away with misbehaving."

Over the years, Liss-Riordan has sought employee status for truck drivers, call-center workers, home cleaners, even exotic dancers. "It's just the next logical extension to take it into these on-demand jobs, where it's pretty clear these low-wage workers are not running their own businesses," says the National Employment Law Project's Ruckelshaus, who has worked with Liss-Riordan on several cases. A lawyer defending one of Liss-Riordan's suits spins her MO in another way: "She's found this tiny niche, and now she's just exploiting the hell out of it."

Indeed, her power-to-the-worker rhetoric flies in the face of many of Silicon Valley's prized principles and has earned her some well-funded enemies. The very labor laws she defends, says veteran VC Len Baker of Sutter Hill Ventures, are "encrusted with so much crap they just really bog us down." Sam Altman, who heads the prolific startup hatchery Y Combinator, believes that "individual flexibility and freedom" should trump current laws that tie employees to employer. "I definitely think it's bad to make everyone de facto full-time employees," he says. The whole point of the on-demand economy, maintains Eric Goldman, director of the High Tech Law Institute at the Santa Clara University School of Law, "is to allow more granular ways of people providing their services." This new, frictionless, seamless way of parsing tasks and connecting available labor to paying work, says Baker, is "just much more efficient economically."

To all this, Liss-Riordan simply responds: Bogus. She finds the cult of contract labor "really kind of scary, a great loophole" that's allowing corporations to screw the little guys. In her view, companies like Uber blatantly skirt minimum-wage and overtime-pay rules, which have been in place since the New Deal. By classifying drivers as contractors, Uber can fire them at will, have them run down their own cars and tires while avoiding having to reimburse them the IRS-mandated 57.5 cents (now 54) per mile for wear and tear, and sidestep mandates for workers' compensation and health insurance. The legal framework behind this "might be one of the sharpest attacks on workers we've seen in a long time," Liss-Riordan says. "The rhetoric is, 'But oh, this is good for the worker—be this on-demand worker, and you'll have this freedom.' But they are not their own bosses. Technology has created more extreme ways that employers can take advantage of workers. They are tethered to their phone. There are constant ratings, surge incentives, and data tracking their behavior at times, with more pull than a human manager would have."

Silicon Valley, naturally, would like to come up with another way to get around this existential divide. "The best thing would be a new categorization" for gig-economy workers, says Altman, "because these people really lie somewhere between traditional notions of contractor and employee." But Liss-Riordan has a standard retort for this third-category concept: "Why is there this call for dismantling these protections that have been fought for over decades in order to

help a $50 billion company get richer, while the drivers are making less and less and paying Uber's business expenses?" To her, the notion that flexibility is incompatible with full-time employment is a cop-out. "Plenty of companies let workers set their own schedules," she says. "If it costs Uber more to make everyone employees, they should just take a bigger cut and at least be transparent about all this."

Back in December, in U.S. District Court Judge Edward M. Chen's domain high above the city, Liss-Riordan strenuously objected to Uber's move of emailing every driver a new contract, which had to be signed for drivers to continue working. Buried within the fine print was a clause that rendered signers ineligible to join any future class action lawsuits, instead mandating arbitration to resolve grievances. Liss-Riordan finds it infuriating, if somewhat vindicating, that companies have turned to such clauses as a way of dodging responsibility. "They didn't even deign to talk to class counsel before sending out a communication to my clients," she said to the judge. "I would urge the court to consider the arguments that Uber should not be able to curtail liability. Not on the 14th page of an email on an iPhone." Judge Chen ruled in her favor, overriding Uber's arbitration agreement and allowing drivers to file suit as a class.

Arbitration clauses like the one Judge Chen struck down are increasingly being used by companies as a legal end-around. The Supreme Court has strengthened the power of these clauses in recent years, on the grounds that individual mediations are a more efficient means of resolving disputes. But to Liss-Riordan, the shift serves only to protect big business: "I just think it's reprehensible that the Supreme Court has allowed all these companies that are blatantly breaking the law to protect themselves."

It was Uber's arbitration clause that ultimately sent Liss-Riordan's suit careening to a settlement. When the U.S. Court of Appeals for the Ninth Circuit, on April 5, agreed to hear Uber's appeal, "it was not a good sign at all," she says. If Judge Chen's decision to override the arbitration agreement was reversed by the Ninth Circuit, her clients could be left high and dry. "Uber made it known they would appeal this all the way to the Supreme Court if they could," she says. And given the deadlocked state of the court at the moment, the odds of a 4–4 decision leaving the lower court's ruling in place seemed too risky. "There's just a lot of uncertainty," she says.

During our meeting at the Westin, I asked Liss-Riordan if she viewed her lawsuits as primarily having a policing function on bad-acting companies like Uber, or if she believed that she had a shot at challenging the constitutionality of arbitration clauses. She was circumspect. "There are so many ways that companies can evade the laws," she said. "If you chase them in litigation, they can just keep changing the arbitration clause a little bit. For them, they are like this magic bullet."

Using lawsuits, Liss-Riordan is trying to combat these corporate shenanigans by bringing old-fashioned collective bargaining to the new economy. And increasingly, other jurisdictions are taking a similar approach. Seattle just passed a law allowing Uber drivers to organize, and new legislation aimed at enabling gig workers to bargain collectively was recently introduced before the California legislature. (The bill was pulled before a final vote.) The Teamsters are now reportedly attempting to create an independent drivers' "association" akin to a union. "Lawsuits like hers are already having an impact," says Arun Sundararajan, professor at the New York University Stern School of Business and the author of The Sharing Economy: The End of Employment and the Rise of Crowd-Based Capitalism. The fundamental benefit of these

lawsuits, he says, is in "getting us on a path toward a better solution to funding our social safety net."

Liss-Riordan is never one to relent unless forced. Says her partner Lichten, admiringly, "She's like a pit bull with a Chihuahua in her mouth." Among the concessions Uber had to make to reach the April settlement was forgoing its practice of firing drivers without cause. "That's a pretty big deal," says Santa Clara University law professor Goldman. What's more, drivers will no longer be deactivated for a low rate of pickups, will receive a warning before losing their job, and can contest a termination before a panel of their peers. An even bigger deal, Liss-Riordan says, was convincing the judges in both her Uber and Lyft cases to deny summary judgment. What this means is that companies will not be able to do away with lawsuits of this nature quickly and painlessly. "They were saying that any company that finds itself with a lawsuit for misclassification can find itself in front of a jury. And that's big," she says. "It's a big price to put an end to the case, and it will continue to give companies pause before they play fast and loose with these rules."

There is evidence of this already. On-demand players such as Instacart, Shyp, Zirtual, and Honor have recently shifted course, reclassifying some of their workers as employees. "Everyone who wants to be Uber of the next thing—they've been watching these battles," Liss-Riordan says. And, she is quick to point out, Uber may be paying $100 million to make this suit go away, but it hasn't gotten the employment-classification monkey off its back. "No court has decided here whether these drivers are employees or independent contractors," she says. At multiple times during our phone conversation in April, Liss-Riordan returned to her favorite point: "This was a settlement. Nothing has been decided."

Before hanging up, I pushed her on my last question: What is your next chess move against Uber? Is this fight over? She hemmed and hawed over what to reveal publicly, before finally relenting. "Oh, OK," she said, grinning audibly on the other end of the line. "You can say I'm not done with this company."

*Originally published in the June issue of San Francisco*