# EXHIBIT H

*Notify*

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                                  SUPERIOR COURT
                                                                                CIVIL ACTION
                                                                                No. 11-4758-BLS1

JOHN D'ITALIA, on behalf of himself
and others similarly situated

vs.

LOWE'S HOME CENTERS, INC.

\*\*\*\*

## MEMORANDUM AND ORDER ON
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

In this action, the plaintiff[1] seeks to represent a class of contractors who worked as installers for Lowe's Home Centers, in a claim that he and the others were wrongly categorized as independent contractors and so deprived various benefits that Lowe's extended to persons it classified as employees.

For the reasons that follow, Plaintiff's Motion for Class Certification is ALLOWED IN PART, as specified in the Order below.

---

[1] A second putative class member, Ryan Correia, received a deposition subpoena from the defendant. In a case, perhaps, of unintended consequences, Correia contacted plaintiff's counsel for representation at the deposition, and later asked to join the action as a second named plaintiff. The motion was allowed without opposition.

## BACKGROUND

For purposes of this motion I assume the following facts, which are derived from the Complaint and from other papers submitted by both sides.

### A.    The Parties.

Plaintiff D'Italia is a general contractor doing business as a sole proprietor under the name D'Italia & Son's Construction. From May through October, 2011, he worked as a "General Contractor" installer (see below), remodeling kitchens and bathrooms for customers of five Lowe's stores in Massachusetts. Plaintiff Correia (see footnote 1) worked in the same program from April or May, 2011 until October, 2011. They seek to represent a class consisting of:

> All persons who installed products for Lowe's Home Centers, Inc. ("Lowe's") or performed Installation Services for Lowe's in the Commonwealth of Massachusetts as Type I Installers, or General Contractors, and who were misclassified and treated as independent contractors by Lowe's.[2]

There are thought to be at least 411 individuals meeting this description.

Lowes is a chain of retail stores that sells home improvement products and, at least lately, certain services. There are about 27 Lowe's stores in Massachusetts. In the service end of the business, customers contract with Lowe's for total makeovers of kitchens and bathrooms, or for more specific installation of items that Lowe's sells such as appliances, flooring and carpeting, countertops and cabinets, siding, roofing, air conditioners, doors, and windows. In either case, the items to be installed are to be purchased from Lowe's.

---

[2]This description is taken from the plaintiffs' motion papers. It is better conceived than the original request in the Complaint (¶7), for certification of a class of "[a]ll persons who installed products for Lowe's or performed services for Lowe's in the Commonwealth of Massachusetts and who were treated as independent contractors by Lowe's but over whom Lowe's exercised control and direction in the performance of their installation services."

## B.     Lowe's Installer Programs: On Paper.

For the actual remodeling and installation work, Lowe's relies on contractors[3] who have their own contracting businesses. Historically, Lowe's contracted with persons (called, in the motion papers, "Legacy" installers) in specific trades; Lowe's would assemble a team of installers suited to the particular job, even if it was a full, multi-trade kitchen or bath remodel. Sometime in 2011, however, Lowe's changed this model, at least for larger-scale projects: now, a customer purchasing a new kitchen or bathroom, instead of working with numerous Legacy tradesman, works with a single General Contractor installer who enters into a contract for the job with Lowe's, then subcontracts with the tradesmen he selects for the job.[4] Mr. D'Italia and Mr. Correia were General Contractor installers.[5]

No copy of a Legacy installer contract is included in the record. Mr. D'Italia's General Contractor Agreement is there, however. It contains the expected disclaimers of any relationship of employment, partnership, joint venture, or anything else other than independent contractor. (¶13.5) There is also agreement that the "General Contractor shall supervise and direct the Project [and] shall be responsible for, and have control over, construction means, methods, techniques, sequences and

---

[3]The term is used here in the colloquial sense of persons who do carpentry and other construction work, not to prejudge the nature of the relationship as between employment and independent contracting.

[4]Although this is the general model, the General Contractor Agreement (see below) appears to contemplate that in some cases, at least, General Contractor installers will work side by side with tradesmen, now called "Type 2 Installers," arranged by Lowe's.

[5]There are also references in the papers to "Type 1" and "Type 2" installers. Nowhere did I find clear definitions, but it appears (particularly from the fragments provided of Kevin Becker's deposition) that "Type 2" installers contract with specific manufacturers (e.g., Corian) to install their projects, and that "Type 1" embraces both Legacy and General Contractor installers who contract with Lowe's.

procedures and for coordinating all portions of the Project," except that he is to comply with any manufacturer's instructions. (¶1.1) He is to contract with the necessary subcontractors. (¶¶1.3, 2.0) There is no provision for salary or wages, unemployment, overtime, health insurance or other benefits; there is, however, an integration clause providing that the contract documents constitute the parties' entire understanding. (¶13.10) Bearing in mind that the essence of every contract is the exertion of some degree of control over the behavior of another person, there is little in this one that goes beyond the customary expectations of independent contractors: workmanlike performance, appropriate communication, appropriate licensure of everyone on the workplace, and so on.

The plaintiff points to other evidence, however, suggesting that this relationship may extend somewhat beyond what one traditionally associates with independent contractors. As noted above, the homeowner contracts with Lowe's, which then subcontracts with the installer; the installer and the homeowner have no direct contractual relationship. The Lowe's General Contractor Guide, while beginning with the installer's acknowledgment that he is an independent contractor who is responsible for his means, methods, tools, equipment, and tax obligations and not entitled to wages and benefits, then notes that "[t]here are many criteria that must be met in order to maintain a relationship with Lowe's." Among these are requirements:

- That the contractor and each of his employees wear a Lowe's shirt and cap while on a Lowe's job (but nowhere else);
- That he place (with the homeowner's permission) a sign on the lawn announcing that this is "Another Installation by Lowe's," and leave and explain a Lowe's customer survey brochure at the end of the job;
- That he submit himself and all employees to a background check by Lowe's;

- That he permit jobsite inspections by Lowe's to ensure that everyone working there has been screened, and to "allow[] Lowe's to ensure our customer satisfaction with our products and the services provided by our General Contractors" (and also that the jobsite is orderly and that the Lowe's apparel, yard sign, and brochure are on display);
- That he comply with a schedule of labor rates for fixed-cost jobs;
- In some cases, that he attend a preconstruction meeting at the jobsite with the owner and the Lowe's sales associate to measure the job and to assist the sales associate "with project planning and customer expectation setting";
- That he prepare all job estimates using "the detail worksheet provided by Lowe's"; and
- That he test all installed products and clean up debris at the end of the job.

"Remember," the Guide urges, "that to Lowe's customers, you are the face of Lowe's." Contractors are to "meet or exceed the basic standards of courtesy and professionalism in providing services to Lowe's customers"; show up on time; park in a courteous manner, mindful of the customer's need for access and of possible fluid leaks on the driveway; display the Lowe's apparel and sign; minimize dust, debris, and tracked-in dirt using drop cloths, plastic booties, etc. as appropriate; refrain from moving possessions without the customer's permission; eschew swearing, cursing, loud music, arguing, gossip, alcohol, drugs, sexual and other prohibited harassment, smoking, and fraternization with the customer; arrange the designated toilet facility with the customer; use the house telephone sparingly and only with permission; dispose of debris regularly and appropriately and "don't litter"; never borrow a customer's tools or supplies; close and secure

windows each day; and be careful of pets, "as some people treat them like family members." Also, "Do not solicit independent contract work from any Lowe's customer.... All referrals are the property of Lowe's." Finally, there are descriptions of awards and other perks, and of group health, dental, vision and prescription drug coverage available (presumably at the contractor's cost) through National Health Access.

### C. Lowe's Installer Programs: In Practice.

Plaintiff D'Italia[6] testified by deposition that Lowe's exercised control over various aspects of his work. A Lowe's salesperson always scheduled the initial meeting with the customer, always attended, always set the start date for the work, and usually made daily jobsite visits, taking down the names of his crew and making sure their CORI checks were done, that everyone was wearing Lowe's shirts and hats, and that there was a drip pan under each vehicle. D'Italia used his own tools, but was required to purchase all materials – "[s]crews, sheetrock, whatever was needed for that job" – from Lowe's, if it carried the item.

Two of the five stores he worked with were particularly hands-on, insisting that D'Italia – who supervised multiple crews working multiple projects at once – be on the Lowe's job(s) every day. Although D'Italia generally was allowed to use judgment as to means and methods, in other respects

> [t]hey directed me on all the jobs. They sent me to every job. They told me what time to be there. They told me the sequence of the job,

---

[6] D'Italia's co-plaintiff, Ryan Correia, testified to some of the same sorts of control, but not all. In his experience, the Lowe's representative always attended the initial meeting and "dictated the price and dictated everything on the jobs." The representatives set the start date, told Correia he had to be on the job every day, and required a daily written progress report (though when Correia balked at this, the Lowe's representative on the job looked the other way or did it for him).

-6-

> how it should play out. But as far as the technique or the skill of the job goes, that's a different story. ... There's only three of the jobs, the technique of the job, they had issues with. They had a different technique.

On one of these three jobs, the customer was happy with D'Italia's kitchen remodeling work and signed off at completion, but a Lowe's salesperson went to inspect it and made D'Italia go back and paint behind the stove he'd installed. In two other instances, Lowe's ordered him to take a member of his crew off the job.

D'Italia attributed some of these issues to a supervisor named Robin, who directed the installation business of sixteen Lowe's stores (and who once chewed him out because he and his crew were not wearing their Lowe's apparel, which hadn't been delivered yet). When Robin told D'Italia he would have to start filing daily timesheets showing the hours worked by each crewmember, he quit.

With its opposition, Lowe's has submitted deposition testimony and affidavits, including those of eighteen Massachusetts-based contractors who take Lowe's jobs. At least six are General Contractor installers; the rest appear to be Legacy installers, among them general contractors, a finish carpenter, a plumbing and heating specialist, and many flooring and carpet installers. They have taken work from Lowe's for as little as a few months to as long as eleven or twelve years. Two do only Lowe's jobs and are too busy to do anything else; two more say that less than five percent of their work is for Lowe's; the rest are somewhere in between. Some (especially the legacy specialists) work hands-on and alone, or with a very small number of employees and/or subcontractors; others manage large crews on multiple jobs simultaneously, and do not do any of the physical work themselves. All understand they are free to take non-Lowe's work, and all but two do.

These eighteen corroborate D'Italia's testimony that different Lowe's stores imposed differing levels of supervision on the contractors / installers, expand on this theme considerably, and contradict D'Italia in some respects. For example:

- Several (e.g. Anderson, Duffy, Rizzo, Velasquez) aver that a Lowe's salesperson rarely or never attends the initial meeting with the customer; others (e.g. Chagnon, Pann), that this occurs usually or always; still others, that it depends on the store (Najem) or the type of job (always on a major remodel; never on a simple installation; Frasier).

- Practices regarding jobsite visits occupied a similar spectrum, some (Anderson, Chagnon, Fay, Pezzulo) calling it rare or occasional; others (Duffy, Velasquez) more common. Here again, there seems to be variation among stores (Minchuk, Okirim) and some correlation with the length and complexity of the project (Frasier, Reyes, Rizzo, Searles). All said, however, that Lowe's personnel never directed or interfered with the means, methods, or control of the work.

- Some contractors (Duffy, Halton) do their own scheduling directly with the customer; one (Chagnon) does it only through Lowe's; still others (Pann, Rizzo) simply wait until Lowe's has delivered the items to be installed, then call the customer to arrange a start date; and one (Najem) follows the preference of the individual store.

- Some mentioned Lowe's pricing sheets, but said that these are just a starting point for them when they price the labor on the project. (Anderson, Chagnon, Pann) Several mentioned that their work is priced by the job, and that Lowe's has never required that they submit time sheets. (Brossman, Rizzo)

- Practices and frequency of communication between contractor and Lowe's are all over the map, some using phone or e-mail, some staying in touch daily and others not until the job is done. At least two (Chagnon, Pann) were supplied with daily report forms but declined to use them, with no repercussions. (Chagnon's crews don't even wear Lowe's shirts and caps or plant its lawn signs, and no one has complained.)
- None of the affiants said that Lowe's interfered with their hiring or subcontracting decisions (beyond requiring background checks), or ordered anyone off a job.
- No affiant said he was ever required to buy materials (other than the appliances, flooring, doors and windows, etc. that the customer has purchased) from Lowe's, and most explicitly denied this. All use their own tools and vehicles.

### D.     The Indemnity Clause.

Under paragraph 11.1 of the General Contractor Agreement, D'Italia – and, I assume, every General Contractor installer – agreed to indemnify Lowe's (and various parties affiliated with it) and hold it harmless against claims in numerous categories. One such category, under subparagraph 11.1.8, is:

> a reclassification or attempt to reclassify General Contractor's Personnel or Subcontractors as employees of any Lowe's Indemnitee, including, without limitation, (i) any tax or other liability (including interest and penalty) resulting from a Lowe's Indemnitee's failure to pay, deduct or withhold income taxes, FICA taxes, or Federal Unemployment Tax Act taxes, or amounts pertaining to worker's compensation, or (ii) obligations relating to violations of employment discrimination statutes or regulations, the Fair Labor Standards Act, the IRCA or the Occupational Safety and Health Act; or (iii) any other legal Claim arising out of the legal relationship between General Contractor and any of General Contractor's Personnel or Subcontractors.

Lowe's sees in this provision an irreconcilable conflict of interest between the named class representatives and those whom they seek to represent; the plaintiffs, for their part, see a contract that is unenforceable as against public policy.

## DISCUSSION

### A. The Applicable Substantive Law.

The plaintiffs' claim for misclassification is brought under G.L. c. 149, §148B, which reads (in pertinent part) as follows:

> (a) For the purpose of this chapter and chapter 151, an individual performing any service, except as authorized under this chapter, shall be considered to be an employee under those chapters unless:
>
> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
>
> (2) the service is performed outside the usual course of the business of the employer; and,
>
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

The employer has the burden of proving all three of these indicia of independence; if any one is left unproved, then the individual in question is an employee, entitled to the protections of the Wage Act (biweekly wage payments including vacation or holiday pay), to overtime pay, and to all other employment benefits extended by the employer to its other employees. Liability is strict, based on the nature of the service provided, irrespective of the employer's intent. Somers v. Converged Access, Inc., 454 Mass. 582, 589-91 (2009).

**B.     Standard for Class Certification.**

The requirements for certification of a class in this Court are found in Mass. R. Civ. P. 23(a) and (b):

> (a) **Prerequisites to Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> (b) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Thus, the familiar checklist — numerosity, commonality, typicality, adequacy, predominance, and superiority — which the Massachusetts rule shares with its federal counterpart, Fed. R. Civ. P. 23(a) and (b)(3). (There are also some differences between the state and federal rules, which are explored as necessary below.)

The Massachusetts version of Rule 23, however, lacks much of the language and some of the flexibility of the federal rule. It does not, for example, "provide a mechanism by which plaintiffs can 'opt out' of the class," as in federal Rule 23(c)(2)(B)(v), Weld v. Glaxo Wellcome, Inc., 434 Mass. 81, 84 (2001); see Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 602 (1985); it does not

-11-

permit certification of a "limited issue" class, as under federal Rule 23(c)(4), Fletcher; and it lacks any explicit provision for forming sub-classes, as in federal Rule 23(c)(5).[7]

The Court's task at this stage of the proceeding is to determine preliminarily whether the requirements of numerosity, commonality, typicality, adequacy, predominance, and superiority are satisfied.

> The plaintiffs bear the burden of providing information sufficient to enable the motion judge to form a reasonable judgment that the class meets the requirements of rule 23; they do not bear the burden of producing evidence sufficient to prove that the requirements have been met. ... "[N]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule."

Weld, 434 Mass. at 87 (footnote and citation omitted). The certification issue is addressed to the Court's "broad discretion," Aspinall v. Philip Morris Cos., Inc., 442 Mass. 381, 391 (2004), and the standard for certification "defies mathematical precision." Weld at 85.

Taking the six requirements of Massachusetts Rule 23 in turn:

**1.    Numerosity.**

With a head count of 411 or so potential claimants, the numerosity requirement is satisfied as to the class proposed. I did not find in the record a reference to how many of these are General Contractor and how many are Legacy installers, but I will assume for present purposes that there are

---

[7]Extending the logic of the Fletcher case – which reasoned that features "expressly provided by the drafters of the Federal rule" but omitted in the state rule therefore do not exist in Massachusetts class action practice, 394 Mass. at 602 – this would mean that the Court may not certify sub-classes in a Massachusetts class action.

enough past and present General Contractor installers – the only class I am presently prepared to certify; see *infra* – to make joinder impracticable.

### 2. Commonality.

The commonality requirement is satisfied as well, at least as among the General Contractor installers. Although the facts before me suggest a good deal of variance in the manner in which Lowe's interacts with its installers (often depending on which store referred the job), it seems highly likely that the contract documents are common, or substantially so, to General Contractor installers across the board. On the first statutory prong, therefore, the question of whether General Contractor installers are "free from control and direction" *as a matter of contract* is common to all, though the question of whether such freedom exists "*in fact*" is not. Under the control-by-contract sub-prong of section 148B – and recalling that if the employer fails to negate *any* prong, the plaintiff wins -- there is therefore at least this common issue among General Contractor installers.

There is also the second prong, under which Lowe's must prove that "the service is performed outside the usual course of the business of the employer." This too would seem to be an issue common to most or all General Contractor installers and all Lowe's stores; the brand of any retail chain is built on a dependable consistency from one store to the next. Lowe's either is in the businesses of kitchen and bath remodeling, or it isn't.

The third prong – whether the installers are "customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed" – also appears to be common to most or all of the General Contractor installers.

The plaintiff has not shown, however, that there is sufficient commonality as between General Contractor and Legacy installers, or even among Legacy installers as a group, to warrant

their inclusion in the class. Concerning the first prong under section 148B, the record contains no contract, handbook, or other materials pertaining to Legacy contractors. Although I assume the contracts, at least, were prepared on a standard form, I do not assume that it is the same form as is used with General Contractor installers, or that it necessarily remained the same throughout the decade or more that the Legacy program has existed. As respects control-in-fact, it appears that because their projects are generally smaller, Legacy contractors generally function more independently than General Contractor installers (though here as with the General Contractor installers, different stores and sales associates have somewhat different management styles).

On the second prong, whether the service is within or outside Lowe's course of business presents a different question as between kitchen and bath remodeling and specific product installations.

Finally, there is commonality as to the third prong – whether the plaintiffs are engaged in a customarily established trade, etc. – but it does not appear to favor the plaintiffs; it seems likely that if they are to succeed, it will have to be on Prongs 1 and/or 2.

The Legacy installers will therefore be excluded from the class.[8]

### 3. Typicality.

On contractual control and on the second and third prongs – albeit not necessarily on the question of whether the installers are free from Lowe's direction and control "in fact" – Messrs. D'Italia's and Correia's claims appear typical of those of the General Contractor installers.

---

[8] This is an example of a case that might benefit from subclasses, were they available under the Massachusetts rule.

### 4. Adequacy.

The plaintiffs are capably represented by counsel who appear willing and able to go the distance.

Unless the indemnity clause in paragraph 11.1.8 (quoted above) is unenforceable on public policy grounds, the named plaintiffs may indeed be inadequate representatives of their own employees and subcontractors. This argues, however, for litigating the enforceability issue early and considering decertification or re-definition of the class if need be, rather than denying certification for fear that there *might* be a conflict.

### 5. Predominance.

The common issues – two and one-half out of the three statutory prongs – appear to predominate over the apparently non-common question of whether installers were in fact free from Lowe's control and direction.

### 6. Superiority.

In most respects, class action treatment appears to offer a superior method of adjudicating the present dispute. Many of the issues may well be amenable to determination on cross motions for summary judgment. Individual claims are likely small enough that even with the potential for treble damages and statutory attorneys' fees should a Wage Act violation be proved, litigating them one by one may not be deemed economical.

I do have one significant concern. The evidence of control-by-contract (the first sub-prong of Prong 1) seems less than overwhelming; nor could success on Prong 2 or 3 be called a foregone conclusion. Were the case to be presented without evidence of class-wide control-in-fact (the second sub-prong of Prong 1), and should the plaintiffs fail to establish that they were employees by the

terms of their contract or under one or more of the other prongs, this may work to the detriment of some class members who might have been able to prove that they were *in fact* directed and controlled as employees, yet may be bound by the adverse judgment in this action. Here, the omission in Massachusetts Rule 23 of the "limited issue" class looms large, especially if the doctrine of claim preclusion and its corollary, the rule against claim-splitting, were to be applied.

The SJC considered a somewhat – but imperfectly – analogous situation in Aspinall v. Philip Morris Cos., 442 Mass. 381 (2004). Affirming the certification of a class action under Chapter 93A,[9] in which smoker/consumers sought benefit-of-the-bargain economic damages on account of alleged misrepresentations as to the virtues of "light" cigarettes, the court noted:

> The plaintiffs do not seek damages for personal injuries. Were it otherwise, unique and different experiences of each individual member of the class would require litigation of substantially separate issues and would defeat the commonality of interests in the certified class. The defendants argue that principles of claim preclusion may operate to harm the interests of future class members who may wish to assert personal injury claims in a future action. This argument has no merit. "Claim preclusion makes a valid, final judgment conclusive on the parties and their privies, and prevents relitigation of all matters that were or could have been adjudicated in the action." It is true that neither G.L. c. 93A, §9(3), nor rule 23 allow a member of a certified class not wishing to be bound by the class litigation to "opt out." The doctrine of claim preclusion, however, only applies in circumstances where the party to be precluded has had the incentive and opportunity to raise the claim fully in the earlier lawsuit. The doctrine is grounded on considerations of fairness and judicial efficiency and would not operate to bar a member of a class certified to proceed, as here, only on an economic theory of damages from future pursuit of claims for personal injury unsuitable for class treatment.

442 Mass. at 399 n.19 (citations omitted).

---

[9]The fact that Aspinall was a Chapter 93A, not a Rule 23, class action had implications for the propriety of class certification, see 442 Mass. at 391-92. There is no reason to suppose, however, that the claim preclusion rules should differ as between the two types of class actions.

Here, unlike in Aspinall, the plaintiffs assert a single claim: that they were employees of Lowe's and entitled to benefits, for which they seek economic damages. That they have several modes of proof available to them does not mean that there are several claims. The passage just quoted (especially, the last two sentences) suggests, however, that perhaps the common-law doctrine of claim preclusion should be applied more flexibly, in the interests of justice, than the language of the Rule itself, so that even were the named plaintiffs in this case to eschew evidence of control-in-fact, and even were they to lose the case, other General Contractor installers would be free to litigate this omitted issue in a separate, future action.

In any event, the standard for class certification is not perfection, or certainty, or freedom from all risk; it is simply a "sufficient" showing to enable a "reasonable judgment" that the requirements for certification have been met. Applying this standard, I find that class action treatment is superior to other available methods for adjudicating these disputes. Should it appear otherwise as the case and the record develop more fully, the class can be decertified. See Mass. R. Civ. P. 23(d); Ahearn v. Vose, 64 Mass. App. Ct. 403, 421 (2005).

## ORDER

For the foregoing reasons, the plaintiffs' Motion for Class Certification is ALLOWED IN PART, as follows. A class is provisionally certified, to consist of:

> All persons who performed installation and/or remodeling services for Lowe's in the Commonwealth of Massachusetts as General Contractor installers under a "General Contractor Agreement" (Rev. 9/1/10 or later), and who were classified and treated as independent contractors by Lowe's.

Counsel are to appear on **December 17, 2012 at 3:00 p.m.**, or such other date as they may mutually agree and report to the Court, for a further Rule 16 conference.

*[signature]*
Thomas P. Billings, Associate Justice

Dated: December 4, 2012

*Notice sent*
*12.05.12*
*(md)*