SHANNON LISS-RIORDAN, SBN 310719
(sliss@llrlaw.com)
ANNE KRAMER, SBN 315131
(akramer@llrlaw.com)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:    (617) 994-5800
Facsimile:    (617) 994-5801

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CHRISTOPHER JAMES and SPENCER VERHINES, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.,<br><br>Defendant. | CASE NO. 3:19-cv-06462-EMC<br>CASE NO. 3:20-cv-01886-EMC<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Hon. Edward M. Chen<br><br>Hearing:    December 3, 2020<br>Time:    1:30 p.m.<br>Courtroom: 5 |

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................. 1

II.  ARGUMENT ....................................................................................................... 2

   A. Uber is a Hiring Entity, As Other Courts Have Recognized ........................... 2

   B. Plaintiffs Need Not Prove Commonality as to All Three Prongs of the ABC Test ........ 2

   C. In Any Case, There is Commonality on All Three Prongs of the ABC Test ................. 4

   D. Common Questions Predominate in Plaintiffs' Specific Claims .................................. 9

   E. Uber's Claim That Individualized Inquiries Regarding Which Drivers Opted Out
      of Arbitration Preclude Class Certification Is Disingenuous and Must Be
      Rejected ............................................................................................................ 14

   F. Whether Drivers Want the Law to Be Followed is Irrelevant, Both to the Merits
      and Class Certification, but in any Case, Drivers' Purported Expressions of Not
      Wanting to Be Employees Result from Uber's Threats of What it Would Do if It
      Had to Reclassify Drivers ................................................................................... 15

   G. Contrary to Uber's Contentions, Plaintiffs Are Typical ...................................... 18

III. CONCLUSION ..................................................................................................... 20

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

Agerbrink v. Model Serv. LLC

4
    2017 WL 933095 (S.D.N.Y. Mar. 8, 2017)................................................................9

5
Air Couriers Internat. v. Employment Dev. Dep't
    150 Cal. App. 4th 923 (2007) ......................................................................................9

6
Alexander v. FedEx Ground Package Sys., Inc.

7
    765 F.3d 981 (9th Cir. 2014) .......................................................................................8

8
Arredondo v. Delano Farms Co.
    301 F.R.D. 493 (E.D. Cal. 2014)...............................................................................13

9
Arzate v. Bridge Terminal Transp., Inc.
    192 Cal. App. 4th 419 (2011) ......................................................................................8

10
Awuah v. Coverall North America, Inc.

11
    No. 1:07-cv-10287 (D. Mass. Sept. 27, 2011)............................................................5

12
Beauperthuy v. 24 Hour Fitness USA, Inc.
    772 F. Supp. 2d 1111 (N.D. Cal. 2011).....................................................................11

13
Bee, Denning, Inc. v. Capital All. Grp.
    310 F.R.D. 614 (S.D. Cal. 2015) .................................................................................4

14

15
Blades v. Monsanto Co.
    400 F.3d 562 (8th Cir. 2005) .......................................................................................4

16
Boston Bicycle Couriers v. Deputy Dir. of the Div. of Empl. & Training
    778 N.E.2d 964 (2002) ................................................................................................8

17
Campbell v. City of Los Angeles

18
    903 F.3d 1090 (9th Cir. 2018) ...................................................................................11

19
Carey v. Gatehouse Media Massachusetts I, Inc.
    94 N.E.3d 420 (2018) ..................................................................................................5

20
Carr v. Flowers Foods, Inc.

21
    2019 WL 2027299 (E.D. Pa. May 7, 2019).................................................................3

22
Carrow v. FedEx Ground Package Sys., Inc.
    2019 WL 7184548 (D.N.J. Dec. 26, 2019).................................................................5

23
Cochran v. Schwan's Home Serv., Inc.
    228 Cal. App. 4th 1137 (Ct. App. 2014) ...................................................................10

24

25
Cope v. Let's Eat Out, Inc.
    319 F.R.D. 544 (W.D. Mo. 2017)..............................................................................11

26
Costello v. BeavEx, Inc.
    810 F.3d 1045 (7th Cir. 2016) ............................................................................2, 3, 4

27

28

Costello v. Kohl's Illinois, Inc.
  2014 WL 4377931 (S.D.N.Y. Sept. 4, 2014) ............................................................18

Cotter v. Lyft, Inc.
  60 F. Supp. 3d 1067 (N.D. Cal. 2015)........................................................................2

Coverall N. America v. Div. of Unemployment
  447 Mass. 852, 857 N.E.2d 1083 (2006)....................................................................8

Creely v. HCR ManorCare, Inc.
  789 F. Supp. 2d 819 (N.D. Ohio 2011) .....................................................................18

D'Italia v. Lowe's Home Centers Inc.
  No. 11-4758-BLS1 (Suffolk Super. Ct. Dec. 12, 2012) .............................................5

Dalton v. Lee Publications, Inc.
  270 F.R.D. 555 (S.D. Cal. 2010) ..............................................................................16

DaSilva v. Border Transfer of MA, Inc.
  296 F. Supp. 3d 389 (D. Mass. 2017).........................................................................3

De Giovanni v. Jani-King Intern., Inc.
  262 F. R. D. 71 (D. Mass. Sep. 21, 2009) ..................................................................5

Dilts v. Penske Logistics, LLC
  267 F.R.D. 625 (S.D. Cal. 2010) ..............................................................................11

Douglas Cty. Fed'n v. Douglas Cty. Sch. Dist. RE-1
  325 F.R.D. 355 (D. Colo. 2018).................................................................................13

Dynamex Operations W. v. Superior Court
  4 Cal. 5th 903 (2018), reh'g denied (June 20, 2018) ......................................3, 8, 17

Ellis v. Costco Wholesale Corp.
  285 F.R.D. 492 (N.D. Cal. 2012) ................................................................................4

Gammella v. P.F. Chang's China Bistro, Inc.
  120 N.E.3d 690 (2019) ..............................................................................................11

Garcia v. E.J. Amusements of New Hampshire, Inc.
  2015 WL 1623827 (D. Mass. Apr. 13, 2015).............................................................16

Hanlon v. Chrysler Corp.
  150 F.3d 1011 (9th Cir. 1998) .....................................................................................4

Henning v. Indus. Welfare Com.
  46 Cal. 3d 1262 (1988) ..............................................................................................11

Herrera v. Zumiez, Inc.
  953 F.3d 1063 (9th Cir. 2020) ...................................................................................10

In re Wells Fargo Home Mortg. Overtime Pay Litig.
  527 F. Supp. 2d 1053 (N.D. Cal. 2007).....................................................................18

JKH Enterprises, Inc. v. Dep't of Indus. Relations
  142 Cal. App. 4th 1046 (2006) .......................................................................... 9, 17

Johnson v. Serenity Transportation, Inc.
  2018 WL 3646540 (N.D. Cal. Aug. 1, 2018), aff'd, 802 F. App'x 250 (9th Cir. 2020) ... 5, 6, 14

Joseph v. GMC
  109 F.R.D. 635 (D. Col. 1986) ................................................................................ 18

Konik v. Time Warner Cable
  2010 WL 8471923 (C.D. Cal. Nov. 24, 2010) ........................................................ 4

Leyva v. Medline Indus. Inc.
  716 F.3d 510 (9th Cir. 2013) ................................................................................. 12

Magalhaes v. Lowe's Home Centers, Inc.
  2014 WL 907675 (D. Mass. Mar. 10, 2014) ........................................................... 3

Marsu, B.V. v. Walt Disney Co.
  185 F.3d 932 (9th Cir. 1999) ................................................................................. 10

Martin v. Tango's Rest., Inc.
  969 F.2d 1319 (1st Cir. 1992) ............................................................................... 16

Martinez v. Combs
  49 Cal. 4th 35 (2010) ............................................................................................. 8

Martins v. 3PD, Inc.
  2013 WL 1320454 (D. Mass. Mar. 28, 2013) ................................................... 3, 10

Matamoros v. Starbucks Corp.
  699 F.3d 129 (1st Cir. 2012) ................................................................................. 15

Moyle v. County of Contra Costa
  2007 WL 4287315 (N.D. Cal. Dec. 5, 2007) ......................................................... 10

Mujo v. Jani-King Int'l, Inc.
  2019 WL 145524 (D. Conn. Jan. 9, 2019) .............................................................. 5

Norris-Wilson v. Delta-T Grp., Inc.
  270 F.R.D. 596 (S.D. Cal. 2010) ........................................................................... 15

O'Connor v. Uber Techs., Inc.
  311 F.R.D. 547 (N.D. Cal. 2015), rev'd and remanded on other grounds, 904 F.3d 1087 (9th Cir. 2018) .................................................................................................... 1, 9

O'Connor v. Uber Techs., Inc.
  82 F. Supp. 3d 1133 (N.D. Cal. 2015) .................................................................... 2

O'Connor v. Uber Techs., Inc.
  No. 13-CV-03826-EMC, 2019 WL 4394401 (N.D. Cal. Sept. 13, 2019) ................ 14

O'Connor v. Uber Techs., Inc.
  No. C-13-3826 EMC, 2015 WL 5138097 (N.D. Cal. Sept. 1, 2015) ............... passim

Olson v. California
  No. 2:19-cv-10956, 2020 WL 905572 (C.D. Cal., Feb. 10, 2020)..................................17

Portillo v. Nat'l Freight, Inc.
  2020 WL 3582514 (D.N.J. July 1, 2020) ..............................................................5

Richie v. Blue Shield of California
  No. C-13-2693 EMC, 2014 WL 6982943 (N.D. Cal. Dec. 9, 2014)..........................10

Ruiz v. Affinity Logistics Corp.
  754 F.3d 1093 (9th Cir. 2014) ...........................................................................8

Sandoval, et al. v. M.J.F. Bowery Corp. d/b/a/ Ten's Show Club
  29 Mass. L. Rptr. 11 (Essex Super. July 22, 2011) ...............................................5

Schroeder v. Envoy Air, Inc.
  2017 WL 10525816 (C.D. Cal. Feb. 6, 2017) ....................................................13

Schroeder v. Envoy Air, Inc.
  2017 WL 3835804 (C.D. Cal. Aug. 30, 2017) ....................................................13

Schwann v. FedEx Ground Package Sys., Inc.
  2013 WL 1292432 (D. Mass. Apr. 1, 2013)..........................................................3

Sebago v. Bos. Cab Dispatch, Inc.
  471 Mass. 321, 28 N.E.3d 1139 (2015).................................................................5

Smith v. Cardinal Logistics Mgmt. Corp.
  No. 07-2104 SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008)............................16

Stallsmith v. Linder Psychiatric Grp., Inc.
  2016 WL 279271 (E.D. Cal. Jan. 22, 2016) ......................................................11

Tony & Susan Alamo Foundation v. Sec'y of Labor
  471 U.S. 290 (1985) .........................................................................................16

Torres v. Mercer Canyons Inc.
  835 F.3d 1125 (9th Cir. 2016) .........................................................................13

Tyson Foods, Inc. v. Bouphakeo
  136 S. Ct. 1036 (2016) ....................................................................................13

Valadez v. CSX Intermodal Terminals, Inc.
  298 F. Supp. 3d 1254 (N.D. Cal. 2018)..............................................................14

Vazquez v. Jan-Pro Franchising Int'l, Inc.
  923 F.3d 575 (9th Cir.), opinion withdrawn, 930 F.3d 1107 (9th Cir. 2019), and opinion
  reinstated in part on reh'g, 939 F.3d 1050 (9th Cir. 2019) ...............................5, 8

Wilson v. Kiewit Pac. Co.
  2010 WL 5059522 (N.D. Cal. Dec. 6, 2010)......................................................10

Yokoyama v. Midland Nat'l Life Ins. Co.
  594 F.3d 1087 (9th Cir.2010) ..........................................................................12

**Rules**

Fed. R. Civ. P. 23 ................................................................................................passim

**Other Authorities**

Wright, Miller & Kane
   7AA Fed. Prac. & Proc. Civ. § 1778 (3d ed.)...........................................................4

**Statutes**

Cal. Bus. & Prof. Code § 16600 ...........................................................................19

Cal. Lab. Code § 246 ...........................................................................................12

Pub. Util. Code§ 5445.2........................................................................................2

1    **I.     INTRODUCTION**

2           In its Opposition Brief, Uber insists that no class can be certified here even though this

3    Court previously certified a class on the misclassification question under the *more difficult*,

4    multi-factor <u>Borello</u> test and certified the same expense reimbursement claim Plaintiffs bring

5    here. <u>O'Connor v. Uber Techs., Inc.</u>, No. C-13-3826 EMC, 2015 WL 5138097 (N.D. Cal. Sept.

6    1, 2015); <u>O'Connor v. Uber Techs., Inc.</u>, 311 F.R.D. 547 (N.D. Cal. 2015), <u>rev'd and remanded</u>

7    <u>on other grounds</u>, 904 F.3d 1087 (9th Cir. 2018). But this Court has previously recognized the

8    "inherent tension" between Uber's argument that "it has properly classified *every single driver*

9    as an independent contractor" and its insistence that "individual issues with respect to each

10   driver's 'unique' relationship with Uber so predominate" that class certification is inappropriate.

11   <u>O'Connor</u>, 2015 WL 5138097 at *2 (emphasis in original). That same tension permeates Uber's

12   arguments here. Under the "ABC" test that now governs Plaintiffs' claims, a class can be

13   certified, since Plaintiffs are all but certain to win the threshold misclassification issue under

14   Prong B alone, which turns on the nature of Uber's business – clearly a common issue for all

15   Uber drivers. <u>See infra</u>, § II(B). In any case, all three prongs of the "ABC" test are capable of

16   determination on a class-wide basis, as are Plaintiffs' derivative claims for minimum wage,

17   overtime, wage statements, and paid sick leave. <u>See infra</u>, § II(C)-(D).

18          In a desperate attempt to avoid liability for its misclassification, Uber has made several

19   superficial changes to its system this year in California, which it details in its Opposition.

20   Plaintiffs dispute that these policy changes make any material difference to the drivers' status

21   under the law, but in any case, the alleged changes have no bearing on class certification

22   because these new policies are nonetheless available to the class, and therefore, their effect on

23   the misclassification analysis, if any, will be determined on a class-wide basis. Likewise, Uber's

24   claim that drivers wish to maintain the status quo is clearly heavily influenced by Uber's threats

25   about how it would respond to a legal requirement that it reclassify drivers, but in any case, as

26   the Court recognized in certifying a class in <u>O'Connor</u>, it has no bearing on class certification.

27

28

See supra, § II(F). As set forth below, the Court should certify the proposed class here.

## II.    ARGUMENT

### A.  Uber is a Hiring Entity, As Other Courts Have Recognized

Uber argues that it is not a "hiring entity" under the statute, and therefore, the "ABC" test does not apply. This is an erroneous argument, but it is a *merits-based argument* that will be resolved the same way for *all* drivers and is therefore not an impediment to class certification. California courts have already recognized that "[c]ontrary to Defendants' argument, A.B. 5 does not establish any 'threshold requirement' to show that the putative employer is a hiring entity that must be met before applying the ABC test." People v. Uber, (Ex. 1)[1] at *20. In any case, Uber is a "hiring entity." As the Court in People v. Uber made clear, the California Public Utilities Commission recognizes Uber and Lyft as hiring entities that "contract with, employ, or retain" drivers. Id. at *21 (citing Pub. Util. Code§ 5445.2(a)(2), (3)). Likewise, this Court has repeatedly recognized that drivers provide services to Uber. O'Connor v. Uber Techs., Inc., 82 F. Supp. 3d 1133, 1142 (N.D. Cal. 2015) ("[I]t is obvious drivers perform a service for Uber…."); see also Cotter v. Lyft, Inc., 60 F. Supp. 3d 1067, 1078 (N.D. Cal. 2015) ("[T]he argument that … drivers perform no service for Lyft, is not a serious one."); People v. Uber, (Ex. 1) at *20 (rejecting this argument as "nonsense"). None of the minor changes to Uber's system over the years have changed the reality that drivers are essential to Uber's business and that they provide services *to Uber*, which "set[s] drivers' qualification standards, solicit[s] applications, conduct[s] background checks and in-person interviews with applicants, engage[s] certain applicants as drivers while rejecting others, and enter[s] into standard form contracts with drivers." Id. at *21. Uber's argument must be rejected.

### B.  Plaintiffs Need Not Prove Commonality as to All Three Prongs of the ABC Test

As set forth infra, II(C), Plaintiffs here can establish commonality on all three prongs of the "ABC" test; however, Costello v. BeavEx, Inc., 810 F.3d 1045, 1060 (7th Cir. 2016), and

---

[1]    All exhibits cited herein are Exhibits to the Liss-Riordan Declaration in support of Plaintiffs' Reply in support of Class Certification, filed herewith.

the numerous cases cited below demonstrate why proving commonality on all the prongs is not

even necessary. The California Supreme Court made clear in <u>Dynamex</u> that the "ABC" test

should make the misclassification analysis more simple than it was previously and that courts

need not reach all three prongs of the test (if one factor is dispositive). <u>Dynamex Operations W.</u>

<u>v. Superior Court</u>, 4 Cal. 5th 903, 955-57, 963 (2018), <u>reh'g denied</u> (June 20, 2018). It would

make little sense to apply this test (differently from how it has been routinely applied in other

states) in a way that makes it more complicated by requiring plaintiffs to establish commonality

on all three prongs. Indeed, courts have routinely certified classes under the "ABC" test without

reach all three prongs. <u>See, e.g.</u>, <u>Costello</u>, 810 F.3d at 1060 (reversing denial of class

certification where the district court had not found commonality on the first prong of the Illinois

"ABC" test because, the Seventh Circuit recognized, the second prong *could be* decided through

common facts and could be dispositive); <u>Carr v. Flowers Foods, Inc.</u>, 2019 WL 2027299, at *20

(E.D. Pa. May 7, 2019) ("[B]ecause two of the three factors of the ABC test are readily

provable through common evidence—and Plaintiffs need only establish one to prevail on their

claim—their employee status is susceptible to class-wide determination."); <u>see also</u> <u>DaSilva v.</u>

<u>Border Transfer of MA, Inc.</u>, 296 F. Supp. 3d 389, 400 (D. Mass. 2017) (certifying class under

prongs A and C); <u>Martins v. 3PD, Inc.</u>, 2013 WL 1320454, at *6 (D. Mass. Mar. 28, 2013)

(certifying class under Prongs A and B and finding it unnecessary to reach Prong C).[2]

     Uber is wrong to suggest that <u>Costello</u> "contravenes Ninth Circuit precedent", and Uber

has offered no meaningful reason to depart from it. Dkt. 92 at 8, n. 2.[3] Indeed, the Ninth Circuit

---

[2]   <u>Costello</u> (in which the U.S. Supreme Court denied *certiorari*) postdates the few outlier (and incorrectly decided) decisions cited by Uber in support of its misguided argument, such as <u>Schwann v. FedEx Ground Package Sys., Inc.</u>, 2013 WL 1292432 (D. Mass. Apr. 1, 2013). Other cases Uber cites are further distinguishable, such as <u>Magalhaes v. Lowe's Home Centers, Inc.</u>, 2014 WL 907675, at *4 (D. Mass. Mar. 10, 2014), where the court found there was no commonality on <u>any</u> of the three prongs of the test because the plaintiffs were providing "over fifty different types" of services to the defendant. The court's statement that "even if Prong B can be subject to common proof", the plaintiffs would still need to show commonality as to the other two prongs, <u>see</u> <u>id.</u> at *8, is not only incorrect, but also dicta.

[3]   <u>Costello</u> shows that the Court can "tak[e] a peek at the merits" when deciding class certification. Indeed, if a case can clearly be won under Prong B, it would make no sense to

has held that "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998) (citing Wright, Miller & Kane, 7AA Fed. Prac. & Proc. Civ. § 1778 (3d ed.)). Thus, if "certifying the class for purposes of prong two would substantially advance the litigation," as it would here by supplying a "common answer on prong two", Costello, 810 F.3d at 1060, then class certification is appropriate, even if individualized issues remain as to Prongs A and C (which is not even the case here, see infra, § II(C)). Indeed, the Seventh Circuit *reversed* the district court in Costello for its refusal to certify a class in view of the clear commonality on Prong B of the "ABC" test, and the same is equally true here. This Court can "take a peek" at the merits in determining whether class certification is appropriate on Prong B alone.[4] See Ellis, 285 F.R.D. at 506; Bee, Denning, Inc., 310 F.R.D. at 623.

### C. In Any Case, There is Commonality on All Three Prongs of the ABC Test

In any case, numerous courts have recognized that class certification is appropriate in

---

deny class certification because of theoretical differences on other prongs (that will never need to be examined). In support of its contrary assertion, Uber cites Konik v. Time Warner Cable, 2010 WL 8471923, at *4 (C.D. Cal. Nov. 24, 2010), which notes that "[a]lthough some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on the merits to the class certification stage." But as the Costello court recognized, "[t]here is no requirement that the district court blind itself to the conjunctive structure of the [ABC] test for employment…. Because Plaintiffs have shown that common evidence will resolve prong two, they have made a prima facie showing that they *can* win their case based on evidence common to the class. That conclusion is not the same as saying, as the district court thought, that Plaintiffs *do* win their case, which is the merits determination." Costello, 810 F.3d at 1060. See also Blades v. Monsanto Co., 400 F.3d 562, 567 (8th Cir. 2005); Ellis v. Costco Wholesale Corp., 285 F.R.D. 492, 506 (N.D. Cal. 2012) ("[T]he court must consider the merits to the extent necessary to determine commonality."); Bee, Denning, Inc. v. Capital All. Grp., 310 F.R.D. 614, 623 (S.D. Cal. 2015) ("[T]he court must consider the merits if the merits overlap with the Rule 23 requirements."). As these cases make clear, there is no "one-way intervention" problem, see Dkt. 92 at 8, because the Court is not ruling on the merits but is simply determining that Plaintiffs "*can* win their case" based on common evidence. Costello, 810 F.3d at 1060.

[4]    And that "peek" has already been shown in the People v. Uber case, where the Superior Court found that the State showed a strong likelihood of success on prevailing on its claim that Uber could not satisfy Prong B. See People v. Uber, (Ex. 1). The justices of the Court of Appeal who heard argument just this week seemed quite in agreement on that point. The transcript of the argument is not yet available, but Plaintiffs will provide it when it becomes available.

1   cases with very similar facts to this one, under *all three prongs* of the "ABC" test[5], and the

2   Court should reach the same conclusion here.

3        **Prong B:** Uber acknowledges that under Prong B, the Court will need to consider

4   whether transportation services offered by Uber drivers are necessary or merely incidental to

5   Uber's business. Dkt. 92 at 10.[6] See Carey v. Gatehouse Media Massachusetts I, Inc., 94 N.E.3d

6   420, 426 (2018). This question can plainly be determined on a class-wide basis.[7] Regardless of

7

8 [5]    See, e.g., Portillo v. Nat'l Freight, Inc., 2020 WL 3582514, *10 (D.N.J. July 1, 2020) (certifying class under all three prongs of New Jersey ABC test); Carrow v. FedEx Ground Package Sys., Inc., 2019 WL 7184548, *11 (D.N.J. Dec. 26, 2019) (same); Mujo v. Jani-King

9 Int'l, Inc., 2019 WL 145524, *8 (D. Conn. Jan. 9, 2019) (same, under Connecticut ABC test); De Giovanni v. Jani-King Intern., Inc., 262 F. R. D. 71, 84-88 (D. Mass. Sep. 21, 2009) (same,

10 under Massachusetts ABC test); D'Italia v. Lowe's Home Centers Inc., No. 11-4758-BLS1 (Suffolk Super. Ct. Dec. 12, 2012), filed at Dkt. No. 57-25 (same); Awuah v. Coverall North

11 America, Inc. No. 1:07-cv-10287, Dkt. 365 at 2-3 (D. Mass. Sept. 27, 2011) (same); Sandoval, et al. v. M.J.F. Bowery Corp. d/b/a/ Ten's Show Club, 29 Mass. L. Rptr. 11 (Essex Super. July 22, 2011) (same).

12 [6]    Plaintiffs submit that the Court may also consider "what business the hiring entity proclaims to be in" (i.e. how Uber holds itself out). Vazquez v. Jan-Pro Franchising Int'l, Inc.,

13 923 F.3d 575, 597 (9th Cir.), opinion withdrawn, 930 F.3d 1107 (9th Cir. 2019), and opinion reinstated in part on reh'g, 939 F.3d 1050 (9th Cir. 2019); see also Johnson v. Serenity

14 Transportation, Inc., 2018 WL 3646540, at *11 (N.D. Cal. Aug. 1, 2018), aff'd, 802 F. App'x 250 (9th Cir. 2020) ("[W]hether Plaintiffs provide services within Serenity's usual course of

15 business is subject to common proof because Serenity defines itself as a mortuary transportation service and all drivers perform the same work: mortuary delivery services."). How Uber holds itself out to the public will clearly be common to the class.

16 [7]    Uber points to its new "Drive Pass" subscription program as evidence that drivers do not

17 work in Uber's usual course of business. This argument is a red herring. First, Uber readily admits that "[d]rivers can switch between a subscription and the traditional service fee at any

18 time", see Dkt. 93 at ⁋ 42, and nothing about the program (which has not been widely used by the class, see Dkt. 94 at Ex. 9), changes the fact that Uber still relies on drivers' provision of

19 transportation services for its revenue, regardless of whether a given driver pays Uber its service fee upfront and in bulk via DrivePass or on a ride-by-ride basis. Thus, this program does not

20 make Uber like the cab companies in Sebago v. Bos. Cab Dispatch, Inc., 471 Mass. 321, 334, 28 N.E.3d 1139, 1151 (2015), who were financially indifferent to how many rides the taxi

21 drivers provided, since the drivers paid flat daily or weekly rates for the use of their cabs. Id. at 1151 ("[t]he medallion owners' leasing business is not directly dependent on the success of the drivers' endeavors.").

22 ███████████████████████████████████████████████████████████████████████████

23 ███████████████████ Moreover, drivers purchasing a Drive Pass must pay for trip requests regardless of whether they "accept, cancel, or decline", and Uber does not even guarantee that the requisite number of trips will be offered,

24 see Ex. 7 at 2, meaning that the Drive Pass program is still designed to encourage drivers to accept as many rides as possible. Uber's business model is still financially dependent on the

25 provision of transportation services by its drivers, and its model is designed to coerce drivers into accepting as many rides as possible. Indeed, Uber's fare addendum specifically disclaims

26 any notion that it "charge[s] a fee to access" the Uber platform, which undercuts Uber's argument that it is merely licensing its software to drivers, who are free to use it without

27                     PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
               CASE NO. 3:19-cv-06462-EMC; CASE NO. 3:20-cv-01886-EMC

28                           5

1    whether the Court ultimately determines that drivers' work is or is not necessary to Uber's

2    business, the answer to this question will necessarily be based on common evidence as it will

3    turn on the nature of Uber's business. See Johnson, 2018 WL 3646540, at *11.[8]

4        **Prong A:** As set forth in Plaintiffs' Motion, the Court has already exhaustively

5    considered Uber's right to control drivers' schedules, routes, pay, and work for other

6    companies, and it concluded that these controls (or lack thereof) are capable of common

7    determination. O'Connor, 2015 WL 5138097, at *17-22. Uber counters that it has made many

8    changes to its policies since 2015 that have generally reduced the company's control over

9    drivers. Dkt. 92 at 9-10. For example, Uber argues that as of July 2020, drivers can now set

10   their own fares and that as of January 2020, drivers no longer have to accept a certain number of

11   ride requests. Dkt. 93 at ¶ 15, 37. As an initial matter, these alleged changes are not as

12   meaningful as Uber suggests.[9] But more importantly, any such changes still apply uniformly to

13   the class, and thus, they go to the merits of Plaintiffs' claim, not commonality.

14       Similarly, Uber argues that it has employed three different contracts during the relevant

15   period with materially different terms, which precludes class certification. In the O'Connor

16

17   interference or influence by Uber. Ex. 5 (Fare Addendum) at 1-2.
     [8] Uber's argument that Prong B is not susceptible to common proof because some drivers
18   rely on Uber as their primary source of income while others do not, or because some drivers
     advertise their own companies, see Dkt. 92 at 11, is an attempt to confuse the three prongs of
19   the test. These issues have no bearing on the Prong B analysis, which focuses on the nature of
     the services provided (transportation) and whether those services are part of Uber's usual course
20   of business.
     [9] Uber still takes actions that warn drivers against rejecting rides. See James Decl. at ¶¶ 4-
21   5; Ex. 2 at 24 (describing how drivers still receive notifications bout their acceptance rate,
     warning them that they will receive fewer ride requests if they do not accept enough rides); ▮
22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Likewise, Uber's "Set Your Own Price" feature is
     still designed to encourage drivers to utilize the default price established by Uber; drivers must
23   select a price floor up to five times the standard fare charged by Uber, but they will not be
     offered rides below their floor, such that drivers are encouraged to set prices as low as possible
24   to avoid missing out on rides. Riders are prompted to confirm the higher price and can decline
     and be reassigned to another driver such that drivers have no real ability to negotiate and every
25   incentive to accept Uber's base fare. Ex. 2 at 19-20; James Decl. at ¶¶ 8-9 & Ex. B to James
     Decl.; ▮▮▮▮▮▮▮▮▮▮▮▮ But more importantly, although these changes
26   may affect the merits of the Prong A analysis, there is no dispute that such policies apply
     uniformly to drivers, and the impact (if any) of these new features is common to the class.

1  litigation, seventeen different contracts had been used during the class period, but the Court

2  nonetheless certified the class, finding the alleged differences between contracts immaterial.

3  O'Connor, 2015 WL 5138097, at *20-22. Here, Uber claims that its "[e]arlier agreements

4  permitted Uber to deactivate drivers' accounts if they failed to maintain a minimum average

5  star-rating", whereas the current contract does not. Dkt. 92 at 9, n. 3. But in fact, the current

6  agreement incorporates by reference Uber's Community Guidelines, which in turn state that

7  "[i]f your rating is lower than the minimum average rating in your city, we will let you know.

8  And drivers…that don't meet the minimum average rating for their city may lose access to the

9  Uber apps." See Ex. 4;

10 

11  Likewise, the current agreement specifies that "[y]ou understand, … that your Riders'

12  experiences with your Rides, as determined by Rider input, may affect your ability to access our

13  Platform or provide Rides." Dkt. 93-1 at § 1.2.[11] In other words, Uber's most recent contract,

14  which went into effect days after AB5 went into effect, has simply disguised the fact that Uber

15  continues to reserve the right to use customer star ratings as grounds to deactivate drivers.

16  **Prong C:** Finally, with respect to Prong C, Uber argues that some "drivers incorporate

17  their own businesses, obtain commercial licenses, hire subcontractors, [and] advertise under

18  their own names," such that they are engaged in an independently established business, offering

19  transportation to the general public. Dkt. 92 at 12.[12] But for purposes of class certification, all

20  _____

[10]

21 

22  [11]     The other change Uber points to in its contracts is that the current contract no longer
   requires drivers to take at least one ride per month, see Dkt. 92 at 9, n. 3, but this minor change
23  is immaterial. O'Connor, 2015 WL 5138097, at *26 ("Uber's contracts require drivers to accept
   at least one ride request from Uber every 30 or 180 days to remain active on the Uber
24  application. This is not particularly informative, however.").
   [12]     Uber's argument that use of a competitor's app like Lyft means drivers are "engaged in
25  an independently established trade", see Dkt. 92 at 12, is a misunderstanding of Prong C. When
   drivers perform work for Uber (or Lyft), they do *not* do so under their own independent
26  business name but rather while "wearing the hat" of Uber. Indeed, the Supreme Court in
   Dynamex expressly cited to two Massachusetts cases that stand for the proposition that the

27

1   drivers are equally free to do these things, whether or not they actually have obtained a TNC

2   license or hired subcontractors. Indeed, courts have affirmed class certification where all drivers

3   *can* hire helpers to do their work for them, regardless of whether all of them did. <u>Alexander v.</u>

4   <u>FedEx Ground Package Sys., Inc.</u>, 765 F.3d 981, 993-94, 997 (9th Cir. 2014); <u>see also</u> <u>Ruiz v.</u>

5   <u>Affinity Logistics Corp.</u>, 754 F.3d 1093, 1102 (9th Cir. 2014); <u>Arzate v. Bridge Terminal</u>

6   <u>Transp., Inc.</u>, 192 Cal. App. 4th 419, 427 (2011).

7        Uber's contention that some drivers are "hired by independent transportation

8   companies", <u>see</u> Dkt. 92 at 12, is immaterial ████████████████████████████

9   ████████████████████████████████████████████████████. Uber is

10  clearly their joint employer under the "ABC" test for purposes of the drivers' work transporting

11  Uber passengers, regardless of whether they may also have been employed by transportation

12  companies. <u>Vazquez</u>, 923 F.3d at 597.[13] Likewise, the fact that some drivers purportedly utilize

13  entrepreneurial skill in the execution of their duties driving for Uber (for example, by choosing

14  to work at higher paid hours, or taking advantage of Uber's "surge pricing") is immaterial to

15  whether they are "engaged in a distinct occupation" of providing transportation services outside

_____

inquiry under Prong C is "whether the worker is wearing the hat of an employee of the
employing company, or is wearing the hat of his own independent enterprise" while performing
the work. <u>See Dynamex</u>, 4 Cal. 5th at 963 (citing <u>Coverall N. America v. Div. of</u>
<u>Unemployment</u> 447 Mass. 852, 857 N.E.2d 1083, 1087 (2006), and <u>Boston Bicycle Couriers v.</u>
<u>Deputy Dir. of the Div. of Empl. & Training</u>, 778 N.E.2d 964, 968 (2002)). When Uber drivers
perform rides for Uber customers, they are uniformly compelled to rely on Uber to assign them
customers, are limited to accepting or rejecting the customers Uber offers them, and must
perform their services subject to Uber's rules and conditions established by Uber (such as the
default base fare and service fee). In sum, Plaintiffs and class members perform their services
transporting Uber passengers under the Uber brand as an "Uber driver" and not as a driver for
their own independently established company. <u>See also</u> <u>O'Connor</u>, 2015 WL 5138097, at *23, n.
24 (noting that "drivers who individually contracted with Uber and have also individually
contracted with Uber's competitors such as Lyft…more closely resemble fast-food workers who
may work shifts at both Burger King and McDonald's.").

[13]   <u>Dynamex</u> interpreted the "suffer or permit" test articulated in <u>Martinez v. Combs</u>, 49
Cal. 4th 35 (2010), which was itself a joint employment case, and the "ABC" test therefore
applies to such drivers, even if they may also be employed by intermediary transportation
companies ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

of their work for Uber, which is the operative question under Prong C. Entrepreneurial initiative is not part of Prong C or any other part of the "ABC" test. Finally, drivers' decision to identify as self-employed contractors on their tax returns has no bearing on the Prong C analysis; indeed, it is not clear how else the drivers would have filed their taxes given that Uber has labeled them as contractors and issued them 1099s. <u>Agerbrink v. Model Serv. LLC</u>, 2017 WL 933095, at *7 (S.D.N.Y. Mar. 8, 2017)  ("It would be a bold worker indeed who, notwithstanding the fact that she is paid as an independent contractor, nevertheless files her taxes as an employee, thereby exposing her employer to potential tax penalties.").[14]

**D.  Common Questions Predominate in Plaintiffs' Specific Claims**

The Court may certify this case as a class action on misclassification liability alone, as many courts have done, deferring damages inquiries. <u>See infra</u>, n. 17; <u>see also</u> Dkt. 56 (Mot. for Class Cert) at pp. 2-3 & n. 19. However, if the Court decides to address each claim, they each clearly raise common issues as well.

**Expense Reimbursement:** First, Uber's argument that the expense reimbursement claim is not subject to certification is frivolous, particularly in view of this Court's prior decision in <u>O'Connor</u> (which was not disturbed by the Ninth Circuit's reversal on other grounds). Plaintiffs are only seeking reimbursement of vehicle and phone-related expenses, which this Court has already found to be necessary, <u>see</u> <u>O'Connor</u>, 311 F.R.D. at 567 ("To even access the Uber app, a smart phone and data plan is required…").[15] Uber argues that it is impossible to know which expenses are attributable to a driver's work for Uber "[b]ecause

---

[14]     <u>See also</u> <u>Air Couriers Internat. v. Employment Dev. Dep't</u>, 150 Cal. App. 4th 923, 927 (2007) (affirming ruling that drivers were employees even though they were issued 1099s); <u>JKH Enterprises, Inc. v. Dep't of Indus. Relations</u>, 142 Cal. App. 4th 1046, 1052 (2006) (same).

[15]     Uber's argument that because some drivers purchase expensive cars or phones, the Court will need to resolve whether a given expense is "necessary" is a red herring. Dkt. 92 at 16. Regardless of which model car or phone a class member uses, the point is that the given equipment is necessary to perform services for Uber, and class members are entitled to reimbursement. Moreover, that Uber itself exerts control over what vehicles a driver can use, <u>see</u> Ex. 6, further underscores that these expenses are necessary. In any event, Plaintiffs will seek reimbursement of vehicle expenses using the IRS mileage rate, which computes an average cost of operating a vehicle and thus does not vary based upon the type of vehicle. This Court certified a class on this claim in <u>O'Connor</u> based on the IRS rate. <u>O'Connor</u>, 311 F.R.D. at 567.

drivers regularly switch between multi-sided platforms…and engage in personal errands while logged onto the app." Dkt. 92 at 16. But this argument is erroneous; when a driver is driving to pick up or drop off an Uber passenger, he or she is necessarily incurring expenses in furtherance of his or her work for Uber. That a driver can switch between taking rides for Uber and Lyft does not change the fact that expenses incurred *while driving to pick up or drop off an Uber customer* are indisputably attributable to Uber.[16]

Finally, Uber argues that "many putative class members receive full reimbursement from the third-party companies that employ them", which precludes certification of this claim as to these drivers. Dkt. 92 at 15. However, that some small number of drivers may have received some reimbursement or had their vehicles provided by someone else will not result in a different analysis, since those drivers still had to pay for their expenses (though their payment of those expenses was made through paying a portion of their fares to the third-party company).[17]

**Minimum Wage & Overtime:** Uber argues because drivers' pay is allegedly calculated differently for different drivers, class certification is not possible on Plaintiffs' minimum wage claims. Specifically, Uber argues, some drivers receive surge pricing and others receive

---

[16]     As for phone expenses, courts have held that "when employees must use their personal cell phones for work-related calls, Labor Code section 2802 requires the employer to reimburse them." Cochran v. Schwan's Home Serv., Inc., 228 Cal. App. 4th 1137, 1140 (Ct. App. 2014); see also Herrera v. Zumiez, Inc., 953 F.3d 1063, 1078 (9th Cir. 2020); Richie v. Blue Shield of California, No. C-13-2693 EMC, 2014 WL 6982943, *17 (N.D. Cal. Dec. 9, 2014) (certifying class for § 2802 claim for telephone expenses and noting that "employer was required to reimburse an employee for the reasonable expense of the mandatory use of a personal cell phone, even when the employee did not incur an 'extra expense' as a result of that call (for example, when the employee had an 'unlimited minutes' plan") (internal quotation omitted)). "To comply with section 2802, the employer must pay some reasonable percentage of the employee's cell phone bill." Herrera, 953 F.3d at 1078.  Thus, cell phone expense reimbursement damages can be calculated or estimated for drivers based on the amount of time a given driver was online, logged into the Uber app, and therefore using phone data to run the app. See Marsu, B.V. v. Walt Disney Co., 185 F.3d 932, 938-39 (9th Cir. 1999) ("[t]he law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation").

[17]     If the Court deemed it necessary, it could  bifurcate the issues of liability and damages pursuant to Rule 23(c)(4) for drivers who drove through intermediary companies – or certify these drivers' claims for now only on misclassification liability. See Martins v. 3PD, Inc., 2013 WL 1320454, *8, n. 3 (D. Mass. Mar. 28, 2013); Wilson v. Kiewit Pac. Co., 2010 WL 5059522, *9 (N.D. Cal. Dec. 6, 2010); Moyle v. County of Contra Costa, 2007 WL 4287315, *22 (N.D. Cal. Dec. 5, 2007).

significant tips. Dkt. 92 at 13. Uber is wrong; California law does not allow Uber to take the tip

credit into account when calculating minimum wage damages, see Henning v. Indus. Welfare

Com., 46 Cal. 3d 1262, 1279 (1988), and the fact that hourly rates vary from driver to driver,

day to day, does not matter; the point is that Uber has no policy to ensure that drivers receive at

least minimum wage for all hours worked or overtime for hours worked beyond forty per week.

Moreover, it has uniformly: (1) failed to compensate drivers for time spent between rides; and

(2) required drivers to bear their own vehicle expenses, effectively lowering their hourly

wages.[18] Dkt. 59 at ¶¶ 7, 9; Dkt. 58 at ¶¶ 7, 9; Ex. 5 at p. 1 (describing payment based on

distance and/or time of the ride with passenger in the car); █████████████████

████████████████████████████████████   That damages would need to be calculated for

each driver goes without saying, since that is true in almost all wage cases. The law is clear that

[18]     Uber's cases are distinguishable.  For instance, in Beauperthuy v. 24 Hour Fitness USA, Inc., 772 F. Supp. 2d 1111, 1125 (N.D. Cal. 2011), abrogated by Campbell v. City of Los Angeles, 903 F.3d 1090 (9th Cir. 2018), the "Plaintiffs [we]re unable to identify a single policy, plan, or decision which required them to work off-the-clock" and instead, Plaintiffs relied on a number of different allegations that only applied to certain contracts that were in effect over a ten year period. By contrast, here, Plaintiffs allege common policies on the part of Uber: misclassifying drivers, failing to compensate drivers for time spent between rides; and requiring drivers to bear their own vehicle expenses. The class sought here covers a roughly twenty-month period (to date), and the method of compensation (by the ride) has not varied; only the rate of pay has changed. Likewise, in Stallsmith v. Linder Psychiatric Grp., Inc., 2016 WL 279271, at *2 (E.D. Cal. Jan. 22, 2016), Plaintiffs alleged "different amounts of allegedly uncompensated time and for different kinds of tasks, none of which were recorded." Here, by contrast, Plaintiffs allege common policies, and Uber has clear records of drivers' time spent on the application and their total pay.
        That some drivers since July 2020 have purportedly "set their own fares" is likewise immaterial. The system essentially allows drivers to choose to only accept various increments of "surge pricing", not engaging in true negotiations with riders, as Uber tries to claim.  In any case, what matters for purposes of this claim is that Uber has no policy to ensure that drivers receive at least minimum wage for all hours worked.  Plaintiffs will show all drivers in the class have not made minimum wage for the time between rides, and many if not most drivers have made less than minimum wage (particularly when accounting for their expenses, and not counting their tips), for at least some periods of time when driving passengers or driving to pick up passengers. In any event, it is not necessary for all class members to have suffered an injury, and indeed, it is typical in class actions for minimum wage that not all class members will have routinely suffered minimum wage violations. See, e.g., Gammella v. P.F. Chang's China Bistro, Inc., 120 N.E.3d 690, 701 (2019); Cope v. Let's Eat Out, Inc., 319 F.R.D. 544, 555 (W.D. Mo. 2017); see also Dilts v. Penske Logistics, LLC, 267 F.R.D. 625, 635 (S.D. Cal. 2010).
        Likewise, the fact that some drivers have paid a subscription fee rather than a per ride service fee is irrelevant; for purposes of calculating damages, the amount of the subscription fee would be deducted from the amount of the drivers' wages (just like Uber's commission is deducted from drivers' pay), leaving only what remains after customer tips and the service fee/subscription fee is subtracted.

individualized damages determinations do not preclude certification. <u>Leyva v. Medline Indus.</u> <u>Inc.</u>, 716 F.3d 510, 513 (9th Cir. 2013); <u>Yokoyama v. Midland Nat'l Life Ins. Co.</u>, 594 F.3d 1087, 1094 (9th Cir.2010).

Likewise, Uber argues that determining whether "on-call" time logged in to the Uber app constitutes working time will require individualized inquiries that preclude class certification. Dkt. 92 at 14-15. But to the extent all class members were equally free to use other applications at the same time as the Uber app or to engage in other personal activities while using the Uber app, the issue of whether "on-call" time is compensable is common to all of them. Uber's arguments as to why that time may not be compensable go to the merits.[19]

**Paid Sick Leave:** Contrary to Uber's contentions, Plaintiffs' claim for paid sick leave would not require "mini-trials." Uber does not dispute that whether it had a paid sick leave policy is a common question that should be certified. Calculating the amount of paid sick leave each driver is eligible for is easily accomplished as it is directly tied to the number of hours each driver spent working.[20] Uber insists that each class member would need to show that they provided "reasonable advance notification of the need for sick leave" and that they had a qualifying reason to take it. Dkt. 92 at 16-17. First, as this Court has already held, because "Uber does not dispute that, at the time this case was filed, it did not offer sick pay, Plaintiffs

---

[19]    Uber contends that since January 2020, drivers do not have to accept a minimum number of rides; however, drivers continue to receive notifications from Uber warning that if they accept too few rides, they will be assigned fewer rides by Uber. <u>See</u> James Decl. at ¶¶ 4-5; Ex. 2 at 24.  Likewise, Uber's new Drive Pass feature requires drivers to pay up front for a certain number of rides, regardless of whether they accept, reject, or cancel, creating an economic incentive to accept all rides (since drivers will have paid for them whether they accept them or not. Ex. 7, Ex. 8; Ex. 2 at 20-21; James Decl. at ¶ 7. The effect is, as Plaintiffs expect to show in the case, that drivers continue to be under pressure to accept most ride requests.

[20]    Indeed, Uber has offered benefits to drivers, that it claimed were similar to sick leave benefits, in conjunction with the Covid-19 pandemic, that were predicated on how many hours a driver worked during a specified time period, showing that this information is in fact easily calculable. (As Plaintiffs previously argued, Uber's stringent documentation requirements, as well as its limitation that drivers must have been diagnosed with, or were quarantining due to Covid-19, contravened Cal. Lab. § 246, <u>see</u> Civ. A. No. 3:20-cv-01886, Dkt. 40 at 34, n. 14). Likewise, Uber's own analysis in opposing this Motion shows that it can easily calculate the accrual of sick leave by drivers by looking to the number of hours they spent on the app and number of days in which they completed rides. <u>See</u> Dkt. 94 at Ex. A3.

1   need not plead that they requested it in order to state their claim." Dkt. 74 at 6. Indeed, it would

2   be nonsensical to require a worker to request permission to take paid sick leave from an

3   employer that does not even purport to offer it. Moreover, with respect to whether certain

4   drivers may never have had occasion to take sick leave and therefore have differing damages,

5   courts have nonetheless certified this type of claim, recognizing that differences in the

6   calculation of damages are not a reason to deny class certification where a company has a

7   uniform policy (or lack of policy) regarding failure to provide paid sick leave. See, e.g.,

8   Schroeder v. Envoy Air, Inc., 2017 WL 10525816, at *6 (C.D. Cal. Feb. 6, 2017) ("Envoy's

9   company-wide sick leave policy may have given rise to a claim in _most_ of those individuals.")

10  (emphasis added); Schroeder v. Envoy Air, Inc., 2017 WL 3835804, at *4 (C.D. Cal. Aug. 30,

11  2017) (certifying class of all of Envoy's California employees over a 4 year period on sick leave

12  claim); Douglas Cty. Fed'n v. Douglas Cty. Sch. Dist. RE-1, 325 F.R.D. 355, 363-64 (D. Colo.

13  2018) ("[T]hat Defendant's elimination of the sick leave bank affected Plaintiffs in varying

14  ways does not preclude commonality.").[21] Moreover, even if some class members were

15  ultimately found not to have suffered any damages, this fact does not prevent class certification.

16  See Torres v. Mercer Canyons Inc., 835 F.3d 1125, 1136 (9th Cir. 2016) ("[A] well-

17  defined class may inevitably contain some individuals who have suffered no harm as a result of

18  a defendant's unlawful conduct."); see also Tyson Foods, Inc. v. Bouphakeo, 136 S. Ct. 1036,

19  1044, 1049-50 (2016).

20      **Wage Statements:** Uber's sole argument against certification of Plaintiffs' pay

21  statement claim is that "[i]temized wage statement claims are derivative of an employee's right

22  to the wages themselves" so that this Court should deny certification if it agrees with Uber that

23

---

24  [21]    Courts have recognized that "the class need not be so ascertainable that every potential
       member can be identified at the commencement of the action." Arredondo v. Delano Farms Co.,
25  301 F.R.D. 493, 544 (E.D. Cal. 2014). To determine if a particular Uber driver worker would
       have had occasion to take sick leave during the class period because they experienced a time
26  when they had to work while sick or take unpaid time off to care for a family member, etc., the
       Court could simply utilize surveys or questionnaires. Id. at 544-45.

27                           PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
                           CASE NO. 3:19-cv-06462-EMC; CASE NO. 3:20-cv-01886-EMC
28                                                    13

1   Plaintiffs other claims are not subject to certification. Dkt. 92 at 17. By the same token, if the

2   Court certifies Plaintiffs' claim for misclassification (which it should), then it should likewise

3   certify the claim for wage statements. See Johnson, 2018 WL 3646540, at *15 ("If the drivers

4   were employees and not independent contractors—a question the Court has already decided is

5   subject to common proof—the wage statement [] claim[] [is] also subject to common proof.");

6   see also Valadez v. CSX Intermodal Terminals, Inc., 298 F. Supp. 3d 1254, 1269 (N.D. Cal.

7   2018) ("Defendant acknowledges that the wage statement violation claim "succeeds or fails"

8   based on employment status.").

9       **E.  Uber's Claim That Individualized Inquiries Regarding Which Drivers Opted Out**
       **of Arbitration Preclude Class Certification Is Disingenuous and Must Be**

10         **Rejected**

11       Uber's argument that it would require fact-intensive individualized inquiries to

12  determine which drivers opted out of its arbitration agreement, and is therefore a member of the

13  proposed class, must be rejected. Indeed, this argument is particularly disingenuous given that

14  the Court just certified a settlement class of such individuals, and the group was readily

15  ascertainable for settlement purposes. O'Connor v. Uber Techs., Inc., No. 13-CV-03826-EMC,

16  2019 WL 4394401, *1 (N.D. Cal. Sept. 13, 2019). Moreover, this Court previously certified a

17  class of drivers who opted out of arbitration before later expanding the class to include those

18  drivers who were bound to arbitrate as well. O'Connor, 2015 WL 5138097, at *7.[22] Uber's

19  frivolous argument on this point should be rejected.[23] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

20  [22]   Although the Court's decision to expand the class was later overturned on appeal, there
is no question that these claims can be certified as to those drivers not bound by the arbitration

21  clause, of which Uber has indicated contains approximately 4,828 drivers. See Dkt. 94 at ¶ 27.

22  [23]   Contrary to Uber's contentions at pp. 18-29 of its Opposition, there is no "manageability
problem" here. Plaintiffs have demonstrated that Prong B will be resolved on a common basis,

23  as Plaintiffs provide the same services to the same defendant's business. This fact alone will
most likely determine whether Plaintiffs are Uber's employees. Likewise, this Court has already

24  certified the very same expense reimbursement claim that issue here; mileage can be calculated
with resort to Uber's records and the relevant IRS reimbursement rate applied. Estimates of

25  phone expenses based on hours spent online ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
can be easily accomplished. Whether Uber provided paid sick leave to its drivers is

26  likewise a common issue, capable of determination on a class-wide basis. ▮▮▮▮▮▮▮▮

27          PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
       CASE NO. 3:19-cv-06462-EMC; CASE NO. 3:20-cv-01886-EMC

28                  14

**F. Whether Drivers Want the Law to Be Followed is Irrelevant, Both to the Merits and Class Certification, but in any Case, Drivers' Purported Expressions of Not Wanting to Be Employees Result from Uber's Threats of What it Would Do if It Had to Reclassify Drivers**

Once again, as in O'Connor, Uber has trotted out the argument that many drivers do not "want" to be reclassified as employees, rendering the named Plaintiffs inadequate representatives. The Court correctly rejected this argument before, and it should do so again. O'Connor, 2015 WL 5138097, at *12 ("Uber vigorously argues that the named Plaintiffs are neither adequate nor typical of the putative class members they seek to represent because they seek a remedy—an employment relationship with Uber—that irreconcilably conflicts with the interests of countless drivers….The Court rejects this argument.").

As this Court previously recognized, the relevant legal question at issue in this litigation is not whether drivers *want* to be employees, but rather whether they were properly classified under the relevant legal standard. Drivers' desires on this question are legally irrelevant -- a fact this Court already recognized in certifying the class in O'Connor, 2015 WL 5138097, at *13 ("[E]ven if Uber *had* demonstrated some real tension between the goals of the class representatives and some statistically significant percentage of the class members, courts have refused to find inadequacy on these grounds.") (emphasis in original); see also Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012) (holding that "an interest by certain putative class members in maintaining the allegedly unlawful policy is not a reason to deny class certification" and affirming class certification notwithstanding dozens of affidavits from class members attesting they felt they would be harmed if it was successful) [24]; Norris-Wilson v. Delta-T Grp., Inc., 270 F.R.D. 596, 606 (S.D. Cal. 2010); Garcia v. E.J. Amusements of New

and courts frequently certify such claims. See Dkt. 56 at 15 (citing cases). Uber's alarmist arguments to the contrary must be rejected.

[24]   As the court recognized in Matamoros, class members who do not want to join the case (and collect whatever damages they may be owed) are free to opt out of the class.

1  Hampshire, Inc., 2015 WL 1623827, *9 (D. Mass. Apr. 13, 2015); Dalton v. Lee Publications,

2  Inc., 270 F.R.D. 555, 560 (S.D. Cal. 2010).

3          Courts have long held that workers may not disclaim their right to recovery in order to

4  defeat enforcement of remedial wage and hours laws. See Tony & Susan Alamo Foundation v.

5  Sec'y of Labor, 471 U.S. 290, 302 (1985) (employer liable for paying even employees who do

6  not want to be reimbursed for their wages); Smith v. Cardinal Logistics Mgmt. Corp., No. 07-

7  2104 SC, 2008 WL 4156364, at *7 (N.D. Cal. Sept. 5, 2008) (noting that "the protections

8  conferred by [the labor code] have a public purpose beyond the private interests of the workers

9  themselves"). As the Supreme Court explained: "If an exception … were carved out for

10  employees willing to testify that they performed work 'voluntarily,' employers might be able to

11  use superior bargaining power to coerce employees to make such assertions, or to waive their

12  protections under the Act." Tony & Susan Alamo Foundation, 471 U.S. at 302; Martin v.

13  Tango's Rest., Inc., 969 F.2d 1319, 1324 (1st Cir. 1992) (awarding damages to "involuntary

14  plaintiff" because "payment of back wages, if proved due, is intended to protect complying

15  competitors of the defendants, in addition to making the employee whole"). The same is true

16  here; that some drivers may prefer to be classified as independent contractors does not have any

17  bearing on the legal question of whether Uber has broken the law by classifying them as such.

18          In any event, drivers' attitudes regarding employment classification are clearly the result

19  of Uber's multi-million-dollar campaign to threaten them that it will fire drivers and strip them

20  of their flexibility if they are reclassified as employees. See, e.g., Ex. A to James Decl. at p. 12

21  (describing that if Prop 22 does not pass, drivers will not be able to work when and where you

22  want, working using multiple apps, and "only 20-30% [of] current drivers" will be allowed to

23  continue working for Uber); see also Ex. 10. But there is no reason that Uber would have to

24  make these changes, as many employees work only occasionally or on flexible schedules and

25  variable shifts. O'Connor, 2015 WL 5138097, at *13 ("Uber has not definitely established that

26  all (or even much) of this 'flexibility' would necessarily be lost, nor has Uber even established

27
28

1   that a victory for Plaintiffs in this lawsuit would require Uber to use 'less flexible' work

2   schedules going forward."); <u>Olson v. California</u>, No. 2:19-cv-10956, 2020 WL 905572 at *14

3   (C.D. Cal., Feb. 10, 2020) (noting that "even if AB 5 enforcement actions require

4   reclassification of gig economy drivers, Company Plaintiffs [including Uber] could still offer

5   [drivers] flexibility and freedom while treating them as employees."); <u>see also</u> <u>JKH Enterprises,</u>

6   <u>Inc.</u>, 142 Cal.App.4th at 1051 (finding drivers were employees despite the fact they were "not

7   required to work either at all or on any particular schedule"). Indeed, Plaintiffs disagree with

8   Uber's arguments that reclassification would *have to* result in the parade of horribles Uber

9   describes, including drivers being laid off, making less money, losing flexibility, losing the

10  ability to work for other companies, and losing access to federal benefits. These threatened

11  effects do not have to occur; it is up to *Uber* to decide whether it would take away flexibility for

12  drivers if it were required to reclassify them.[25] In any case, these are fundamentally policy

13  arguments for the legislature (or for the public in connection with the Proposition 22

14  referendum) and <u>*not*</u> for this Court.

15      Indeed, this entire argument may be particularly irrelevant, as this case very well may

16  not be the case to decide whether Uber will need to reclassify its drivers going forward. In

17

18  [25]     Uber's claim that it will not be able to afford to employ all of its drivers is unsupported;
    to the extent hiring drivers as employees is more expensive, Uber could charge more for its
19  services rather than laying off drivers, which would have the added benefit of ensuring fairness
    in the marketplace rather than requiring the public to pay the costs of its misclassification.
20  Likewise, Uber's claim that drivers might make less money is based on Uber's speculative
    decision to recoup business costs by lowering driver compensation. Moreover, this argument
21  ignores that the minimum wage also serves to provide a floor that mitigates against economic
    uncertainty, and therefore the goal of the Labor Code is not just to maximize drivers' earnings
22  but to render them more predictable. Uber also claims drivers will lose their flexibility, but there
    is no reason this should necessarily be the case; "if a business concludes that it improves the
23  morale and/or productivity of a category of workers to afford them the freedom to set their own
    hours or to accept or decline a particular assignment, the business may do so while still treating
24  the workers as employees . . . ." <u>Dynamex</u>, 4 Cal.5th at 961, fn. 28. Uber's claim that drivers
    would lose the ability to "multi-app" presupposes that there is some benefit to doing so; if
25  drivers could rely on a single company for reliable work and wages, they would presumably not
    need to log on to multiple apps at once. Finally, as Judge Schulman recognized, "[t]hat these
26  drivers may temporarily qualify for emergency federal benefits during the pandemic does not
    fundamentally alter the precariousness of their financial existence, which is directly attributable
27  to Defendants' refusal to classify and treat them as employees entitled to protection under
    California law." <u>People v. Uber</u>, (Ex. 1) at *29.

People v. Uber (Ex. 1), the Attorney General has already obtained an injunction requiring Uber to reclassify its drivers as employees. Thus, the instant case may decide instead what damages drivers are entitled to, based upon their misclassification. Plaintiffs suspect that few drivers will reject having a check sent to them, if it is determined they are owed wages based upon Uber's Labor Code violations (and if they do not want it, they do not need to cash it).

But, in any event, Plaintiffs vigorously dispute Uber's contention that "the vast majority of drivers oppose reclassification." Indeed, a survey has shown that 63% of drivers state they want public officials to enforce misclassification laws in California to ensure that drivers receive basic workplace protections. See Ex. 2 at 9. Moreover, the same drivers who express a desire to maintain flexibility *also* desire the benefits of employee status. Id. at 10; see also Ex. 3 at 34; Sauceda Decl. at ¶¶ 9-10. It is unsurprising that some drivers profess to be against reclassification given that Uber has been emailing them every few days with a barrage of threats and misinformation about the alleged necessary consequences of reclassification. See, e.g., James Decl. at ¶ 6, Ex. A; Sauceda Decl. at ¶¶ 7-8; Ex. 10.[26]

**G. Contrary to Uber's Contentions, Plaintiffs Are Typical**

Finally, Uber's argument that Plaintiffs James and Verhines are not typical of the class should be rejected.  First, Uber argues that Plaintiffs James and Verhines are not typical of part-

---

[26]      The Court should disregard the "happy camper" declarations Uber submitted, see Dkt. Nos. 96-113, just as it disregarded them in O'Connor, 2015 WL 5138097, at *12 (recognizing that a tiny sample of hand-picked driver declarations are "statistically insignificant" and were not "randomly selected [to] constitute a representative sample of the driver population."); see also Costello v. Kohl's Illinois, Inc., 2014 WL 4377931, *7, n. 7 (S.D.N.Y. Sept. 4, 2014) ("The Court finds these declarations—dubbed 'happy camper' declarations by Plaintiffs—to be of limited value to the instant motion"); Creely v. HCR ManorCare, Inc., 789 F. Supp. 2d 819, 840 (N.D. Ohio 2011); In re Wells Fargo Home Mortg. Overtime Pay Litig., 527 F. Supp. 2d 1053, 1060-61 (N.D. Cal. 2007); Joseph v. GMC, 109 F.R.D. 635, 640 (D. Col. 1986).
      The Court may recall that, when Uber submitted this same type of "happy camper" declarations in O'Connor, Plaintiffs' counsel's paralegal called many of these declarants and learned they had not been told that the case Uber was opposing was seeking reimbursement for their expenses; when they learned that, they supported the case. See O'Connor, Civ. A. No. 13-3826-EMC at Dkt. 314. Once again, Uber did not inform the drivers who signed these declarations that the plaintiffs in this case are seeking to recover expense reimbursement for the miles they have driven and other wage benefits. See Sauceda Decl. at ¶¶ 9-10; Mazzola Decl. at ¶¶ 3-5. Their "opinion" therefore, as set forth in those declarations, regarding whether the law should be enforced, is particularly not entitled to any weight.

1   time drivers because they are full-time drivers. However, as this Court recognized, differences

2   regarding how much drivers were working for Uber is not material to the question of whether

3   they were misclassified, even under <u>Borello</u>, and this distinction is not material under any of the

4   prongs of the "ABC" test either. Indeed, all drivers perform the same service for Uber

5   (transporting Uber's customers) regardless of how many hours they drive on average, they are

6   all subject to the same policies, and they all hold themselves out as wearing the "hat" of Uber

7   when they drive for Uber. <u>See</u> <u>O'Connor</u>, 2015 WL 5138097, at *17 n. 15 ("The relevant

8   question is Uber's *right* to control its drivers' schedules. Because it uniformly has no such

9   control, it is not surprising that there are significant differences between class members with

10  respect to the actual number of hours they spend driving for Uber….") (emphasis in original).

11       Second, Uber argues that Plaintiffs are not typical of drivers who work for many

12  different gig economy companies (as they both worked primarily for Uber), and that "they seek

13  a remedy that will trigger the duty of loyalty and force drivers to pick one app over all others…."

14  Dkt. 92 at 24. But many if not most Uber drivers work for other gig companies as well, and

15  there is no material difference regarding their status as Uber's employees whether or not they

16  work for other companies. <u>O'Connor</u>, 2015 WL 5138097, at *23 n. 24 (noting that drivers who

17  drove for Uber and its competitors "resemble fast-food workers who may work shifts at both

18  Burger King and McDonald's").[27] In any case, as noted, this case is unlikely to be the case that

19  will decide whether Uber must reclassify its drivers going forward; this case may simply be the

20  case to seek damages for Uber's legal violations.[28]

21       Third, Uber argues that Plaintiffs James and Verhines are not typical of drivers who

22  employ subcontractors, <u>see</u> Dkt. 92 at 24-25, but again, as set forth above, these drivers are not

23  in a materially different position than any other Uber drivers (including the named plaintiffs)

---

24  [27]   Plaintiff Verhines testified that he worked for both Lyft and Instacart in addition to
25  Uber. <u>See</u> Ex. 9 (Verhines Dep.) at 186:22-189:20, 196:4-23.

26  [28]   Moreover, it seems highly unlikely that classification as employees would prevent
    drivers from working for both Uber and Lyft, particularly given that non-compete agreements
    are illegal under California law with limited exceptions. <u>See</u> Cal. Bus. & Prof. Code § 16600.

27              PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
                CASE NO. 3:19-cv-06462-EMC; CASE NO. 3:20-cv-01886-EMC
28                                      19

with respect to their work driving for Uber. Particularly with respect to Prongs A and B, these drivers *perform the same services* (transportation) under Prong B, they are subject to the same policies and controls imposed by Uber under the same contracts under Prong A, and they wear the "hat" of Uber when they drive Uber customers under Prong C.

Finally, Uber argues that because Plaintiff Verhines testified that he "do[es] not want to drive for [Uber] anymore," he cannot seek injunctive relief compelling reclassification of drivers. Dkt. 92 at 25. Again, Plaintiffs may not need to seek injunctive relief in this case since a pending action by the state of California is already seeking such relief. See People v. Uber, (Ex. 1). In any case, Uber mischaracterizes Plaintiff Verhines' testimony. He did not say he quit driving for Uber but instead expressed his aspirational wish that he would quit if he could. He is still active on the Uber app and may continue to work for Uber. See Ex. 9 (Verhines Dep.) at 131:8, 232:22-23 ("I prefer not to have to work with them at all anymore, but I may have to. I don't know."). The cases cited by Uber involved former employees who no longer worked for the defendant at all, which is not true of Mr. Verhines.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be granted. Uber has not raised any arguments in its Opposition to undermine the appropriateness of the class sought here.

DATED:          October 15, 2020

Respectfully submitted,

CHRISTOPHER JAMES and SPENCER VERHINES, individually and on behalf of all others similarly situated,

By: */s/ Shannon Liss-Riordan*
Shannon Liss-Riordan
Attorney for Plaintiffs

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by electronic filing on October 15, 2020, on all counsel of record.

By: */s/ Shannon Liss-Riordan*_____

Shannon Liss-Riordan