1   GIBSON, DUNN & CRUTCHER LLP
    THEODORE J. BOUTROUS JR., SBN 132099
2     tboutrous@gibsondunn.com
    THEANE EVANGELIS, SBN 243570
3     tevangelis@gibsondunn.com
    BLAINE H. EVANSON, SBN 254338
4     bevanson@gibsondunn.com
    HEATHER RICHARDSON, SBN 246517
5     hrichardson@gibsondunn.com
    333 South Grand Avenue
6   Los Angeles, CA  90071-3197
    Telephone: 213.229.7000
7   Facsimile:  213.229.7520

8   Attorneys for Uber Technologies, Inc.

9

10              **UNITED STATES DISTRICT COURT**

11       **NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION**

12  CHRISTOPHER JAMES and SPENCER          CASE NO.  3:19-cv-06462-EMC
    VERHINES, individually and on behalf of all
13  others similarly situated,                **DEFENDANT UBER TECHNOLOGIES,
                                              INC.'S SUPPLEMENTAL BRIEF ON PROP
14                    Plaintiffs,             22'S IMPACT ON PLAINTIFFS' MOTION
                                              FOR CLASS CERTIFICATION**
15        v.
                                              **Hearing**:
16  UBER TECHNOLOGIES, INC.,                  Date: December 22, 2020
                                              Time: 1:30 p.m.
17                    Defendant.              Place: Courtroom 5

18                                            Judge: Honorable Edward M. Chen
                                              Action Filed: October 8, 2019
19                                            Trial Date: none set

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

<u>Page</u>

I.      INTRODUCTION .................................................................................................... 1

II.     ARGUMENT ........................................................................................................... 1

        A.      Proposition 22 Unquestionably Applies to Plaintiffs' Claims Against Uber................ 1

        B.      Prop 22 Underscores That Plaintiffs Are Inadequate Class Representatives................ 5

        C.      Individualized Issues Predominate for Plaintiffs' Claims.............................................. 6

III.    CONCLUSION ........................................................................................................ 8

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Alberghetti v. Corbis Corp.*,
5   263 F.R.D. 571 (C.D. Cal. 2010) ....................................................................................5

6   *Berry v. County of Sonoma*,
   30 F.3d 1174 (9th Cir. 1994)...........................................................................................6

7
   *Carroll v. Lowes Home Ctrs., Inc.*,
8   2014 WL 1928669 (S.D. Fla. May 6, 2014) ...................................................................7

9   *Cassady v. Morgan, Lewis, & Bockius LLP*,
   145 Cal. App. 4th 220 (2006) .........................................................................................7
10
   *Dawson v. Hertz Transporting, Inc.*,
11   2018 WL 6112623 (C.D. Cal. Nov. 5, 2018)..................................................................7

12
   *Dunbar v. Albertson's, Inc.*,
13   141 Cal. App. 4th 1422 (2006) .......................................................................................7

14   *Johnson v. Serenity Transp., Inc.*,
   2018 WL 3646540 (N.D. Cal. Aug. 1, 2018)..................................................................7
15
   *Ladore v. Ecolab, Inc.*,
16   2012 WL 12861141 (C.D. Cal. Apr. 11, 2012) ..............................................................6

17
   *Lampe v. Queen of the Valley Med. Ctr.*,
18   19 Cal. App. 5th 832 (2018) ...........................................................................................8

19   *Mies v. Sephora U.S.A., Inc.*,
   234 Cal. App. 4th 967 (2015) .........................................................................................7
20
   *Nicholas v. Uber Techs., Inc.*,
21   2020 WL 7173249 (N.D. Cal. Dec. 7, 2020) ..................................................................6

22
   *Olson v. California*
23   No. 20-55267 (9th Cir. Nov. 18, 2020),
   https://www.youtube.com/watch?v=wIk__X_FnqQ .......................................................2
24
   *People v. Uber Techs., Inc.*,
25   56 Cal. App. 5th 266 (2020) ...........................................................................................3

26   *Ramirez v. TransUnion LLC*,
   951 F.3d 1008 (9th Cir. 2020).........................................................................................7
27
   *Torres v. Air to Ground Servs., Inc.*,
28   300 F.R.D. 386 (C.D. Cal. 2014) ....................................................................................7

1

**Statutes**

Cal. Bus. & Prof. Code § 7449 ...............................................................................................5

Cal. Bus. & Prof. Code § 7450 ...............................................................................................1

Cal. Bus. & Prof. Code § 7451 .......................................................................................2, 3, 4

Cal. Bus. & Prof. Code § 7463 .......................................................................................2, 3, 6

**Constitutional Provisions**

Cal. Const. art. II, § 10 ...........................................................................................................1

**Other Authorities**

Cal. Pub. Util. Comm., *Order Instituting Rulemaking on Regulations Relating to
   Passenger Carriers, Ridesharing, & New Online-Enabled Transportation Services*
   (Apr. 26, 2018), 2018 WL 2149034....................................................................................2

Cheryl Miller, *Proposition 22 Clouds Future of Pending Worker-Classification Suits*,
   The Recorder (Nov. 4, 2020), https://www.law.com/therecorder/2020/11/04/
   proposition-22-clouds-future-of-pending-worker-classification-suits/............................4

*Official Voter Information Guide* (2020),
   https://vig.cdn.sos.ca.gov/2020/general/pdf/complete-vig.pdf.....................................1, 2, 5

*State Ballot Measures - Statewide Results*, Secretary of State,
   https://electionresults.sos.ca.gov/returns/ballot-measures (last visited Dec. 8, 2020)......................1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

## I.   INTRODUCTION

California voters decisively and overwhelmingly approved Proposition 22, establishing that drivers who use the Uber app are *independent*—not employees of the platforms they use.  Prop 22 thus categorically rejected the relief sought by Plaintiffs in this case, and as a result, Plaintiffs cannot make out their predicate showing that Uber has misclassified drivers.

For all the reasons set forth in Uber's opposition to class certification, Plaintiffs' claims are unfit for classwide adjudication.  Nothing in Prop 22 eliminates the host of individualized issues related to Plaintiffs substantive claims, none of which are capable of proof through classwide evidence or are suitable for classwide adjudication.  Plaintiffs' claims are even more baseless than they were before Prop 22 was approved, and Plaintiffs' decision to nonetheless proceed in this case only further highlights their inadequacy as putative class representatives.

The Court should deny Plaintiffs' motion for class certification.

## II.   ARGUMENT

### A.   Proposition 22 Unquestionably Applies to Plaintiffs' Claims Against Uber.

On Tuesday, November 3, a resounding majority of the voters approved Prop 22.  The voters ratified what an overwhelming majority of drivers have said all along:  that they want to remain independent.  *See* Dkt. 95-9 at 3; Dkt. 95-10.  The final result has not yet been officially certified, but the Secretary of State reports that Prop 22 has passed by a 17-point margin:  58.6% to 41.4%.  *See State Ballot Measures - Statewide Results*, Secretary of State, https://electionresults.sos.ca.gov/returns/ballot-measures (last visited Dec. 8, 2020).  "Results will be certified by December 11, 2020." *Id.*  Prop 22 will take effect on "the fifth day after the Secretary of State files the statement of the vote."  Cal. Const. art. II, § 10(a).

Prop 22's core purpose, which the courts must "effectuate" (Ex. A (Prop 22) § 5), is "[t]o protect the basic legal right of Californians to choose to work as independent contractors with rideshare and delivery network companies throughout the state" (*id.* § 1 (adding Cal. Bus. & Prof. Code § 7450(a))).  Both the proponents and the opponents of Prop 22 based their arguments for and against Prop 22 on the fact that the measure would treat drivers who use Uber as independent contractors.  *E.g.*, *Official Voter Information Guide* 57 (2020), https://vig.cdn.sos.ca.gov/2020/general/pdf/complete-vig.pdf

(State Legislative Analyst:  "This measure makes app-based rideshare and delivery drivers independent contractors."); *id.* at 12 (official argument against Prop 22:  "No on 22 stops billion-dollar app companies like Uber, Lyft, and DoorDash from writing their own exemption to California law …."). Given the massive public attention Prop 22 received, much of which *explicitly* named Uber, there can be no doubt that the voters intended to "protect[] the choice of app-based drivers to work as independent contractors."  *Id.* at 58 (official argument in favor of Prop 22).

In fact, the California Attorney General (who has obtained an injunction against Uber under AB 5) has argued that *Uber "will not be subject to the ABC test under AB 5"* once Prop 22 takes effect, and that "any attempt to enforce [AB 5] after December 16 would not be proper" because "[a]fter Prop 22 goes into effect, those claims would no longer be viable."  Oral Argument at 17:37, 19:30, 22:35, *Olson v. California* No. 20-55267 (9th Cir. Nov. 18, 2020), https://www.youtube.com/watch?v=wIk__X_FnqQ.

To effectuate its purpose of ensuring that drivers remain independent, Prop 22 provides that "an app-based driver is an independent contractor and not an employee or agent with respect to the app-based driver's relationship with a network company" if four conditions are met:  (1) "[t]he network company does not unilaterally prescribe specific dates, times of day, or a minimum number of hours during which" drivers must work; (2) the network company does not require drivers "to accept any specific rideshare service … request as a condition of maintaining access to the … platform"; (3) the network company does not restrict drivers from "performing rideshare services … through other network companies except" when actively transporting passengers; and (4) the network company does not restrict drivers "from working in any other lawful occupation or business."  Prop 22 § 1 (adding Cal. Bus. & Prof. Code § 7451).  There can be no question that Uber meets these conditions.

As a threshold matter, Uber is a "[n]etwork company":  As to its Rides business, it is a "[t]ransportation network company," as defined in California Public Utilities Code § 5431(c).  *Id.* (adding Cal. Bus. & Prof. Code § 7463(l), (p)).  As Plaintiffs explain in their reply brief, the California Public Utilities Commission—charged with enforcing the Code—already has determined that Uber meets that definition.  *See* Dkt. 118-4 (Reply) at 2; *accord*, *e.g.*, Cal. Pub. Util. Comm., *Order Instituting Rulemaking on Regulations Relating to Passenger Carriers, Ridesharing, & New Online-*

*Enabled Transportation Services* (Apr. 26, 2018), 2018 WL 2149034, at *10 ("Uber[] … [is] a TNC under the plain meaning of Pub. Util. Code § 5431."); *People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266, 316–17 (2020) ("[D]efendants are regulated by the Public Utilities Commission (PUC) as 'transportation network companies' (TNC), defined as 'an organization … that provides prearranged transportation services for compensation using an online-enabled application or platform to connect passengers with drivers using a personal vehicle.'" (quoting Cal. Pub. Util. Code § 5431(c))). Drivers who use the Uber Rides app are thus "app-based drivers." Prop 22 § 1 (adding Cal. Bus. & Prof. Code § 7463(a), (q)).

It is also undisputed that Uber "does not unilaterally prescribe" when drivers "must be logged into the" app. *Id.* (adding Cal. Bus. & Prof. Code § 7451(a)). "Uber does not require drivers to spend any specific amount of time on the Rides platform (i.e., using the App). Drivers have complete discretion over whether, when, and how often they access the Rides platform." Dkt. 93 (Rosenthal Decl.) ¶ 21; *id.* ¶¶ 23 ("Uber cannot schedule drivers to drive at a particular time or require them to accept trips"), 24 (Uber does not "schedule them to work certain days/times"); Dkt. 93-1 (Platform Access Agreement or PAA) § 1.2 (drivers "decide when, where and whether (a) [they] want to offer P2P Service facilitated by [Uber's] Platform and (b) [they] want to accept, decline, ignore or cancel a Ride … request").[1]

Uber further "does not require the app-based driver to accept any specific rideshare service … request." Prop 22 § 1 (adding Cal. Bus. & Prof. Code § 7451(b)). Rather, "[a] driver can decline a trip for any reason. *There are no penalties for declining a trip* and a driver's 'Uber Pro' rewards program status is not affected. Many drivers routinely decline trip requests." Rosenthal Decl. ¶ 15 (emphasis added); *id.* ¶ 21 ("Uber does not require a driver to accept trips, and there is no penalty for declining

---

[1] *See also*, *e.g.*, Dkt. 96 (Abousleiman Decl.) ¶¶ 5–7 (driver touting the flexibility to start and stop driving at will); Dkt. 97 (Anandpuri Decl.) ¶¶ 5–6 (same); Dkt. 99 (Barseghian Decl.) ¶¶ 2–3 (same); Dkt. 100 (Bermudez Decl.) ¶¶ 7–8 (same); Dkt. 101 (Brondtsetter Decl.) ¶¶ 5–6 (same); Dkt. 103 (Feldman Decl.) ¶ 7 (same); Dkt. 104 (Glenn Decl.) ¶ 7 (same); Dkt. 105 (Haghiri Decl.) ¶ 11 (same); Dkt. 110 (Robertson Decl.) ¶ 15 (same); Dkt. 111 (Sauceda Decl.) ¶¶ 5–6 (same); Dkt. 112 (Slaton Decl.) ¶ 6 (same); Dkt. 113 (Zeidner Decl.) ¶ 7 (same).

trip requests."); PAA § 1.2 (drivers "are not required to accept any minimum number of Rides in order to access [Uber's] Platform").[2]

Finally, Uber "does not restrict the app-based driver from performing rideshare services" using other apps, and it "does not restrict the app-based driver from working in any other lawful occupation or business." Prop 22 § 1 (adding Cal. Bus. & Prof. Code § 7451(c)–(d)). "Drivers … can, and do, simultaneously 'multi-app'—i.e., use other applications such as Lyft and Grubhub at the same time as the Uber Driver App. As a result, drivers can transition from using the Uber Driver App to other applications simply by swiping their phones. Drivers can also use other apps at the same time as the Uber Driver App, and choose between matching options provided by the apps to maximize their economic success." Rosenthal Decl. ¶ 28; PAA § 1.2 ("[I]t is entirely [drivers'] choice whether to provide P2P Service to Riders directly, using [Uber's] Platform, or using any other method to connect with Riders, including, but not limited to other platforms and applications in addition to, or instead of, [Uber's]").[3]

Thus, after Prop 22, drivers who use the Uber Rides app are not employees; they are "independent contractor[s]" "[n]otwithstanding any other provision of law, including, but not limited to, the Labor Code, the Unemployment Insurance Code, and any orders, regulations, or opinions of the

---

[2] *See also*, *e.g.*, Barseghian Decl. ¶ 13 ("I can decide if I want to accept the ride or not. If I don't want to go [to] the place where the ride ends up, I don't have to do the ride. It's up to me."); Dkt. 102 (Cazares Decl.) ¶ 5 ("Uber won't penalize me for declining any particular ride …."); Feldman Decl. ¶ 8 ("I can decide whether I want to accept or decline requests for rides through the Uber application …."); Haghiri Decl. ¶ 8 ("I can turn down as many trips as I want without penalty."); Dkt. 106 (Kyle Decl.) ¶ 11 ("I also love the flexibility that comes from being able to pick and choose which rides I want to take and not be penalized for declining rides. Especially if I am wanting to wrap up but I'm an hour from home, I can reject rides that will take me too far from home, and wait for riders that want to go in a direction that I want to go. I never have to accept a ride I don't want to give."); Dkt. 107 (Martinez Decl.) ¶ 8 ("I feel free to decline any trip requests, and I have never felt as though I couldn't decline a request."); Dkt. 109 (Olson Decl.) ¶ 12 ("I am not penalized by Uber for rejecting rides. I have declined rides many times, and I have never received any communication from Uber about not accepting rides."); Sauceda Decl. ¶ 8 ("When using the Uber app, I'm free to decide whether to accept or decline rides that come to me through the app. In the past, Uber would sometimes notify me if my acceptance rate was starting to dip, but Uber has never told me I had to accept more rides to continue to use the app. It's up to me, the driver. Uber never threatened to deactivate my use of the app.").

[3] *See also*, *e.g.*, Abousleiman Decl. ¶ 8 ("Uber did not restrict me from having another job."); Anandpuri Decl. ¶ 7 (driver recounting experience multi-apping, as permitted by Uber); Dkt. 98 (Baggett Decl.) ¶¶ 11–12 (same); Barseghian Decl. ¶ 6 (same); Cazares Decl. ¶ 4 (same); Glenn Decl. ¶ 12 (same); Dkt. 108 (Neumeyer Decl.) ¶ 12 (same); Olson Decl. ¶¶ 10–11 (same); Robertson Decl. ¶ 8; Sauceda Decl. ¶ 4 (same).

Department of Industrial Relations or any board, division, or commission within the Department of Industrial Relations." Prop 22 § 1 (adding Cal. Bus. & Prof. Code § 7451).[4]

**B.      Prop 22 Underscores That Plaintiffs Are Inadequate Class Representatives.**

The vast majority of drivers oppose employment—but Plaintiffs nonetheless seek that very result. *See* Dkt. 92 (Opp.) at 20; Dkt. 95-9 at 3; Dkt. 95-10.  That is why drivers, by a 4:1 margin, prefer to remain as independent contractors and resoundingly supported Prop 22. *See* Dkt. 95-10.

With Prop 22, California voters joined drivers in overwhelmingly rejecting Plaintiffs' attempt to turn drivers into employees and in supporting driver independence.  The Voter Information Guide explained that voting for Prop 22 "means: App-based rideshare and delivery companies could hire drivers as independent contractors." *Official Voter Information Guide* 12 (2020), https://vig.cdn.sos.ca.gov/2020/general/pdf/complete-vig.pdf; *accord id.* at 57 (State Legislative Analyst:  "This measure makes app-based rideshare and delivery drivers independent contractors."). The People enthusiastically supported that outcome.  They found and "declare[d]" that "[p]rotecting the ability of Californians to work as independent contractors throughout the state using app-based rideshare and delivery platforms is necessary so people can continue to choose which jobs they take, to work as often or as little as they like, and to work with multiple platforms or companies, all the while preserving access to app-based rideshare and delivery services that are beneficial to consumers, small businesses, and the California economy." Prop 22 § 1 (adding Cal. Bus. & Prof. Code § 7449(e)).

Despite this, Plaintiffs still seek an order declaring that drivers are misclassified.  Accordingly, Uber's position that Plaintiffs' attempt to obtain relief antithetical to the interests of the majority of the putative class renders them inadequate class representatives has only been strengthened by the passing of Prop 22. *See Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 578 (C.D. Cal. 2010) ("For obvious reasons, a class representative is not adequate if the representative seeks relief which the class members

---

[4]  Plaintiffs' counsel has acknowledged that Prop 22 bars prospective relief. *See* Cheryl Miller, *Proposition 22 Clouds Future of Pending Worker-Classification Suits*, The Recorder (Nov. 4, 2020), https://www.law.com/therecorder/2020/11/04/proposition-22-clouds-future-of-pending-worker-classification-suits/ ("At this point those cases are really going to be about collecting damages up until the time Prop 22 takes effect").  To the extent Plaintiffs argue here that they can obtain past damages based on the proposition that drivers are or ever were employees—an argument voters in California decisively rejected—they are mistaken.  But that merits question is for another day.  The individualized elements of their claims discussed in Uber's opposition and summarized below preclude class certification in any event.

do not want."); Dkt. 95-10 (drivers polled preferred to be independent contractors by a 71% to 17% margin); Opp. 19–24.

## C.    Individualized Issues Predominate for Plaintiffs' Claims.

Drivers' independence is now enshrined in Prop 22.  But even putting that aside, Prop 22 does not affect the predominance analysis for Plaintiffs' purported claims.  The same individualized issues necessary to resolve Plaintiffs' wage-and-hour claims against Uber still preclude class certification, as detailed in Uber's opposition to class certification.  The Court should deny class certification for the same reasons Uber has argued.  *See* Opp. 5–19.

In particular, as laid out in Uber's Opposition, Plaintiffs' claims require them to show that drivers not only were misclassified, but also were denied the substantive wage-and-hour protections afforded to employees under California law.  Prop 22 does not help Plaintiffs establish the elements of their claims with classwide evidence, and Plaintiffs still cannot show that their substantive wage-and-hour claims satisfy commonality and predominance.

For example, Plaintiffs seek minimum wage and overtime pay for all the time drivers are logged into the app.  But whether "on-call" time is compensable is a "highly fact-driven, context-dependent inquiry, which is ill-suited to class treatment" (*Ladore v. Ecolab, Inc.*, 2012 WL 12861141, at *12 (C.D. Cal. Apr. 11, 2012)), especially where, as here, drivers vary significantly in how they actually use the app (*see Berry v. County of Sonoma*, 30 F.3d 1174, 1185 (9th Cir. 1994) ("The inquiry … is not whether the [workers] are prevented from participating in certain personal activities, but whether they *actually* engage in personal activities during on-call shifts." (emphasis added)); *see also Nicholas v. Uber Techs., Inc.*, 2020 WL 7173249, at *4, *11 (N.D. Cal. Dec. 7, 2020) (dismissing minimum wage and overtime claims because plaintiffs failed to allege facts relating to their individual use of the app and "fail[ed] to explain why … waiting time qualifies as legally compensable")).  Many drivers regularly decline ride requests, use competing app-based platforms, and engage in personal activities— all while logged into the Rides app.  *See* Opp. 14–15; Dkt. 95-6 at 186:9–21 (Plaintiff Verhines testifying that he would call potential suppliers for his personal business, watch YouTube videos, and listen to podcasts all while logged into the app).  Because Uber's records do not reflect and cannot determine the activities drivers actually engage in while logged into the app, there is no manageable

1   way to adjudicate these claims on a classwide basis.[5]

2          Plaintiffs' claim for expense reimbursement fares no better—a failing also unchanged by Prop

3   22.  Plaintiffs suggest that reimbursement for phone expenses can be calculated "based on the amount

4   of time a given driver was online, logged into the Uber app, and therefore using phone data to run the

5   app."  Reply 10.  But Plaintiffs cannot show that such expenses are directly attributable to Uber as

6   drivers often run multiple competing apps concurrently and engage in personal activities while logged

7   into the Rides app.  *See* Opp. 3, 15–16.  Under Plaintiffs' proposal, drivers would have a perverse

8   incentive to simply log into the app and decline all ride requests to avoid paying their phone bills.  *See*

9   *Cassady v. Morgan, Lewis, & Bockius LLP*, 145 Cal. App. 4th 220, 235 (2006) ("No public policy

10  would be served by requiring employers to indemnify for expenses attributable to an employee's

11  conduct while working for a different employer.").  Plaintiffs also fail to account for drivers who

12  received reimbursement from third-party transportation companies and thus have no claim for

13  damages.  *See Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1023 & n.6 (9th Cir. 2020).

14         Likewise, Plaintiffs' claim for sick pay remains unfit for classwide adjudication, as Uber's

15  liability depends on whether drivers experienced a qualifying condition "and whether they already

16  received compensation for those sick days" via Uber's response to COVID-19.  *See Carroll v. Lowes*

17  *Home Ctrs., Inc.*, 2014 WL 1928669, at *9 n.16 (S.D. Fla. May 6, 2014); *Torres v. Air to Ground*

18  *Servs., Inc.*, 300 F.R.D. 386, 403 (C.D. Cal. 2014).  In a footnote to their reply brief, Plaintiffs belatedly

19  suggest that "the Court could simply utilize surveys or questionnaires" to determine if a particular

20  driver experienced a qualifying condition warranting paid sick leave.  Reply 13 n.21.  But "[i]t is not

21  sufficient … simply to mention a procedural tool; the party seeking class certification must explain

22  how the procedure will effectively manage the issues in question, and [Plaintiffs] ha[v]e failed to do so

23  here."  *Dunbar v. Albertson's, Inc.*, 141 Cal. App. 4th 1422, 1425, 1432 (2006) (rejecting plaintiff's

24  bare suggestion "that individual issues could be effectively managed with the use of … survey results");

25

26  [5]  Prop 22 does not suggest otherwise.  It guarantees that drivers receive "120 percent of the applicable
    minimum wage" and per-mile reimbursement of vehicle expenses incurred only during their "engaged

27  time": namely, "the period of time …  from when an app-based driver accepts a rideshare request …
    to when the app-based driver completes that rideshare request."  Prop 22 § 1 (adding Cal. Bus. & Prof.

28  Code §§ 7453(d)(4), 7463 (j)(1)).  In stark contrast, Plaintiffs seek "all time that drivers are on the app"
    as "compensable time" (Dkt. 56 at 15 n.15)—an inquiry that inherently defies class certification.

1  *Mies v. Sephora U.S.A., Inc.*, 234 Cal. App. 4th 967, 985 (2015) (denying class certification where

2  plaintiff's proposal for statistical sampling "was undeveloped and unsubstantiated").

3       Finally, Plaintiffs' wage statement claim is still derivative of their minimum wage and overtime

4  claims as they specifically fault Uber for failing to provide wage statements that "includ[e] hours

5  worked and hourly wages." Dkt. 81 ¶ 47. Their wage statement claim thus hinges on the number of

6  hours each driver works—an invariably fact-intensive question. *See* Opp. 14–15. Plaintiffs' reliance

7  on *Johnson v. Serenity Transportation, Inc.*, 2018 WL 3646540, at *15 (N.D. Cal. Aug. 1, 2018), is

8  misplaced as the putative employer "did not provide statements identifying *any* hours worked." By

9  contrast, Uber lists the time drivers spend and they amount they earn for each ride (Dkt. 58-1 at 6), and

10  the only question is whether on-call time is also compensable. Because the Court cannot answer that

11  question on a classwide basis, Plaintiffs' wage statement claim may not be certified. *See*, *e.g.*, *Dawson*

12  *v. Hertz Transporting, Inc.*, 2018 WL 6112623, at *9 (C.D. Cal. Nov. 5, 2018) (declining to certify

13  wage statement claim where predicate "wage claims … [we]re not suitable for certification"); *Lampe*

14  *v. Queen of the Valley Med. Ctr.*, 19 Cal. App. 5th 832, 852 (2018) (same).

15       Plaintiffs cannot establish a common question capable of classwide resolution, much less that

16  common questions predominate over individual ones, and Prop 22 does not impact these inquiries.

17  **III.   CONCLUSION**

18       The Court should deny Plaintiffs' motion for class certification.

19

20  DATED: December 8, 2020                    GIBSON, DUNN & CRUTCHER LLP

21                                             By:   _____/s/ *Theane Evangelis*_____
                                                          Theane Evangelis

22
                                               Attorneys for Defendant Uber Technologies, Inc.
23

24

25

26

27

28

# EXHIBIT A

statewide election ballot, the provisions of the other measure or measures shall be deemed to be in conflict with this act. If this act receives a greater number of affirmative votes than another measure deemed to be in conflict with it, the provisions of this act shall prevail in their entirety, and the other measure or measures shall be null and void.

# PROPOSITION 22

This initiative measure is submitted to the people in accordance with the provisions of Section 8 of Article II of the California Constitution.

This initiative measure adds sections to the Business and Professions Code and amends a section of the Revenue and Taxation Code; therefore, new provisions proposed to be added are printed in *italic type* to indicate that they are new.

## PROPOSED LAW

SECTION 1. Chapter 10.5 (commencing with Section 7448) is added to Division 3 of the Business and Professions Code, to read:

*CHAPTER 10.5.   APP-BASED DRIVERS AND SERVICES*

*Article 1.   Title, Findings and Declarations, and Statement of Purpose*

*7448.   Title. This chapter shall be known, and may be cited, as the Protect App-Based Drivers and Services Act.*

*7449.   Findings and Declarations. The people of the State of California find and declare as follows:*

*(a) Hundreds of thousands of Californians are choosing to work as independent contractors in the modern economy using app-based rideshare and delivery platforms to transport passengers and deliver food, groceries, and other goods as a means of earning income while maintaining the flexibility to decide when, where, and how they work.*

*(b) These app-based rideshare and delivery drivers include parents who want to work flexible schedules while children are in school; students who want to earn money in between classes; retirees who rideshare or deliver a few hours a week to supplement fixed incomes and for social interaction; military spouses and partners who frequently relocate; and families struggling with California's high cost of living that need to earn extra income.*

*(c) Millions of California consumers and businesses, and our state's economy as a whole, also benefit from the services of people who work as independent contractors using app-based rideshare and delivery platforms. App-based rideshare and delivery drivers are providing convenient and affordable transportation for the public, reducing impaired and drunk driving, improving mobility for seniors and individuals with disabilities, providing new transportation options for* families who cannot afford a vehicle, and providing new affordable and convenient delivery options for grocery stores, restaurants, retailers, and other local businesses and their patrons.

*(d) However, recent legislation has threatened to take away the flexible work opportunities of hundreds of thousands of Californians, potentially forcing them into set shifts and mandatory hours, taking away their ability to make their own decisions about the jobs they take and the hours they work.*

*(e) Protecting the ability of Californians to work as independent contractors throughout the state using app-based rideshare and delivery platforms is necessary so people can continue to choose which jobs they take, to work as often or as little as they like, and to work with multiple platforms or companies, all the while preserving access to app-based rideshare and delivery services that are beneficial to consumers, small businesses, and the California economy.*

*(f) App-based rideshare and delivery drivers deserve economic security. This chapter is necessary to protect their freedom to work independently, while also providing these workers new benefits and protections not available under current law. These benefits and protections include a healthcare subsidy consistent with the average contributions required under the Affordable Care Act (ACA); a new minimum earnings guarantee tied to 120 percent of minimum wage with no maximum; compensation for vehicle expenses; occupational accident insurance to cover on-the-job injuries; and protection against discrimination and sexual harassment.*

*(g) California law and rideshare and delivery network companies should protect the safety of both drivers and consumers without affecting the right of app-based rideshare and delivery drivers to work as independent contractors. Such protections should, at a minimum, include criminal background checks of drivers; zero tolerance policies for drug- and alcohol-related offenses; and driver safety training.*

*7450.   Statement of Purpose. The purposes of this chapter are as follows:*

*(a) To protect the basic legal right of Californians to choose to work as independent contractors with rideshare and delivery network companies throughout the state.*

*(b) To protect the individual right of every app-based rideshare and delivery driver to have the flexibility to set their own hours for when, where, and how they work.*

*(c) To require rideshare and delivery network companies to offer new protections and benefits for app-based rideshare and delivery drivers, including minimum compensation levels, insurance to cover on-the-job injuries, automobile accident insurance, health care subsidies for qualifying drivers, protection*

**21**

**22**

against harassment and discrimination, and mandatory contractual rights and appeal processes.

(d) To improve public safety by requiring criminal background checks, driver safety training, and other safety provisions to help ensure app-based rideshare and delivery drivers do not pose a threat to customers or the public.

Article 2.   App-Based Driver Independence

7451.   Protecting Independence.   Notwithstanding any other provision of law, including, but not limited to, the Labor Code, the Unemployment Insurance Code, and any orders, regulations, or opinions of the Department of Industrial Relations or any board, division, or commission within the Department of Industrial Relations, an app-based driver is an independent contractor and not an employee or agent with respect to the app-based driver's relationship with a network company if the following conditions are met:

(a) The network company does not unilaterally prescribe specific dates, times of day, or a minimum number of hours during which the app-based driver must be logged into the network company's online-enabled application or platform.

(b) The network company does not require the app-based driver to accept any specific rideshare service or delivery service request as a condition of maintaining access to the network company's online-enabled application or platform.

(c) The network company does not restrict the app-based driver from performing rideshare services or delivery services through other network companies except during engaged time.

(d) The network company does not restrict the app-based driver from working in any other lawful occupation or business.

7452.   Contract and Termination Provisions. (a) A network company and an app-based driver shall enter into a written agreement prior to the driver receiving access to the network company's online-enabled application or platform.

(b) A network company shall not terminate a contract with an app-based driver unless based upon a ground specified in the contract.

(c) Network companies shall provide an appeals process for app-based drivers whose contracts are terminated by the network company.

7452.5.   Independence Unaffected.   Nothing in Article 3 (commencing with Section 7453) to Article 11 (commencing with Section 7467), inclusive, of this chapter shall be interpreted to in any way alter the relationship between a network company and an app-based driver for whom the conditions set forth in Section 7451 are satisfied.

Article 3.   Compensation

7453.   Earnings Guarantee. (a) A network company shall ensure that for each earnings period, an app-based driver is compensated at not less than the net earnings floor as set forth in this section. The net earnings floor establishes a guaranteed minimum level of compensation for app-based drivers that cannot be reduced. In no way does the net earnings floor prohibit app-based drivers from earning a higher level of compensation.

(b) For each earnings period, a network company shall compare an app-based driver's net earnings against the net earnings floor for that app-based driver during the earnings period. In the event that the app-based driver's net earnings in the earnings period are less than the net earnings floor for that earnings period, the network company shall include an additional sum accounting for the difference in the app-based driver's earnings no later than during the next earnings period.

(c) No network company or agent shall take, receive, or retain any gratuity or a part thereof that is paid, given to, or left for an app-based driver by a customer or deduct any amount from the earnings due to an app-based driver for a ride or delivery on account of a gratuity paid in connection with the ride or delivery. A network company that permits customers to pay gratuities by credit card shall pay the app-based driver the full amount of the gratuity that the customer indicated on the credit card receipt, without any deductions for any credit card payment processing fees or costs that may be charged to the network company by the credit card company.

(d) For purposes of this chapter, the following definitions apply:

(1) "Applicable minimum wage" means the state mandated minimum wage for all industries or, if a passenger or item is picked up within the boundaries of a local government that has a higher minimum wage that is generally applicable to all industries, the local minimum wage of that local government. The applicable minimum wage shall be determined at the location where a passenger or item is picked up and shall apply for all engaged time spent completing that rideshare request or delivery request.

(2) "Earnings period" means a pay period, set by the network company, not to exceed 14 consecutive calendar days.

(3) "Net earnings" means all earnings received by an app-based driver in an earnings period, provided that the amount conforms to both of the following standards:

(A) The amount does not include gratuities, tolls, cleaning fees, airport fees, or other customer pass-throughs.

(B) The amount may include incentives or other bonuses.

**22**

*(4) "Net earnings floor" means, for any earnings period, a total amount that is comprised of:*

*(A) For all engaged time, the sum of 120 percent of the applicable minimum wage for that engaged time.*

*(B) (i) The per-mile compensation for vehicle expenses set forth in this subparagraph multiplied by the total number of engaged miles.*

*(ii) After the effective date of this chapter and for the 2021 calendar year, the per-mile compensation for vehicle expenses shall be thirty cents ($0.30) per engaged mile. For calendar years after 2021, the amount per engaged mile shall be adjusted pursuant to clause (iii).*

*(iii) For calendar years following 2021, the per-mile compensation for vehicle expenses described in clause (ii) shall be adjusted annually to reflect any increase in inflation as measured by the Consumer Price Index for All Urban Consumers (CPI-U) published by the United States Bureau of Labor Statistics. The Treasurer's Office shall calculate and publish the adjustments required by this subparagraph.*

*(e) Nothing in this section shall be interpreted to require a network company to provide a particular amount of compensation to an app-based driver for any given rideshare or delivery request, as long as the app-based driver's net earnings for each earnings period equals or exceeds that app-based driver's net earnings floor for that earnings period as set forth in subdivision (b). For clarity, the net earnings floor in this section may be calculated on an average basis over the course of each earnings period.*

### Article 4.   Benefits

*7454.   Healthcare Subsidy. (a) Consistent with the average contributions required under the Affordable Care Act (ACA), a network company shall provide a quarterly health care subsidy to qualifying app-based drivers as set forth in this section. An app-based driver that averages the following amounts of engaged time per week on a network company's platform during a calendar quarter shall receive the following subsidies from that network company:*

*(1) For an average of 25 hours or more per week of engaged time in the calendar quarter, a payment greater than or equal to 100 percent of the average ACA contribution for the applicable average monthly Covered California premium for each month in the quarter.*

*(2) For an average of at least 15 but less than 25 hours per week of engaged time in the calendar quarter, a payment greater than or equal to 50 percent of the average ACA contribution for the applicable average monthly Covered California premium for each month in the quarter.*

*(b) At the end of each earnings period, a network company shall provide to each app-based driver the following information:*

*(1) The number of hours of engaged time the app-based driver accrued on the network company's online-enabled application or platform during that earnings period.*

*(2) The number of hours of engaged time the app-based driver has accrued on the network company's online-enabled application or platform during the current calendar quarter up to that point.*

*(c) Covered California may adopt or amend regulations as it deems appropriate to permit app-based drivers receiving subsidies pursuant to this section to enroll in health plans through Covered California.*

*(d) (1) As a condition of providing the health care subsidy set forth in subdivision (a), a network company may require an app-based driver to submit proof of current enrollment in a qualifying health plan. Proof of current enrollment may include, but is not limited to, health insurance membership or identification cards, evidence of coverage and disclosure forms from the health plan, or claim forms and other documents necessary to submit claims.*

*(2) An app-based driver shall have not less than 15 calendar days from the end of the calendar quarter to provide proof of enrollment as set forth in paragraph (1).*

*(3) A network company shall provide a health care subsidy due for a calendar quarter under subdivision (a) within 15 days of the end of the calendar quarter or within 15 days of the app-based driver's submission of proof of enrollment as set forth in paragraph (1), whichever is later.*

*(e) For purposes of this section, a calendar quarter refers to the following four periods of time:*

*(1) January 1 through March 31.*

*(2) April 1 through June 30.*

*(3) July 1 through September 30.*

*(4) October 1 through December 31.*

*(f) Nothing in this section shall be interpreted to prevent an app-based driver from receiving a health care subsidy from more than one network company for the same calendar quarter.*

*(g) On or before December 31, 2020, and on or before each September 1 thereafter, Covered California shall publish the average statewide monthly premium for an individual for the following calendar year for a Covered California bronze health insurance plan.*

*(h) This section shall become inoperative in the event the United States or the State of California implements a universal health care system or substantially similar system that expands coverage to the recipients of subsidies under this section.*

**22**

*7455. Loss and Liability Protection.* No network company shall operate in California for more than 90 days unless the network company carries, provides, or otherwise makes available the following insurance coverage:

(a) For the benefit of app-based drivers, occupational accident insurance to cover medical expenses and lost income resulting from injuries suffered while the app-based driver is online with a network company's online-enabled application or platform. Policies shall at a minimum provide the following:

(1) Coverage for medical expenses incurred, up to at least one million dollars ($1,000,000).

(2) (A) Disability payments equal to 66 percent of the app-based driver's average weekly earnings from all network companies as of the date of injury, with minimum and maximum weekly payment rates to be determined in accordance with subdivision (a) of Section 4453 of the Labor Code for up to the first 104 weeks following the injury.

(B) "Average weekly earnings" means the app-based driver's total earnings from all network companies during the 28 days prior to the covered accident divided by four.

(b) For the benefit of spouses, children, or other dependents of app-based drivers, accidental death insurance for injuries suffered by an app-based driver while the app-based driver is online with the network company's online-enabled application or platform that result in death. For purposes of this subdivision, burial expenses and death benefits shall be determined in accordance with Section 4701 and Section 4702 of the Labor Code.

(c) For the purposes of this section, "online" means the time when an app-based driver is utilizing a network company's online-enabled application or platform and can receive requests for rideshare services or delivery services from the network company, or during engaged time.

(d) Occupational accident insurance or accidental death insurance under subdivisions (a) and (b) shall not be required to cover an accident that occurs while online but outside of engaged time where the injured app-based driver is in engaged time on one or more other network company platforms or where the app-based driver is engaged in personal activities. If an accident is covered by occupational accident insurance or accidental death insurance maintained by more than one network company, the insurer of the network company against whom a claim is filed is entitled to contribution for the pro-rata share of coverage attributable to one or more other network companies up to the coverages and limits in subdivisions (a) and (b).

(e) Any benefits provided to an app-based driver under subdivision (a) or (b) of this section shall be considered amounts payable under a worker's compensation law or disability benefit for the purpose of determining amounts payable under any insurance provided under Article 2 (commencing with Section 11580) of Chapter 1 of Part 3 of Division 2 of the Insurance Code.

(f) (1) For the benefit of the public, a DNC as defined in Section 7463 shall maintain automobile liability insurance of at least one million dollars ($1,000,000) per occurrence to compensate third parties for injuries or losses proximately caused by the operation of an automobile by an app-based driver during engaged time in instances where the automobile is not otherwise covered by a policy that complies with subdivision (b) of Section 11580.1 of the Insurance Code.

(2) For the benefit of the public, a TNC as defined in Section 7463 shall maintain liability insurance policies as required by Article 7 (commencing with Section 5430) of Chapter 8 of Division 2 of the Public Utilities Code.

(3) For the benefit of the public, a TCP as defined in Section 7463 shall maintain liability insurance policies as required by Article 4 (commencing with Section 5391) of Chapter 8 of Division 2 of the Public Utilities Code.

### Article 5.   Antidiscrimination and Public Safety

*7456. Antidiscrimination.* (a) It is an unlawful practice, unless based upon a bona fide occupational qualification or public or app-based driver safety need, for a network company to refuse to contract with, terminate the contract of, or deactivate from the network company's online-enabled application or platform, any app-based driver or prospective app-based driver based upon race, color, ancestry, national origin, religion, creed, age, physical or mental disability, sex, gender, sexual orientation, gender identity or expression, medical condition, genetic information, marital status, or military or veteran status.

(b) Claims brought pursuant to this section shall be brought solely under the procedures established by the Unruh Civil Rights Act (Section 51 of the Civil Code) and will be governed by its requirements and remedies.

*7457. Sexual Harassment Prevention.* (a) A network company shall develop a sexual harassment policy intended to protect app-based drivers and members of the public using rideshare services or delivery services. The policy shall be available on the network company's internet website. The policy shall, at a minimum, do all of the following:

(1) Identify behaviors that may constitute sexual harassment, including the following: unwanted sexual advances; leering, gestures, or displaying sexually suggestive objects, pictures, cartoons, or posters; derogatory comments, epithets, slurs, or jokes;

**22**

graphic comments, sexually degrading words, or suggestive or obscene messages or invitations; and physical touching or assault, as well as impeding or blocking movements.

(2) Indicate that the network company, and in many instances the law, prohibits app-based drivers and customers utilizing rideshare services or delivery services from committing prohibited harassment.

(3) Establish a process for app-based drivers, customers, and rideshare passengers to submit complaints that ensures confidentiality to the extent possible; an impartial and timely investigation; and remedial actions and resolutions based on the information collected during the investigation process.

(4) Provide an opportunity for app-based drivers and customers utilizing rideshare services or delivery services to submit complaints electronically so complaints can be resolved quickly.

(5) Indicate that when the network company receives allegations of misconduct, it will conduct a fair, timely, and thorough investigation to reach reasonable conclusions based on the information collected.

(6) Make clear that neither app-based drivers nor customers utilizing rideshare services or delivery services shall be retaliated against as a result of making a good faith complaint or participating in an investigation against another app-based driver, customer, or rideshare passenger.

(b) Prior to providing rideshare services or delivery services through a network company's online-enabled application or platform, an app-based driver shall do both of the following:

(1) Review the network company's sexual harassment policy.

(2) Confirm to the network company, for which electronic confirmation shall suffice, that the app-based driver has reviewed the network company's sexual harassment policy.

(c) Claims brought pursuant to this section shall be brought solely under the procedures established by the Unruh Civil Rights Act (Section 51 of the Civil Code) and will be governed by its requirements and remedies.

7458.  Criminal Background Checks. (a) A network company shall conduct, or have a third party conduct, an initial local and national criminal background check for each app-based driver who uses the network company's online-enabled application or platform to provide rideshare services or delivery services. The background check shall be consistent with the standards contained in subdivision (a) of Section 5445.2 of the Public Utilities Code. Notwithstanding any other provision of law to the contrary, after an app-based driver's consent is obtained by a network company for an initial background check, no additional consent shall be required for the continual

monitoring of that app-based driver's criminal history if the network company elects to undertake such continual monitoring.

(b) A network company shall complete the initial criminal background check as required by subdivision (a) prior to permitting an app-based driver to utilize the network company's online-enabled application or platform. The network company shall provide physical or electronic copies or summaries of the initial criminal background check to the app-based driver.

(c) An app-based driver shall not be permitted to utilize a network company's online-enabled application or platform if one of the following applies:

(1) The driver has ever been convicted of any crime listed in subparagraph (B) of paragraph (2) of subdivision (a) of Section 5445.2 of the Public Utilities Code, any serious felony as defined by subdivision (c) of Section 1192.7 of the Penal Code, or any hate crime as defined by Section 422.55 of the Penal Code.

(2) The driver has been convicted within the last seven years of any crime listed in paragraph (3) of subdivision (a) of Section 5445.2 of the Public Utilities Code.

(d) (1) The ability of an app-based driver to utilize a network company's online-enabled application or platform may be suspended if the network company learns the driver has been arrested for any crime listed in either of the following:

(A) Subparagraph (B) of paragraph (2), or paragraph (3), of subdivision (a) of Section 5445.2 of the Public Utilities Code.

(B) Subdivision (c) of this section.

(2) The suspension described in paragraph (1) may be lifted upon the disposition of an arrest for any crime listed in subparagraph (B) of paragraph (2), or paragraph (3), of subdivision (a) of Section 5445.2 of the Public Utilities Code that does not result in a conviction. Such disposition includes a finding of factual innocence from any relevant charge, an acquittal at trial, an affidavit indicating the prosecuting attorney with jurisdiction over the alleged offense has declined to file a criminal complaint, or an affidavit indicating all relevant time periods described in Chapter 2 (commencing with Section 799) of Title 3 of Part 2 of the Penal Code have expired.

(e) Nothing in this section shall be interpreted to prevent a network company from imposing additional standards relating to criminal history.

(f) Notwithstanding Section 1786.12 of the Civil Code, an investigative consumer reporting agency may furnish an investigative consumer report to a network company about a person seeking to become an app-based driver, regardless of whether the app-based

**22**

driver is to be an employee or an independent contractor of the network company.

7459. Safety Training. (a) A network company shall require an app-based driver to complete the training described in this section prior to allowing the app-based driver to utilize the network company's online-enabled application or platform.

(b) A network company shall provide each app-based driver safety training. The safety training required by this section shall include the following subjects:

(1) Collision avoidance and defensive driving techniques.

(2) Identification of collision-causing elements such as excessive speed, DUI, and distracted driving.

(3) Recognition and reporting of sexual assault and misconduct.

(4) For app-based drivers delivering prepared food or groceries, food safety information relevant to the delivery of food, including temperature control.

(c) The training may, at the discretion of the network company, be provided via online, video, or in-person training.

(d) Notwithstanding subdivision (a), any app-based driver that has entered into a contract with a network company prior to January 1, 2021, to provide rideshare services or delivery services shall have until July 1, 2021, to complete the safety training required by this section, and may continue to provide rideshare services or delivery services through the network company's online-enabled application or platform until that date. On and after July 1, 2021, app-based drivers described in this subdivision must complete the training required by this section in order to continue providing rideshare services and delivery services.

(e) Any safety product, feature, process, policy, standard, or other effort undertaken by a network company, or the provision of equipment by a network company, to further public safety is not an indicia of an employment or agency relationship with an app-based driver.

7460. Zero Tolerance Policies. (a) A network company shall institute a "zero tolerance policy" that mandates prompt suspension of an app-based driver's access to the network company's online-enabled application or platform in any instance in which the network company receives a report through its online-enabled application or platform, or by any other company-approved method, from any person who reasonably suspects the app-based driver is under the influence of drugs or alcohol while providing rideshare services or delivery services.

(b) Upon receiving a report described in subdivision (a), a network company shall promptly suspend the app-based driver from the company's online-enabled application or platform for further investigation.

(c) A network company may suspend access to the network company's online-enabled application or platform for any app-based driver or customer found to be reporting an alleged violation of a zero tolerance policy as described in subdivision (a) where that driver or customer knows the report to be unfounded or based the report on an intent to inappropriately deny a driver access to the online-enabled application or platform.

7460.5. A network company shall make continuously and exclusively available to law enforcement a mechanism to submit requests for information to aid in investigations related to emergency situations, exigent circumstances, and critical incidents.

7461. App-based Driver Rest. An app-based driver shall not be logged in and driving on a network company's online-enabled application or platform for more than a cumulative total of 12 hours in any 24-hour period, unless that driver has already logged off for an uninterrupted period of 6 hours. If an app-based driver has been logged on and driving for more than a cumulative total of 12 hours in any 24-hour period, without logging off for an uninterrupted period of 6 hours, the driver shall be prohibited from logging back into the network company's online-enabled application or platform for an uninterrupted period of at least 6 hours.

7462. Impersonating an App-Based Driver. (a) Any person who fraudulently impersonates an app-based driver while providing or attempting to provide rideshare or delivery services shall be guilty of a misdemeanor, and is punishable by imprisonment in a county jail for up to six months, or a fine of up to ten thousand dollars ($10,000), or both. Nothing in this subdivision precludes prosecution under any other law.

(b) In addition to any other penalty provided by law, any person who fraudulently impersonates an app-based driver while providing or attempting to provide rideshare services or delivery services in the commission or attempted commission of an offense described in Section 207, 209, 220, 261, 264.1, 286, 287, 288, or 289 of the Penal Code shall be sentenced to an additional term of five years.

(c) In addition to any other penalty provided by law, any person who fraudulently impersonates an app-based driver while providing or attempting to provide rideshare services or delivery services in the commission of a felony or attempted felony and in so doing personally inflicts great bodily injury to another person other than an accomplice shall be sentenced to an additional term of five years.

(d) In addition to any other penalty provided by law, any person who fraudulently impersonates an app-based driver while providing or attempting to provide rideshare services or delivery services in the

**22**

commission of a felony or attempted felony and in so doing causes the death of another person other than an accomplice shall be sentenced to an additional term of 10 years.

### Article 6.   Definitions

7463.  For purposes of this chapter, the following definitions shall apply:

(a)  "App-based driver" means an individual who is a DNC courier, TNC driver, or TCP driver or permit holder; and for whom the conditions set forth in subdivisions (a) to (d), inclusive, of Section 7451 are satisfied.

(b)  "Average ACA contribution" means 82 percent of the dollar amount of the average monthly Covered California premium.

(c)  "Average monthly Covered California premium" equals the dollar amount published pursuant to subdivision (g) of Section 7454.

(d)  "Covered California" means the California Health Benefit Exchange, codified in Title 22 (commencing with Section 100500) of the Government Code.

(e)  "Customer" means one or more natural persons or business entities.

(f)  "Delivery network company" (DNC) means a business entity that maintains an online-enabled application or platform used to facilitate delivery services within the State of California on an on-demand basis, and maintains a record of the amount of engaged time and engaged miles accumulated by DNC couriers. Deliveries are facilitated on an on-demand basis if DNC couriers are provided with the option to accept or decline each delivery request and the DNC does not require the DNC courier to accept any specific delivery request as a condition of maintaining access to the DNC's online-enabled application or platform.

(g)  "Delivery network company courier" (DNC courier) means an individual who provides delivery services through a DNC's online-enabled application or platform.

(h)  "Delivery services" means the fulfillment of delivery requests, meaning the pickup from any location of any item or items and the delivery of the items using a passenger vehicle, bicycle, scooter, walking, public transportation, or other similar means of transportation, to a location selected by the customer located within 50 miles of the pickup location. A delivery request may include more than one, but not more than 12, distinct orders placed by different customers. Delivery services may include the selection, collection, or purchase of items by a DNC courier provided that those tasks are done in connection with a delivery that the DNC has agreed to deliver. Delivery services do not include deliveries that are subject to Section 26090, as that section read on October 29, 2019.

(i)  "Engaged miles" means all miles driven during engaged time in a passenger vehicle that is not owned, leased, or rented by the network company.

(j) (1)  "Engaged time" means, subject to the conditions set forth in paragraph (2), the period of time, as recorded in a network company's online-enabled application or platform, from when an app-based driver accepts a rideshare request or delivery request to when the app-based driver completes that rideshare request or delivery request.

(2) (A)  Engaged time shall not include the following:

(i)  Any time spent performing a rideshare service or delivery service after the request has been cancelled by the customer.

(ii)  Any time spent on a rideshare service or delivery service where the app-based driver abandons performance of the service prior to completion.

(B)  Network companies may also exclude time if doing so is reasonably necessary to remedy or prevent fraudulent use of the network company's online-enabled application or platform.

(k)  "Local government" means a city, county, city and county, charter city, or charter county.

(l)  "Network company" means a business entity that is a DNC or a TNC.

(m)  "Passenger vehicle" means a passenger vehicle as defined in Section 465 of the Vehicle Code.

(n)  "Qualifying health plan" means a health insurance plan in which the app-based driver is the subscriber, that is not sponsored by an employer, and that is not a Medicare or Medicaid plan.

(o)  "Rideshare service" means the transportation of one or more persons.

(p)  "Transportation network company" (TNC) has the same meaning as the definition contained in subdivision (c) of Section 5431 of the Public Utilities Code.

(q)  "Transportation network company driver" (TNC driver) has the same meaning as the definition of driver contained in subdivision (a) of Section 5431 of the Public Utilities Code.

(r)  "Charter-party carrier of passengers" (TCP) shall have the same meaning as the definition contained in Section 5360 of the Public Utilities Code, provided the driver is providing rideshare services using a passenger vehicle through a network company's online-enabled application or platform.

### Article 7.   Uniform Work Standards

7464.  (a) The performance of a single rideshare service or delivery service frequently requires an app-based driver to travel across the jurisdictional boundaries of multiple local governments. California has over 500 cities and counties, which can lead to

overlapping, inconsistent, and contradictory local regulations for cross-jurisdictional services.

(b) In light of the cross-jurisdictional nature of the rideshare services and delivery services, and in addition to the other requirements and standards established by this chapter, the state hereby occupies the field in the following areas:

(1) App-based driver compensation and gratuity, except as provided in Section 7453.

(2) App-based driver scheduling, leave, health care subsidies, and any other work-related stipends, subsidies, or benefits.

(3) App-based driver licensing and insurance requirements.

(4) App-based driver rights with respect to a network company's termination of an app-based driver's contract.

(c) Notwithstanding subdivision (b), nothing in this section shall limit a local government's ability to adopt local ordinances necessary to punish the commission of misdemeanor and felony crimes or to enforce local ordinances and regulations enacted prior to October 29, 2019.

### Article 8.   Income Reporting

7464.5  (a) A network company that is acting as a third-party settlement organization shall prepare an information return for each participating payee who is an app-based driver with a California address that has a gross amount of reportable payment transactions equal to or greater than six hundred dollars ($600) during a calendar year, irrespective of the number of transactions between the third-party settlement organization and the payee. A third-party settlement organization must report these amounts to the Franchise Tax Board and furnish a copy to the payee, even if it does not have a federal reporting obligation. The information return shall identify the following:

(1) The name, address, and tax identification number of the participating payee.

(2) The gross amount of the reportable payment transactions with respect to the participating payee.

(b) Within 30 days following the date such an information return would be due to the Internal Revenue Service, a network company shall file a copy of any information return required by subdivision (a) with the Franchise Tax Board and shall provide a copy to the participating payee.

(c) A network company may fulfill this requirement by submitting a copy of Internal Revenue Service Form 1099-K or by submitting a form provided by the Franchise Tax Board that includes the same information as that on Cal-1099-K.

(d) For purposes of this section:

(1) "Participating payee" has the same meaning as provided in Section 6050W(d)(1)(A)(ii) of Title 26 of the United States Code.

(2) "Reportable payment transaction" has the same meaning as provided in Section 6050W(c)(1) of Title 26 of the United States Code.

(3) "Third-party settlement organization" has the same meaning as provided in Section 6050W(b)(3) of Title 26 of the United States Code.

(e) This section shall not apply in instances where the gross amount of reportable payment transactions for a participating payee in a calendar year is less than six hundred dollars ($600) or where the participating payee is not an app-based driver.

(f) This section shall apply to reportable payment transactions occurring on or after January 1, 2021.

### Article 9.   Amendment

7465.  (a) After the effective date of this chapter, the Legislature may amend this chapter by a statute passed in each house of the Legislature by rollcall vote entered into the journal, seven-eighths of the membership concurring, provided that the statute is consistent with, and furthers the purpose of, this chapter. No bill seeking to amend this chapter after the effective date of this chapter may be passed or ultimately become a statute unless the bill has been printed and distributed to members, and published on the internet, in its final form, for at least 12 business days prior to its passage in either house of the Legislature.

(b) No statute enacted after October 29, 2019, but prior to the effective date of this chapter, that would constitute an amendment of this chapter, shall be operative after the effective date of this chapter unless the statute was passed in accordance with the requirements of subdivision (a).

(c) (1) The purposes of this chapter are described in Article 1 (commencing with Section 7448).

(2) Any statute that amends Section 7451 does not further the purposes of this chapter.

(3) Any statute that prohibits app-based drivers from performing a particular rideshare service or delivery service while allowing other individuals or entities to perform the same rideshare service or delivery service, or otherwise imposes unequal regulatory burdens upon app-based drivers based on their classification status, constitutes an amendment of this chapter and must be enacted in compliance with the procedures governing amendments consistent with the purposes of this chapter as set forth in subdivisions (a) and (b).

(4) Any statute that authorizes any entity or organization to represent the interests of app-based drivers in connection with drivers' contractual relationships with network companies, or drivers' compensation, benefits, or working conditions, constitutes an amendment of this chapter and must

**22**

be enacted in compliance with the procedures governing amendments consistent with the purposes of this chapter as set forth in subdivisions (a) and (b).

(d) Any statute that imposes additional misdemeanor or felony penalties in order to provide greater protection against criminal activity for app-based drivers and individuals using rideshare services or delivery services may be enacted by the Legislature by rollcall vote entered into the journal, a majority of the membership of each house concurring, without complying with subdivisions (a) and (b).

### Article 10.   Regulations

7466. (a)  Emergency regulations may be adopted by Covered California in order to implement and administer subdivisions (c) and (g) of Section 7454.

(b) Any emergency regulation adopted pursuant to this section shall be adopted in accordance with Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, and, for purposes of that chapter, including Section 11349.6 of the Government Code, the adoption of the regulation is an emergency and shall be considered by the Office of Administrative Law as necessary for the immediate preservation of the public peace, health and safety, and general welfare. Notwithstanding any other provision of law, the emergency regulations adopted by Covered California may remain in effect for two years from the date of adoption.

### Article 11.   Severability

7467.   (a) Subject to subdivision (b), the provisions of this chapter are severable. If any portion, section, subdivision, paragraph, clause, sentence, phrase, word, or application of this chapter is for any reason held to be invalid by a decision of any court of competent jurisdiction, that decision shall not affect the validity of the remaining portions of this chapter. The people of the State of California hereby declare that they would have adopted this chapter and each and every portion, section, subdivision, paragraph, clause, sentence, phrase, word, and application not declared invalid or unconstitutional without regard to whether any other portion of this chapter or application thereof would be subsequently declared invalid.

(b) Notwithstanding subdivision (a), if any portion, section, subdivision, paragraph, clause, sentence, phrase, word, or application of Section 7451 of Article 2 (commencing with Section 7451), as added by the voters, is for any reason held to be invalid by a decision of any court of competent jurisdiction, that decision shall apply to the entirety of the remaining provisions of this chapter, and no provision of this chapter shall be deemed valid or given force of law.

SEC. 2.   Section 17037 of the Revenue and Taxation Code is amended to read:

17037.  Provisions in other codes or general law statutes which are related to this part include all of the following:

(a) Chapter 20.6 (commencing with Section 9891) of Division 3 of the Business and Professions Code, relating to tax preparers.

(b) Part 10.2 (commencing with Section 18401), relating to the administration of franchise and income tax laws.

(c) Part 10.5 (commencing with Section 20501), relating to the Property Tax Assistance and Postponement Law.

(d) Part 10.7 (commencing with Section 21001), relating to the Taxpayers' Bill of Rights.

(e) Part 11 (commencing with Section 23001), relating to the Corporation Tax Law.

(f) Sections 15700 to 15702.1, inclusive, of the Government Code, relating to the Franchise Tax Board.

(g) Article 8 (commencing with Section 7464.5) of Chapter 10.5 of Division 3 of the Business and Professions Code.

SEC. 3.   Conflicting Measures.

(a) In the event that this initiative measure and another ballot measure or measures dealing, either directly or indirectly, with the worker classification, compensation, or benefits of app-based drivers shall appear on the same statewide election ballot, the other ballot measure or measures shall be deemed to be in conflict with this measure. In the event that this initiative measure receives a greater number of affirmative votes, the provisions of this measure shall prevail in their entirety, and the provisions of the other ballot measure or measures shall be null and void.

(b) If this initiative measure is approved by the voters but superseded in whole or in part by any other conflicting ballot measure approved by the voters at the same election, and such conflicting measure is later held invalid, this measure shall be self-executing and given full force and effect.

SEC. 4.   Legal Defense.

The purpose of this section is to ensure that the people's precious right of initiative cannot be improperly annulled by state politicians who refuse to defend the will of the voters. Therefore, if this act is approved by the voters of the State of California and thereafter subjected to a legal challenge which attempts to limit the scope or application of this act in any way, or alleges this act violates any local, state, or federal law in whole or in part, and both the Governor and Attorney General refuse to defend this act, then the following actions shall be taken:

(a) Notwithstanding anything to the contrary contained in Chapter 6 (commencing with Section 12500) of Part 2 of Division 3 of Title 2 of the Government Code or any other law, the Attorney

**22**

General shall appoint independent counsel to faithfully and vigorously defend this act on behalf of the State of California.

(b) Before appointing or thereafter substituting independent counsel, the Attorney General shall exercise due diligence in determining the qualifications of independent counsel and shall obtain written affirmation from independent counsel that independent counsel will faithfully and vigorously defend this act. The written affirmation shall be made publicly available upon request.

(c) In order to support the defense of this act in instances where the Governor and Attorney General fail to do so despite the will of the voters, a continuous appropriation is hereby made from the General Fund to the Controller, without regard to fiscal years, in an amount necessary to cover the costs of retaining independent counsel to faithfully and vigorously defend this act on behalf of the State of California.

SEC. 5.   Liberal Construction.

This act shall be liberally construed in order to effectuate its purposes.

# PROPOSITION 23

This initiative measure is submitted to the people in accordance with the provisions of Section 8 of Article II of the California Constitution.

This initiative measure adds sections to the Health and Safety Code; therefore, new provisions proposed to be added are printed in *italic type* to indicate that they are new.

## PROPOSED LAW

SECTION 1.   Name.

This act shall be known as the "Protect the Lives of Dialysis Patients Act."

SEC. 2.   Findings and Purposes.

This act, adopted by the people of the State of California, makes the following findings and has the following purposes:

(a) The people make the following findings:

(1) Kidney dialysis is a life-saving process in which blood is removed from a person's body, cleaned of toxins, and then returned to the patient. It must be done at least three times a week for several hours a session, and the patient must continue treatment for the rest of their life or until they can obtain a kidney transplant.

(2) In California, at least 70,000 people undergo dialysis treatment.

(3) Just two multinational, for-profit corporations operate or manage nearly three-quarters of dialysis clinics in California and treat more than 75 percent of dialysis patients in the state. These two multinational

corporations annually earn billions of dollars from their dialysis operations, including more than $350 million a year in California alone.

(4) The dialysis procedure and side effects from the treatments present several dangers to patients, and many dialysis clinics in California have been cited for failure to maintain proper standards of care. Failure to maintain proper standards can lead to patient harm, hospitalizations, and even death.

(5) Dialysis clinics are currently not required to maintain a doctor on site to oversee quality, ensure the patient plan of care is appropriately followed, and monitor safety protocols. Patients should have access to a physician on site whenever dialysis treatment is being provided.

(6) Dialysis treatments involve direct access to the bloodstream, which puts patients at heightened risk of getting dangerous infections. Proper reporting and transparency of infection rates encourages clinics to improve quality and helps patients make the best choice for their care.

(7) When health care facilities like hospitals and nursing homes close, California regulators are able to take steps to protect patients from harm. Likewise, strong protections should be provided to vulnerable patients when dialysis clinics close.

(8) Dialysis corporations have lobbied against efforts to enact protections for kidney dialysis patients in California, spending over $100 million in 2018 and 2019 to influence California voters and the Legislature.

(b) Purposes:

(1) It is the purpose of this act to ensure that outpatient kidney dialysis clinics provide quality and affordable patient care to people suffering from end-stage renal disease.

(2) This act is intended to be budget neutral for the state to implement and administer.

SEC. 3.   Section 1226.7 is added to the Health and Safety Code, to read:

*1226.7.   (a) Chronic dialysis clinics shall provide the same quality of care to their patients without discrimination on the basis of who is responsible for paying for a patient's treatment. Further, chronic dialysis clinics shall not refuse to offer or to provide care on the basis of who is responsible for paying for a patient's treatment. Such prohibited discrimination includes, but is not limited to, discrimination on the basis that a payer is an individual patient, private entity, insurer, Medi-Cal, Medicaid, or Medicare. This section shall also apply to a chronic dialysis clinic's governing entity, which shall ensure that no discrimination prohibited by this section occurs at or among clinics owned or operated by the governing entity.*

*(b) Definitions:*

**22**

**23**