UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>CHRISTOPHER JAMES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES INC.,<br><br>Defendant.</td><td>Case No. 19-cv-06462-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Docket No. 56</td></tr>
</table>

Plaintiffs Christopher James and Spencer Verhines are current or former Uber drivers who contend that they and a putative class of approximately 4,828 other Uber drivers are Uber's employees and therefore eligible for various protections under the California Labor Code.  *See* Docket No. 81 (Amended Consolidated Class Action Complaint ("Am. Compl.")) ¶ 23.  Plaintiffs raise various wage-and-hour claims under California law and seek various forms of relief, including under California's Unfair Competition Law (UCL) and the federal Declaratory Judgment Act (DJA).  *Id.*

Pending before the Court is Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23.  *See* Docket No. 56 ("Mot.").  For the following reasons, Plaintiffs' motion is **GRANTED in part** and **DENIED in part**.

## I.      BACKGROUND

The Court and the parties are well acquainted with the background of this case, so it is not set forth in detail here.  On May 19, 2020, Plaintiffs filed the pending motion to certify Class, *see* Mot, and two days later Uber filed a motion to dismiss Plaintiffs' consolidated class action complaint.  *See* Mot; Docket No. 61 ("MTD").

United States District Court
Northern District of California

1    On June 30, 2020, the Court dismissed, with leave to amend, the consolidated amended

2    complaint's claims that Uber failed to provide paid sick leave as required by section 246 of the

3    California Labor Code, and any UCL claims premised on violations of section 246.  *See* Docket

4    No. 74 ("Order on MTD").  The Court also dismissed Thomas Colopy as a named Plaintiff in this

5    case without prejudice to his claims.  *See id.*

6    On July 14, 2020, Messrs. James and Verhines (hereinafter, "Plaintiffs") filed the operative

7    amended consolidated class action complaint (hereinafter, "Amended Complaint") alleging as

8    follows.   Plaintiffs are residents of California who drive for Uber.  Am. Compl. ¶¶ 8–9, 17–18.  They

9    bring this case as a putative class action on "behalf of . . . all other individuals who have worked as

10   Uber drivers in California who have not released all of their claims against Uber."  *Id.* ¶ 10.  They

11   assert claims related to their alleged misclassification as independent contractors, including (1) failure

12   to reimburse business expenses, (2) failure to pay minimum wage, (3) failure to pay overtime, (4)

13   failure to provide properly itemized pay statements, (5) failure to provide paid sick leave, and (6)

14   unlawful business practices.  *See id.*   Plaintiffs seek damages dating back to February 28, 2019, as

15   well as declaratory and injunctive relief, which would require Uber to reclassify its drivers as

16   employees.  *Id.* ¶ 7.

17   ## II.    LEGAL STANDARD

18   Although expressly authorized by Rule 23, the "class action is 'an exception to the usual

19   rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal–*

20   *Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S.

21   682, 700–01 (1979)).  "In order to justify departure from that rule, 'a class representative must be

22   part of the class and possess the same interest and suffer the same injury as [her fellow] class

23   members.'"  *Id.* (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

24   Accordingly, before certifying a class, the Court "must conduct a 'rigorous analysis' to

25   determine whether the party seeking certification has met the prerequisites of Rule 23."  *Mazza v.*

26   *Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Zinser v. Accufix Rsch.*

27   *Inst., Inc.*, 253 F.3d 1180, 1186, *amended* 273 F.3d 1255 (9th Cir. 2001)).   The Supreme Court

28   has made it clear that Rule 23 "does not set forth a mere pleading standard."  *Comcast Corp. v.*

*Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart*, 564 U.S. at 349).   Rather, the party seeking certification must "affirmatively demonstrate" her compliance with the requirements of both Rules 23(a) and 23(b).  *See Wal-Mart*, 564 U.S. at 349.

Rule 23(a) permits plaintiffs to sue as representatives of a class only if (1) "the class is so numerous that joinder of all members is impracticable" ("numerosity" requirement); (2) "there are questions of law or fact common to the class" ("commonality" requirement);  (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" ("typicality" requirement); and (4) "the representative parties will fairly and adequately protect the interests of the class" ("adequacy" requirement).   Fed. R. Civ. P. 23(a)(1)-(4).  The purpose of Rule 23(a)'s requirements is largely to "ensure[ ] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and to "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."  *Wal-Mart*, 564 U.S. at 349 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

If each of the Rule 23(a) requirements are satisfied, the purported class must also satisfy one of the three prongs of Rule 23(b).  Here Plaintiffs seek certification under Rule 23(b)(3), which requires the Court to find that "questions of law or fact common to class members predominate over any questions affecting only individual members" ("predominance" requirement), and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" ("superiority" requirement).  Fed. R. Civ. P. 23(b).

The underlying merits of the case, while admittedly relevant at the class certification stage, should not overly cloud the Court's certification analysis—the only question presently before the Court is whether the requirements of Rule 23 are met.  *See Comcast*, 569 U.S. at 33–34.  The fact that certain elements of proof may favor the defendant on the merits does not negate class certification; the issue is whether the proof is amenable to class treatment.  Indeed, once a class is certified, the party prevailing on the merits can benefit from certification, be it Plaintiffs or Defendant.

Moreover, "[n]either the possibility that a plaintiff will be unable to prove [her] allegations, nor the possibility that the later course of the suit might unforeseeably prove the

original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule." *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975). Indeed, even "after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). Ultimately, whether or not to certify a class is within the discretion of the Court. *See Levya v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013); *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL–CIO CLC v. ConocoPhilips Co.*, 593 F.3d 802, 810 (9th Cir. 2010).

## III.    <u>DISCUSSION</u>

This order proceeds as follows. First, the Court will apply the Rule 23(a) criteria (numerosity, commonality, typicality, and adequacy) to Plaintiffs' claim that they are/were Uber's employees, rather than independent contractors, and for each of their five substantive law claims: failure to (1) reimburse business expenses, (2) pay minimum wage, (3) pay overtime, (4) provide properly itemized pay statements, and (5) provide paid sick leave.

Second, the Court will consider whether Plaintiffs have met their burden under Rule 23(b)(3), which requires them to establish that the employment classification question, and all of their substantive claims, can be resolved with reference to predominately common proof (predominance) and that prosecuting their claims in a class action is superior to other available methods (superiority).

A.    Rule 23(a) Requirements

1.    <u>Ascertainability and Numerosity</u>

Before analyzing numerosity under Rule 23(a)(1), courts typically require a showing that the class to be certified is ascertainable. *See Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115, 121–22 (N.D. Cal. 2014); 7A Charles Alan Wright et al., Federal Practice and Procedure § 1760 at 142–47 (3d ed. 2005). To be ascertainable, the definition of the class must be "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member" before trial, and by reference to "objective criteria." *Daniel F.*, 305 F.R.D. at 122; *see also Newton v. Am. Debt Servs., Inc.*, No. 11–cv–3228–EMC, 2015 WL 3614197, at *5–*6 (N.D. Cal.

United States District Court
Northern District of California

June 9, 2015) (discussing ascertainability requirement).  Put differently, the Court must identify "the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the 'best notice practicable' in a Rule 23(b)(3) action." *Daniel F.*, 305 F.R.D. at 121 (quoting Manual for Complex Litigation, Fourth § 21.222 (2004)).

Plaintiffs seek to certify a class of drivers who have driven for Uber in the state of California since February 28, 2019 and who opted out of Uber's arbitration agreement. Membership in this class is objectively ascertainable from Uber's business records.  *See O'Connor v. Uber* (*O'Connor II*), No. C-13-3826 EMC, 2015 WL 5138097, at *8 (N.D. Cal. Sept. 1, 2015). Uber does not dispute that it maintains business records with respect to each of its drivers, nor is there any dispute that those records will reveal whether each putative class member drove for Uber in the state of California since February 28, 2019.  In fact, Uber has already identified 4,828 putative class members,[1] which represent "all individuals who completed at least one ride on the Uber app in California between February 28, 2019 and August 31, 2020, attempted to opt out of arbitration, and have a California driver's license."  Docket No. 94 (Decl. of Justin McCrary in Support of Opp'n to Mot. ("McCrary Decl.")) ¶ 11, n. 4.  The ascertainability requirement is therefore satisfied here.

A plaintiff satisfies the numerosity requirement if "the class is so large that joinder of all members is impracticable."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (quoting Fed. R. Civ. P. 23(a)(1)).  While no court has set the precise number of class members that are needed to satisfy the numerosity requirement, there is general recognition that Rule 23(a)(1) is satisfied when the proposed class contains one hundred or more members.  *See, e.g.*, *Wang v. Chinese Daily News*, 231 F.R.D. 602, 607 (C.D. Cal. 2005) (recognizing there is a presumption of numerosity where the proposed class contains one hundred or more members), *reversed on other grounds by* 737 F.3d 538 (9th Cir.  2013); *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D.  Cal. 1998) (finding a proposed class of forty members sufficient to satisfy

---

[1] Uber explains that this number might be an overestimation because it includes folks who attempted to opt out of the arbitration clause but might not have been eligible to opt out.  McCrary Decl. at n. 4.

numerosity).

Uber is not disputing that the numerosity requirement is satisfied here, nor could it, given that it has already identified almost five thousand putative class members.  McCrary Decl. ¶ 11. Even if that number is an overestimation, there is little doubt that at least one hundred of the roughly five-thousand individuals who drove for Uber in California since February 2019 will meet the class definition.  The numerosity requirement is therefore also satisfied here.

2.    Commonality

In order to satisfy Rule 23(a)(2)'s commonality requirement, a plaintiff must "affirmatively demonstrate" that their claims depend upon at least one common contention the truth or falsity of which "will resolve an issue that is central to the validity" of each one of the class members' "claims in one stroke."  *Wal-Mart*, 564 U.S. at 350.  That is, the lawsuit must call upon the court or jury to decide at least one factual or legal question that will generate a common answer "apt to drive the resolution of the litigation."  *Id.*; *see also id.* at 359 (holding that "[e]ven a single [common] question" will suffice to satisfy Rule 23(a) (quoting Nagareda, The Preexistence Principle and the Structure of the Class Action, 103 Colum. L. Rev. 149, 176, n. 110 (2003)).

In this case, whether Uber misclassified its drivers as independent contractors is a common question that satisfies the commonality requirement.  This Court has previously found that "the common legal issue of whether all class members should be classified as employees or independent contractors is one whose answer would not only be 'apt to drive the resolution of the litigation,' but could in fact be outcome determinative."  *O'Connor II*, 2015 WL 5138097, at *8 (quoting *Guifu Li v. A Perfect Franchise, Inc.*, No. 5:10-CV-01189-LHK, 2011 WL 4635198, at *7 (N.D. Cal. Oct. 5, 2011)).  In *O'Connor II*, the central question—which this Court determined was capable of class-wide determination—was whether employees were misclassified as independent contractors under the common-law multi-factor test laid out in the California Supreme Court's decision in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 769 P.2d 399 (Cal. 1989).  *See id.* at *5–*6.

After this Court's *O'Connor II* decision, however, the California Supreme Court adopted a new test for distinguishing between employees and independent contractors in *Dynamex*

1   *Operations W. v. Superior Court*, 416 P.3d 1 (Cal. 2018), *reh'g denied* (June 20, 2018).   Under

2   the so-called "ABC" test, workers are presumptively considered to be employees unless the

3   "hiring entity" establishes that the worker in question satisfies three conditions:

> (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and*

> (b) that the worker performs work that is outside the usual course of the hiring entity's business; *and*

> (c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

10   *Id.* at 34 (emphasis added).  The legislature has since codified the ABC test with the passage of

11   Assembly Bill No. 5 (AB 5), and the test is now embodied in section 2775 of the California Labor

12   Code.  If the hiring entity fails to prove any *one* of these conditions, the plaintiffs will prevail on

13   the merits of the question of their status as employees.

14          As a preliminary matter, Uber vigorously argues that the ABC test does not apply to this

15   case because Uber is not a "hiring entity" under section 2775(b)(1) of the California Labor Code.

16   *See* Docket No. 92 ("Opp'n") at 5–6; Cal. Lab. Code § 2775(b)(1) ("[P]erson providing labor or

17   services for remuneration shall be considered an employee rather than an independent contractor

18   unless the *hiring entity* demonstrates that all of the following conditions are satisfied." (emphasis

19   added)).  Uber's reasoning is that "the drivers do not render services to [Uber]; rather, drivers are

20   [Uber's] customers, who render services to [Uber's] other customers, the riders, using the two-

21   sided platforms [Uber] developed."  *People v. Uber Techs.*, 270 Cal. Rptr. 3d 290, 307 (Ct. App.

22   2020), *as modified on denial of reh'g* (Nov. 20, 2020).  The California Court of Appeal recently

23   rejected this argument, holding that "[r]eading the term 'hiring entity' in context, we think the

24   phrase is used in *Dynamex* and in section 2775 *for its neutrality*, so that it covers *both* employment

25   status *and* independent contractor status, and thus does not presuppose an answer one way or

26   another."  *Id.* at 308 (emphasis added).  Indeed, the *People v. Uber* Court correctly pointed out that

27   Uber's "hiring entity" argument poses a "false dichotomy" because "drivers' services performed

28   could have been characterized as having been carried out for the benefit of *both* the hirer and a

United States District Court
Northern District of California

7

third party, benefitting each one." *Id.*  For example, the delivery services that drivers performed in *Dynamex* could have been characterized as benefiting *both* Dynamex, the corporate dispatcher, *and* the entities sending and receiving packages.  *Id.*  There is little doubt that even if customers could be deemed a "hiring entity," Uber is a "hiring entity" as well.  Therefore, the Court concludes that the ABC test applies to this case because Uber is a "hiring entity" under section 2775.[2]  Moreover, Uber's argument that it is not a "hiring entity" under *Dynamex* itself presents a legal question common to all members of the class.

Having determined that the ABC test applies, the question that will generate a common answer "apt to drive the resolution of the litigation" is whether the class member drivers were misclassified as independent contractors because Uber failed to satisfy one or more prongs of the ABC test.  *Wal-Mart*, 564 U.S. at 350.  Indeed, if the court or the jury determines that Uber satisfied all three prongs of the ABC test, this class action will have reached its end.  *Guifu Li*, 2011 WL 4635198, at *7 ("If . . . Plaintiffs have been properly classified as independent contractors, the Court need not consider the additional claims that Plaintiffs have raised.").  Inversely, if the court or the jury determine that Uber did not satisfy any one of the prongs, then Plaintiffs are to be—as a class—classified as employees.  *See Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016) ("Because the [ABC] test is conjunctive, if [the hiring entity] cannot satisfy just one prong of the test, its couriers must be treated as employees.").  Either way, the outcome of the ABC test is "apt to drive the resolution of the litigation."  *Guifu Li*, 2011 WL 4635198, at *7.  Therefore, the commonality requirement is satisfied here.

3.    Typicality and Adequacy

Rule 23(a)(3) requires that "the [legal] claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Representative claims are

---

[2] Uber also argues that at least some of Plaintiffs' claims—for example, those based on expense reimbursements in 2019—are governed by *S.G. Borello* because *Dynamex* only applies to wage order claims and AB 5 did not take effect until January 1, 2020.  Opp'n at 7.  But whether *Dynamex* applies to this claim—a legal issue in dispute itself—presents a common question.  In any event, even if *Borello* applied, commonality is satisfied as this Court already determined in *O'Connor II* that "the worker classification claim presents a common issue capable of class-wide adjudication because all (or nearly all) of the individual elements of the *Borello* test themselves raise common questions which will have common answers."  2015 WL 5138097, at *8.

United States District Court
Northern District of California

"typical" if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020) (quoting *Hanlon*, 150 F.3d at 1020). Thus, the "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Moreover, courts may evaluate whether a named plaintiff is typical by determining whether she is "subject to unique defenses which threaten to become the focus of the litigation." *Id.* "Class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to [her]." *Id.*

Rule 23(a)(4) requires that the putative class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). A named plaintiff satisfies the adequacy test if the individual has no conflicts of interest with other class members and if the named plaintiff will prosecute the action vigorously on behalf of the class. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

As other courts and commentators have noted, the typicality and adequacy inquiries tend to significantly overlap. *See, e.g.*, Newberg on Class Actions § 3:32 (5th ed. 2015) ("Due to the related nature of the two requirements and the frequency with which they are challenged on the same grounds, many courts address the typicality and adequacy requirements in a single inquiry."). For instance, a named plaintiff who is subject to unique defenses (*i.e.*, may not satisfy typicality) may also have a conflict of interest with her fellow class members (*i.e.*, be an inadequate class representative). In light of this overlap, and because Uber and the parties largely treat the two issues together in their briefs, the Court analyzes the representative Plaintiffs' ability to represent their fellow class members with respect to all of their claims.

Uber principally argues that Plaintiffs are not adequate because "independent studies" show that the vast majority of drivers oppose reclassification and would be worse off if they are

United States District Court
Northern District of California

reclassified as employees.[3]  Opp'n at  20. This Court already rejected this argument in *O'Connor II*, concluding that "even if Uber had demonstrated some real tension between the goals of the class representatives and some statistically significant percentage of the class members, courts have refused to find inadequacy on these grounds."  2015 WL 5138097, at *13.  Indeed, district courts in the Ninth Circuit routinely refuse to deny class certification where some—even most—of the putative class members oppose it.  *See e.g.*, *Guifu Li*, 2011 WL 4635198, at *9 ("The fact that all proposed class members may not like each other, or even that some potential class members may prefer their current employment situation, is not sufficient to defeat adequacy."); *Norris–Wilson v. Delta T. Grp., Inc.*, 270 F.R.D. 596, 606 (S.D. Cal. 2010) ("Just because potential class members disagree with the spirit of an action doesn't mean it shouldn't be certified.  It will almost always be the case that some putative class members are happy with things as they are.").  Indeed, as Judge Conti correctly explained in *Smith v. Cardinal Logistics Management Corp.*, where putative employees seek to invoke the protections afforded under California labor laws, the Court "must be mindful" of the fact that "the protections conferred by [these laws] have a public purpose beyond the private interests of the workers themselves."  No. 07-2104 SC, 2008 WL 4156364, at *7 (N.D. Cal. Sept. 5, 2008) (quoting *S.G. Borello*, 769 P.2d at 399); *see also* Department of Labor Administrator's Interpretation No. 2015–1, 2015 WL 4449086, at *1 (July 15, 2015) (noting as a public policy matter that "[m]isclassification also results in lower tax revenues for

---

[3] In its opposition, Uber lists harms that will befall the putative class members if they are reclassified as employees, including that it would (1) "prevent hundreds of thousands of drivers from earning *any* income through the app;" (2) cause drivers to make less money; (3) cause drivers to lose the flexibility to work whenever they want; (4) cause drivers to lose their ability to use other ride share applications; (5) prevent drivers who operate transportation business from relying on employees and subcontractors; and (6) "jeopardize the emergency federal benefits available to drivers as self-employed workers during an unprecedented fall in demand for rides due to the pandemic."  Opp'n at. 21–23.  But the only basis that Uber submits for these claims are declarations from its employees and several current drivers.  These declarations are insufficient, because as this Court noted in *O'Connor II,* "it [is doubtful] that most Uber drivers or declarants correctly understand the pertinent legal difference between being an employee and an independent contractor, or the potential consequences of this [litigation]."  2015 WL 5138097, at *13.  Moreover, these declarations are insufficient to definitely establish "that a victory for Plaintiffs in this lawsuit would require Uber to use 'less flexible' work schedules going forward.  *Id.*  In any event, as discussed above, the fact that some class members may oppose the suit and the relief sought therein does not establish the class representation are inadequate within the meaning of Rule 23(a)(4).

government and an uneven playing field for employers who properly classify their workers"). "It would be antithetical" to the public interest embodied in California's Labor Code to permit a portion of Uber's workforce "to frustrate the attempt by others to assert rights under California labor law solely because [they] are satisfied with their current jobs."  *Smith*, 2008 WL 4156364, at *7; *Cf. Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 302 (1985) ("If an exception to the [Fair Labor Standards Act] were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act.").  Moreover, if there are class members who truly object to the goals of this lawsuit, they are free to opt-out of the putative class after it is certified.  *See Dalton v. Lee Publ'ns, Inc.*, 270 F.R.D. 555, 560–61. (S.D. Cal. 2010).

Uber also argues that Messrs. James and Verhines are not typical Uber drivers for several reasons.  First, Uber contends that Messrs. James and Verhines cannot represent the interests of most Uber drivers because they use the application full time.  The Court has already noted in *O'Connor II* that whether "some Uber drivers drive only part-time while others drive full-time . . . is irrelevant for the class-certification analysis under *Borello*."  2015 WL 5138097, at *17 n. 15. Similarly here, the amount of time that drivers spend driving is irrelevant under the ABC test because, under prong A, "the relevant question is Uber's *right* to control its drivers' schedules. Because it uniformly has no such control, it is not surprising that there are significant differences between class members with respect to the actual number of hours they spend driving for Uber." *Id.*

Second, Uber argues that Messrs. James and Verhines are not typical Uber drivers because they do not use competitors' applications and are not independent business owners who employ or subcontract other drivers.  These distinctions are potentially legally significant under prong C of the ABC test, which requires the court or the jury to determine if the putative employee is customarily engaged in an independently established occupation, trade, or business.  *Dynamex*, 416 P.3d at 34.  As an initial matter, as this Court recognized in *O'Connor II*, "to the extent that Uber's 'no typical Uber driver' contention is focused on legally relevant differences between

11

drivers . . . the argument is really a *commonality or predominance* argument masquerading as a typicality argument." 2015 WL 5138097, at *10. That is because, "[i]f legally material differences between class members are so substantial that the predominance or commonality tests cannot be satisfied, then the typicality test likely cannot be satisfied either." *Id.* Here, as will be discussed more fully below, the fact that some Uber drivers use competing applications and work for third-party transportation companies defeats predominance under prong C of the ABC test to the extent plaintiffs seek to certify the entire class with respect thereto. But that does not necessarily preclude certification of a class under prongs A and B of the ABC test.[4]

Third, and finally, Uber argues that Mr. Verhines is not typical because he is seeking injunctive relief compelling drivers to be reclassified as employees even though he testified that he no longer wants to drive for Uber. Reply at 25 (citing Am. Compl. ¶¶ 7, 78–79). Uber mischaracterizes Verhines's testimony; he simply expressed an aspiration to quit driving for Uber: "I prefer not to have to work with them at all anymore, but I may have to. I don't know." Docket No. 120 (Decl. of Shannon Liss-Riordan in Support of Reply ("Liss-Riordan Decl.")), Ex. 9 at 131:8, 232:22-23. This is insufficient to find that Mr. Verhines is atypical.

Accordingly, the Court concludes that Messrs. James's and Verhines's claims are typical of their fellow class members' claims, and that both are adequate class representatives.

B.    Rule 23(b)(3) Requirements

Having satisfied the Rule 23(a) criteria for all of their claims, Plaintiffs must next demonstrate "the superiority of maintaining a class action and show that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Castillo*, 980 F.3d at 730 (quoting *Mazza*, 666 F.3d at 596 (quoting FRCP 23(b)(3))).

1.    Predominance

"The predominance test of Rule 23(b)(3) is 'far more demanding' than the commonality test under Rule 23(a)(2)." *Villalpando v. Exel Direct Inc*, 303 F.R.D. 588, 607 (N.D. Cal. 2014) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)). Predominance is satisfied

---

[4] Plaintiffs do not seek certification of a subclass of drivers who drive exclusively for Uber.

United States District Court
Northern District of California

only "when common issues 'represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.'" *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1182 (9th Cir. 2015) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1777 (2d ed.1986)).  "[T]he focus of the predominance inquiry" is whether "a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (quoting *Amchem*, 521 U.S. at 623).  But the rule "does not require a plaintiff seeking class certification to prove that each element of their claim is susceptible to class-wide proof," so long as one or more common questions predominate.  *Castillo*, 980 F.3d at 730 (quoting *Amgen*, 568 U.S. at 469); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately.'" (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005)).

Here, the Court must perform the predominance analysis twice.  First, the Court will consider whether common questions predominate with respect to the threshold employment misclassification claim.  "If they do not, then the inquiry ends there and class certification should be denied." *Guifu Li*, 2011 WL 4635198, at *12.  Second, if "common questions predominate the classification inquiry," the Court should then consider Plaintiffs' individual substantive claims "to determine whether they also pass the predominance test." *Id.*; *see also Norris–Wilson*, 270 F.R.D. at 606 (following same analytical framework); *Villalpando*, 303 F.R.D. at 608 (same); *Soto v. Diakon Logistics (Del.), Inc.*, No. 08–cv–33–L(WMC), 2013 WL 4500693, at *8 (S.D. Cal. Aug. 21, 2013) (same).

a.   <u>Whether Class Members Are Employees or Independent Contractors</u>

Uber argues that individual issues predominate as to each of the prongs of the ABC test. These arguments fall flat as to prongs A and B.  However, as explained more fully below, individual issues pertaining to whether drivers engaged in an independently established  business predominate under prong C.  Accordingly, the Court will certify the proposed class for purposes of

adjudicating prongs A and B, which means that prong C will have to be adjudicated for each plaintiff on an individual basis.

First, Uber argues that individual issues predominate as to prong A—whether the drivers are "free from the control and direction of [Uber] . . . both under the contract . . . and in fact," *Dynamex*, 416 P.3d at 34; Cal. Lab. Code § 2775(b)(1)(A)—because since January 2020 Uber changed its contract to give drivers much more flexibility and independence, creating several "variations in drivers experience with the app," Opp'n at 9–10.  For example, Uber explains that under the current contract "drivers can now view the estimated fare, destination, and other key information before deciding to accept or decline a dispatch," which has resulted in "wide variation in drivers' accepting the suggested price or departing upwards or downwards." *Id.* at 9.  Similarly, Uber explains that the current contract allows Uber drivers (1) to develop relationships with particular riders who can specifically request them, (2) use the Uber application infrequently without penalty, (3) simultaneously use competing applications like Lyft, (4) contract directly with passengers outside of Uber, (5) hire employees to drive on their behalf, (6) and decline ride requests without facing any penalties.  *Id.* at 10.  Therefore, Uber argues that a class cannot be certified because some drivers avail themselves of these flexible options more than others, leading to varying experiences while using the application.

The problem with this argument is that all the drivers are subject to the same uniform terms of Uber's standardized "Platform Access Agreement,"  even if only some of them take advantage of the new flexible terms of that agreement.  *See* Docket No. 93 (Decl. of Brad Rosenthal in Support of Opp'n to Mot. ("Rosenthal Decl.")) ¶ 50.  Uber is not arguing, for example, that only some drivers are offered the option to use the application infrequently, or that only some drivers are allowed to simultaneously use the Lyft app.  In other words, a jury could very well review the terms of Uber's current standard agreement and conclude "in one stroke" that Uber satisfies prong A of the ABC test because it does not exercise sufficient control or direction over the drivers.  *Wal-Mart*, 564 U.S. at 350.  As this Court noted in *O'Connor II*, "this factor will likely weigh in [Uber's] favor on the merits, [but] the fact that Uber admits that it exercises a uniform amount of control over its drivers' work schedules (*i.e.*, none) benefits Plaintiffs at the

class certification stage because it proves that this factor can be adjudicated on a class-wide basis." 2015 WL 5138097, at *17.  Therefore, the varying experiences of drivers on the app matters not for class certification purposes because whether Uber drivers are given sufficient flexibility such that they are not under Uber's control for purposes of prong A is susceptible to common and class-wide proof, namely, the terms of Uber's current agreement.  *See Id.* at *19 ("To the extent that Uber has uniformly retained a right to discharge its drivers at will in its standardized form contracts, this factor weighs heavily in favor of class certification."); *Ayala v. Antelope Valley Newspapers*, 59 Cal. 4th 522, 534 (2014) (explaining evidentiary importance of form employment contracts).  The issue under prong A is Uber's right to control whether drivers use the application or not (and conversely, drivers' right to choose among options made available by Uber); the same questions apply to all drivers and are thus commonly shared.  *See Villalpando*, 303 F.R.D. at 608 (recognizing that "uniform contracts are a significant focus of the 'right to control' inquiry") (citing *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 989–94 (9th Cir. 2014) and *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1102 (9th Cir. 2014)).

Uber further argues that class certification is inappropriate under prong A because Uber has used three different agreements over the relevant class period, each of which exercised varying control over Uber's drivers.  *See* Opp'n at 8, n. 3; Rosenthal Decl. ¶ 50 ("During the relevant class period, there were two other basic platform use agreements that were used: the November 25, 2019 Technology Services Agreement and the December 11, 2015 Technology Services Agreement.").  For example, although the current agreement allows drivers full discretion as to when to drive, previous agreements required drivers to fulfill at least one ride per month or risk deactivation.  *Compare* Rosenthal Decl., Ex. 1 §1.2, *with id.*, Ex. 2 § 2.1, *and id.*, Ex. 3 § 2.1. Similarly, prior agreements allowed Uber to deactivate drivers if they failed to maintain a minimum average star rating, which is no longer the case under the current agreement.  *Compare id.*, Ex. 1, *with id.*, Ex. 2 § 2.52, *and id.* Ex. 3 § 2.52.

This argument is unpersuasive for at least three reasons.  One, whether drivers are required to fulfill at least one ride, or maintain a minimum rating, does not determine the outcome of the prong A analysis.  In other words, a jury could find that Uber exercised no control—or too much

control—over its drivers under all of the agreements, despite their differences.  Two, Plaintiffs contend that the current agreement incorporates by reference Uber's Community Guidelines, which state that "[i]f your rating is lower than the minimum average rating in your city, we will let you know.  And drivers . . . that don't meet the minimum average rating for their city may lose access to the Uber apps."  Liss-Riordan Decl., Ex. 4 (Uber Community Guidelines); *id.*, Ex. 11 ("Rosenthal Dep.") at 179:2-180:3 (confirming that drivers are automatically deactivated if their ratings fall below a threshold determined by Uber).  If that is true, then Uber's characterization that the agreements are materially different is incorrect.  Three, and most importantly, the existence of multiple agreements is insufficient to establish that individual issues predominate under prong A because the Court could easily certify subclasses consisting of drivers who provided services under each of the three operative agreements throughout the class period.  *See* Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."); *Cf. Rodriguez v. Hayes*, 591 F.3d 1105, 1123 (9th Cir. 2010) ("To the extent there may be any concern that the differing statutes authorizing detention of the various class members will render class adjudication of class members' claims impractical or undermine effective representation of the class, it may counsel the formation of subclasses.");

Second, Uber argues that individual issues predominate as to prong B—whether the drivers perform "work that is outside the usual course of [Uber's] business" *Dynamex*, 416 P.3d at 34; Cal. Lab. Code § 2775(b)(1)(B)—because some drivers purchased a flat subscription for a certain number of leads within a set time period and pay no additional per-ride fee to Uber.  Opp'n at 11.  Uber therefore contends that, at least for drivers who purchased a subscription, "Uber's revenue is not dependent on whether drivers complete trips, which renders their work outside the usual course of Uber's business."  *Id.*  But, as the California Court of Appeal reasoned in *People v. Uber*, subscriptions do not alter the basic fact that providing transportation is Uber's core business:

> While these details relating to how drivers are compensated might to a limited extent bear on whether the drivers are free from Uber's direction and control or whether the drivers are engaged in an independently established trade—prongs A and C of the ABC test— *they do not support Uber's contention that the drivers' work is*

> *outside the usual course of its business under prong B*.  Quite to the
> contrary, according to the People, "Drive Pass . . . financially
> incentivizes the Driver to accept every dispatched ride [and thus] . . .
> is further evidence of why Drivers are within Uber's usual course of
> business—to provide rides."

270 Cal. Rptr. 3d at 316 (emphasis added).  In other words, drivers complete trips for Uber's customers, regardless of how Uber charges its fee to drivers for using the Uber application (per-trip or in bulk).

Uber also argues that "other central pieces of the Prong B" analysis require individualized proof.  For example, Uber points out that many drivers display its competitors' logos or advertise their own transportation companies on their cards and business cards, and that many of them "engage in gig work only in their off-time from their *other* independent primary professions." Opp'n at 11.  But the appropriate question under prong B is whether the drivers' work of driving customers from one place to another is central to Uber's business of providing customers rides from one place to another—not whether drivers "continuously performed" that work.  Opp'n at 12. This Court has repeatedly held that Uber and Uber's drivers are both in the business of transportation.  *See O'Connor v. Uber Techs., Inc.*, (*O'Connor I*), 82 F. Supp. 3d 1133, 1141 (N.D. Cal. 2015) ("[I]t is clear that Uber is most certainly a transportation company."); *O'Connor II*, 2015 WL 5138097, at *27 ("Uber's business is the business of transportation.  . . . It is equally clear that Uber drivers are also in the business of transportation.").  What drivers do when they are not driving for Uber—much like what a part-time employee does on their own free time—does not change the fact that when they are doing work for Uber they are driving Uber's customers around, which is "within [Uber's] usual course of business."  *Dynamex*, 416 P.3d at 34.

Third, and finally, Uber correctly argues that individualized evidence is required to determine, under prong C, whether "the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed" for Uber.  *Dynamex*, 416 P.3d at 36; Cal. Lab. Code § 2775(b)(1)(C).  In *O'Connor II*, this Court declined to certify a "mega-class of *all* Uber drivers who have ever driven for Uber since 2009" because there was "tremendous (and likely material) variance between those class members who held themselves out as a distinct business—or contracted to drive for Uber

indirectly through a distinct third-party business that had itself contracted with Uber to provide driving services—and those who did not."   2015 WL 5138097, at *22 (emphasis added).  The variance was caused by the fact that drivers who owned or worked for third-party transportation companies "did not drive exclusively Uber," which meant that it was "at least plausible that a jury could find that" they were "engaged in a distinct occupation or business" such that they would be classified as independent contractors under the *S.G. Borello* test.[5]  *Id.* at *23.  This Court nonetheless certified a class that excluded drivers who owned or worked for third-party transportation companies, leaving open the possibility that, on a later date, "Plaintiffs could demonstrate that some such drivers could participate in a class action via an *appropriately defined subclass or subclasses* where there are no material variations within such subclass."  *Id.* (emphasis added).

A couple of months later, the *O'Connor* Plaintiffs filed a motion precisely to certify a subclass of Uber drivers laboring for third-party transportation companies.  *See O'Connor v. Uber Technologies* (*O'Connor III*), 311 F.R.D. 547, 552–53 (N.D. Cal. 2015).  This Court denied their motion because there were "potential significant variations" within that subclass, "such as the number of hours that a driver drove for Uber clients versus other clients—that could cause a jury to reach different results" among those drivers.  *Id.* at 553.  Importantly, the Court refused to certify this subclass because the *O'Connor* plaintiffs had "not offered a concrete proposal" for ascertaining which drivers were members of this subclass (or classes):

> "For example, Plaintiffs have not submitted any proof that they could objectively identify all drivers who drove for Uber more than 30 hours per week.  Alternatively, if a subclass were to be defined by the percentage of rides given to Uber customers versus customers obtained from other sources, Plaintiffs have not shown that they could objectively determine whether a driver was more like Ezzikhe or Gebretensia (i.e., drive solely for Uber) or more like Enriquez or Alshara (i.e., drive for Uber about 30% of the time)."  *O'Connor II*, 2015 WL 5138097, at *24.  Despite being given the opportunity, Plaintiffs again fail to meet this burden.

---

[5] The first *S.G. Borello* factor—"whether the one performing services is engaged in a distinct occupation or business"—mirrors prong C of the ABC test—"whether the worker is customarily engaged in an independently established trade, occupation, or business."  *Compare S.G. Borello*, 769 P.2d at 404, *with Dynamex*, 416 P.3d at 36, *and* Cal. Lab. Code § 2775(b)(1)(C).

*Id.* at 552.  Therefore, the Court concluded that the *SG Borello* test could not be applied on a class-wide basis to Uber drivers who also worked for third-party transportation companies because it would be impossible to determine whether they engaged in a distinct occupation or business.  *Id.*; *see also Bowerman v. Field Asset Servs., Inc.* (*Bowerman I* ), No. 13–cv–0057–WHO, 2014 WL 4676611, at *10 (N.D. Cal. Sept. 17, 2014) (initially denying class certification for want of predominance, and remarking that "[i]t is critical to me" that some proposed class members "have independent businesses and do not work full time for [Defendant]"); *Sotelo v. Media News Grp., Inc.*, 143 Cal. Rptr. 3d 293, 308 (Cal. App. 2012) (affirming denial of class certification where the trial court had found a materially significant difference between proposed class members with respect to the "distinct business" *Borello* factor).

Here, the variations that made it impossible to certify a class that included Uber drivers who owned or worked for third-party transportation companies in *O'Connor II* and *III* also pertain to prong C.  Indeed, as Uber underscores in its opposition, some of the putative class members in the instant case also "use Uber's competitors' apps at the same time that they use Uber and build their own clientele base."  Opp'n at 12.  In addition, some drivers incorporate their own businesses, obtain commercial driver's licenses, advertise under their own name, target their driving periods during surge pricing on the Uber application, and identify as self-employed on their tax returns.  *Id.*  A finder of fact could plausibly conclude that some of these putative class members are engaged in an independently established business under prong C of the ABC test, while others are not.  This requires an intensive fact-based inquiry on a case by case basis.  There is no way to resolve this question for all of these drivers, one way or the other, "in one stroke." *Wal-Mart*, 564 U.S. at 350.

Unlike the *SG Borello* test, however, the ABC test is conjunctive, which means that drivers could be categorized as Uber's employees even if some of them are engaged in an independently established trade under prong C, as long as prongs A and B are not satisfied.  Therefore the Court will certify the proposed class so that the trier of fact can adjudicate prongs A and B on a class-wide basis, leaving prong C to be decided on an individual basis.  If the trier of fact finds that either prongs A or B (or both) are not satisfied by Uber, then the drivers would be presumed to be

employees irrespective of prong C.  Conversely, if the trier of fact decides that Uber satisfies

prongs A and B, the jury would have to determine on an individual basis whether each individual

driver also satisfies prong C.  Either way, class certification is appropriate, and would

considerably advance the litigation, because adjudicating two out of the three prongs of the ABC

test using class-wide proof is much more efficient than adjudicating all prongs on an individual

basis.

Accordingly, the predominance requirement is satisfied for the misclassification question

with respect to the adjudication of prongs A and B of the ABC test.

### b.    Plaintiffs' Substantive Claims

Even if "common questions predominate the threshold question of employee

classification," the Court must still consider whether "Plaintiffs' individual claims . . . also pass

the predominance test."  *Guifu Li*, 2011 WL 4635198, at *12; *Soto*, 2013 WL 4500693, at *8.  The

Court concludes that only plaintiffs expense reimbursement and itemized pay statements claims

satisfy the predominance requirement and are thus suitable for class-wide determination.

Accordingly, Plaintiffs will have to adjudicate their minimum wage, overtime, and paid sick leave

claims on an individual basis.

### i.    Expense Reimbursement

Plaintiffs are only seeking reimbursement of vehicle and phone-related expenses, *see*

Reply at 9, which this Court has already found to be appropriate for class certification in

*O'Connor III*.  *See* 311 F.R.D. at 567 ("The Court finds that certifying vehicle-related and phone

expenses will not cause individualized issues to predominate.").  Uber does not raise any new

arguments that would disturb that conclusion.

Accordingly, the predominance requirement is satisfied for Plaintiffs' expense

reimbursement claim because a court or a jury could determine, on a class-wide basis, that Uber's

failure to reimburse drivers for phone-and-vehicle-related expenses violates California's expense

reimbursement laws.  *See Castillo*, 980 F.3d at 730 ("Individual differences in calculating the

amount of damages will not defeat class certification where common issues otherwise

predominate."); *Vaquero v. Ashley Furniture Indus. Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016)

("Our precedent is well settled on this point.  In *Yokoyama*, we held that 'damage calculations alone cannot defeat certification.'  That is, the 'amount of damages is invariably an individual question and does not defeat class action treatment.'" (quoting *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)).

ii.    <u>Itemized Pay Statements</u>

Uber's only argument against certification of Plaintiffs' itemized pay statement claims is that they are "derivative of an employee's right to wages themselves," such that they rise or fall with Plaintiffs' other wage and hour claims.  *Naranjo v. Spectrum Sec. Servs. Inc.*, 253 Cal. Rptr. 3d 248, 265–66 (Ct. App. 2019); *see also Valadez v. CSX Intermodal Terminals, Inc.*, 298 F. Supp. 3d 1254, 1269 (N.D. Cal. 2018), *reconsideration denied*, No. 15-CV-05433-EDL, 2019 WL 1975460 (N.D. Cal. Mar. 15, 2019) ("Defendant acknowledges that the wage statement violation claim 'succeeds or fails' based on employment status.").

Here, the predominance requirement is satisfied for Plaintiffs' itemized wage statements claims because it is also satisfied for the misclassification claim.  *See Johnson v. Serenity Transp., Inc.*, No. 15-CV-02004-JSC, 2018 WL 3646540, at *15 (N.D. Cal. Aug. 1, 2018), *reconsideration denied,* No. 15-CV-02004-JSC, 2018 WL 9782170 (N.D. Cal. Oct. 12, 2018), *and aff'd*, 802 F. App'x 250 (9th Cir. 2020) ("If the drivers were employees and not independent contractors—a question the Court has already decided is subject to common proof—the wage statement and waiting time claims are also subject to common proof.   Accordingly, Plaintiffs' wage statement and waiting time claims are suitable for common resolution.").  In other words, if the trier of fact decides that Uber's drivers are employees, then Uber was required to provide them itemized pay statements.  Determining whether itemized pay statements were provided consistent with California Labor Code § 226(a) and Wage Order 9-2001, can be determined on a class-wide basis since Uber's practice in this regard is uniform.

Accordingly, the predominance requirement is satisfied for Plaintiffs' itemized pay statements claims.

iii.    <u>Minimum Wage and Overtime</u>

Uber explains that it has no uniform pay policy, but rather that its "algorithm calculates

21

suggested fares based on the time and distance traveled and offers surge pricing to account for real-time fluctuations in supply and demand." Opp'n at 13. Similarly, some drivers only work during peak times, receive significant tips from riders, and most importantly, as of July 2020, set their own fares. *See* Rosenthal Decl. ¶ 37. Other drivers purchase a set number of leads for a flat fee (a subscription), which allows them to retain the entirety of the fare passengers pay thereafter. Rosenthal Decl. ¶¶ 42–43. Given the varying modalities that Uber uses to pay its drivers, Uber contends that Plaintiffs' minimum wage and overtime claims are not suitable for class-wide determination because "the Court would have to conduct exhaustive individualized analyses just to determine each driver's hourly pay." Opp'n at 14.

Under Ninth Circuit law, to show predominance "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created legal liability." *Vaquero*, 824 F.3d at 1154 (emphasis added) (quoting *Pulaski v. Middleman, LLC v. Google, Inc.*, 802 F.3d 979 987–88 (9th Cir. 2015)); *see also Castillo*, 980 F.3d at 730 ("[I]f the plaintiffs cannot prove that damages *resulted from* the defendant's conduct, then the plaintiffs cannot establish predominance." (quoting *Vaquero*, 802 F.3d at 1154)).

Uber's argument that "'a case-by-case analysis would be required to determine' Uber's liability as to each individual driver, precluding class-wide adjudication," Opp'n at 15, is unconvincing because its deliberate choice to not have a pay policy that guarantees minimum wage and overtime pay applies to all drivers, regardless of how they use the application or how much money they make driving for Uber. In other words, the jury could determine on a class-wide basis that Uber violated California's minimum wage and overtime laws precisely by not having a pay policy or pay formula that guarantees drivers are paid minimum wage for all hours driven and overtime for every hour above forty per week spent driving. Mot. at 15, n. 15.

The Ninth Circuit's decision in *Vaquero* is instructive on this point. *See* 824 F.3d at 1154–55. There, the plaintiff was a sales associate claiming that the defendant paid its sales associates only a commission, even though it required them to complete many tasks that were unrelated to sales, which violated California's law that "proscribes compensation through commission for work that is not 'directly involved in selling.'" *Id.* at 1154 (quoting *Ramirez v. Yosemite Water*

1   *Co.*, 978 P.2d 2, 10 (Cal. 1999)).  The *Vaquero* Court concluded that the plaintiffs had satisfied

2   predominance because

> Defendants' consciously chosen compensation policy deprived the
> class members of earnings in violation of California's minimum
> wage laws.  In a wage and hour case, unlike in an antitrust class
> action, the employer-defendant's actions *necessarily* caused the
> class members' injury.  Defendants either paid or did not pay their
> sales associates for work performed.  No other factor could have
> contributed to the alleged injury.

7   *Id.* at 1154–55.  Same here, Uber's consciously chosen policy of not guaranteeing minimum wage

8   or overtime deprived its drivers of earnings in assured compliance with California's minimum

9   wage and overtime laws.  This straight-forward question of liability is suitable for class-wide

10  determination.

11          Importantly, the *Vaquero* court also explained that predominance was satisfied "even if the

12  measure of damages proposed [] is imperfect," because "it cannot be disputed that the damages (if

13  any are proved) *stemmed from* Defendants' actions." *Id.* at 1155; *see also Pulaski*, 802 F.3d at

14  987 ("We explained that *Comcast* stood for the proposition that 'plaintiffs must be able to show

15  that their damages *stemmed from* the defendants' actions that created the legal liability.'" (quoting

16  *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013))).  In doing so, the *Vaquero* court

17  reiterated the longstanding principle that "damage calculations alone cannot defeat class

18  certification." *Id.* (quoting *Yokoyama*, 594 F.3d at 1094); *see also Leyva*, 716 F.3d at 514 ("[T]he

19  presence of individualized damages cannot, by itself, defeat class certification under Rule

20  23(b)(3)."); *Blackie*, 524 F.2d at 905 ("The amount of damages is invariably an individual

21  question and does not defeat class action treatment.").

22          Even if Plaintiffs' damages stem from Uber's pay policy, however, class-wide adjudication

23  of Plaintiffs' minimum wage and overtime claims is made problematic by Plaintiffs' insistence

24  that "all time that drivers are on the [Uber] app and thus ready and willing to accept ride requests

25  is compensable time."  Mot. at 15, n. 15.  This Court already recognized in *Yucesoy v. Uber*

26  *Technologies, Inc.*, that determining whether an employee's waiting or "on-call" time is

27  compensable for purposes of overtime and minimum wage violations "is a fact-specific inquiry

28  that looks to the degree to which an employee is free to engage in personal activities" while on-

23

United States District Court
Northern District of California

call.  No. 15-CV-00262-EMC, 2016 WL 493189, at *5 (N.D. Cal. Feb. 9, 2016).  In other words, "[t]he classification of 'on-call' time is a highly fact-driven, context-dependent inquiry, which is ill-suited to class treatment."  *Ladore v. Ecolab, Inc.*, No. CV1109386GAFFMOX, 2012 WL 12861141, at *12 (C.D. Cal. Apr. 11, 2012), *amended*, No. CV 11-9386 FMO (JCX), 2013 WL 12246503 (C.D. Cal. Aug. 2, 2013).

Under Ninth Circuit and California law, courts weigh several factors to determine if an employee should be compensated for on-call time:

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

*Berry v. County of Sonoma*, 30 F.3d 1174, 1183 (9th Cir. 1994) (quoting *Owens v. Loc. No. 169, Ass'n of W. Pulp and Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992)); *Mendiola v. CPS Secs. Sols. Inc.*, 340 P.3d 355, 360 (Cal. 2015) (same).

Here, as in *Yucesoy*, the trier of fact's determination of compensability of waiting time is complicated by the need to balance the *Owens* factors to determine if the putative class members' time is compensable.  This individualized determination turns on "how often these [ride] requests [come] in, how many of the requests they must accept, and the magnitude of the risk of deactivation if requests are not accepted.  Without such information, it is unclear what ability drivers have to conduct personal business while logged onto the app."  2016 WL 493189, at *6. *See also Ladore*, 2012 WL 12861141, at *12 (denying class certification because Ladore  did "not offer[] any evidence to suggest that all putative class members' Weekend Duty was all alike such that it would all be or all would not be compensable overtime under such a fact-driven analysis.").  Presumably, some of the drivers in Plaintiffs' putative class "engaged in personal activities"— including paid work for third parties—while waiting to receive ride requests on the Uber app; others may not or may do so only occasionally.  Determining Uber's liability for wages cannot be determined on a class-wide basis and individualized determinations would be complex and

24

1  manifold.

2          Accordingly, the Court cannot conclude that the predominance requirement is satisfied for

3  Plaintiffs' minimum wage and overtime pay because Plaintiffs refuse to limit those claims to the

4  time that they spent actually driving for Uber.

5                          iv.    Paid Sick Leave

6          Uber first challenges the certification of Plaintiffs' paid sick leave claims by arguing that

7  there is no class-wide evidence to establish that drivers gave "reasonable advance notification" of

8  a need for sick leave.  Opp'n at 16–17 (citing Cal. Lab. Code § 246(m)).  This argument has no

9  merit because "Uber does not dispute that, at the time this case was filed, it did not offer sick pay,

10 *Plaintiffs need not plead that they requested it in order to state their claim*."  Order on MTD at 6

11 (emphasis added).  As Plaintiffs point out, it would be nonsensical to require a worker to request

12 permission to take paid sick leave from an employer that does not offer it.  Reply at 13.

13         Uber also argues that Plaintiffs' sick leave is not appropriate for class-wide determination

14 because "the amount of paid sick leave to which any driver may be entitled is directly tied to the

15 number of hours each driver works . . . which . . . is not subject to common proof."  Opp'n at 17.

16 Uber again conflates liability with damages.  As with Plaintiffs' minimum wage and overtime

17 claims, there is no dispute that Uber does not have a paid-sick-leave policy, such that *any* driver's

18 inability to obtain sick leave necessarily "*stemmed from*" Uber's choice not to offer it.  *Pulaski*,

19 802 F.3d at 987.  The amount of sick leave that each driver was entitled to is an "individualized

20 damages" calculation that "cannot, by itself, defeat class certification under Rule 23(b)(3)."

21 *Leyva*, 716 F.3d at 514.

22         As with Plaintiffs' minimum wage and overtime claims, however, the Court cannot

23 determine if Uber denied Plaintiffs' paid sick leave on a class-wide basis because Plaintiffs insist

24 that all of the time they spent on the application (including waiting time) should count towards

25 determining their sick leave.  That determination is extremely difficult to make as to each driver

26 for reasons stated above.  Accordingly, given Plaintiffs' insistence, the predominance requirement

27 is not satisfied for Plaintiffs' paid sick leave claims either.

28

United States District Court
Northern District of California

c.      Arbitration Opt-Out

Finally, Uber argues that it would require fact-intensive individualized inquiries to determine which drivers opted out of its arbitration agreement.  Opp'n at 17–18.  First, as Plaintiffs' point out, this argument is particularly disingenuous given that the Court just certified a settlement class of such individuals, and Uber conceded that the group was readily ascertainable for settlement purposes.  *See O'Connor v. Uber Techs., Inc.* (*O'Connor IV*), No. 13-CV-03826-EMC, 2019 WL 4394401, *1 (N.D. Cal. Sept. 13, 2019).

Second, Uber does not identify what factual inquiries are necessary to determine if a driver opted out of Uber's arbitration agreement, other than checking to see if the person signed the opt-out provision or not.  In fact, Uber has already identified 4,828 putative class members, which represent "all individuals who completed at least one ride on the Uber app in California between February 28, 2019 and August 31, 2020, attempted to opt out of arbitration, and have a California driver's license."  McCrary Decl. ¶ 11, n. 4.  To be sure, Uber explains that this might be an overestimation because it includes folks who attempted, but where not eligible, to opt out.  *Id.*  But Uber does not explain what it will take to weed those folks out and why it cannot easily be done on a class-wide basis.

Accordingly, this Court will certify a class of Uber drivers who opted out of Uber's arbitration agreement between February 28, 2019 and December 16, 2020

2.      Superiority

Finally, in addition to satisfying all four requirements of Rule 23(a) and the predominance requirement of Rule 23(b)(3), Plaintiffs must also show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3). With respect to the Court's "superiority" analysis, Rule 23(b)(3) suggests the Court consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of

the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed R. Civ. P. 23(b)(3)(A)-(D).

Uber's superiority challenge is focused entirely on the last Rule 23(b)(3) factor: the difficulty of managing Plaintiffs' class action.  The Ninth Circuit has held that "a class action filed under [Rule] 23(b)(3) must be 'superior to other available methods' of adjudication in light of any 'difficulties likely to be encountered in the management of a class action.'"  *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1304 (9th Cir. 1990) (quoting Fed. R. Civ. P. 23(b)(3)).  Manageability "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974), which typically includes "potential difficulties in notifying class members of the suit, calculation of individual damages, and distribution of damages," *Six (6) Mexican Workers*, 904 F.2d at 1304.

Uber does not raise any real manageability concerns; it simply recycles its predominance arguments, claiming that the case is unmanageable because "there are a host of individual issues that would require mini-trials to resolve." Opp'n at 18.  As discussed above, the only issues that will require individualized analysis are prong C of the ABC test and the individual minimum wage, overtime, and paid sick leave claims.  The Court can resolve everything else on a class-wide basis.  In fact, as discussed above, because common issues predominate with respect to prongs A and B of the ABC test, it will "be far more efficient to resolve the question of employment status on a class-wide, rather than individual, basis." *Dalton*, 270 F.R.D. at 565; *see also Estrada v. FedEx Ground Package Sys., Inc.*, 64 Cal. Rptr. 3d 327, 338 (Ct. App. 2007).  Similarly, efficiency counsels in favor of litigating the merits of class members' expense reimbursement and itemized pay statement claims on a class-wide basis.

Accordingly, there are no foreseeable manageability issues because the Court can address numerous common questions with common answers in a single trial.  If Plaintiffs prevail at that trial, then each individual Plaintiff can thereafter pursue their minimum wage, overtime, and paid sick leave claims on an individual basis. *See Loc. Joint Exec. Bd. of Culinary/Bartender Trust*

27

1   *Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (certifying class for purposes

2   of addressing common questions because "individualized issues are few, and most of them are

3   likely to be relatively easy" to adjudicate on an individual basis).  This approach is clearly the

4   superior method of resolving these cases for the Plaintiffs, Uber, and the Court.

5   C.      Proposition 22

6           1.      Background

7           Prop 22 passed on November 3, 2020, repealing AB 5 with respect to app-based drivers

8   and declaring these drivers to be independent contractors, as long as the network company (in this

9   case, Uber) provides those drivers with specific wage and hour protections.[6]  The text of Prop. 22

10  was codified in Division 3, Chapter 10.5, of the California Business and Professions Code.

11          Specifically, under section 7451 of the California Business and Professions Code, "an app-

12  based driver is an independent contractor and not an employee or agent with respect to the app-

13  based driver's relationship with [Uber] if the following conditions are met:

> (a)  The network company does not unilaterally prescribe specific
>       dates, times of day, or a minimum number of hours during
>       which the app-based driver must be logged into the network
>       company's online enabled application or platform.
>
> (b)  The network company does not require the app-based driver to
>       accept any specific rideshare service or delivery service request
>       as a condition of maintaining access to the network company's
>       online enabled application or platform.
>
> (c)  The network company does not restrict the app-based driver
>       from performing rideshare services or delivery services through
>       other network companies except during engaged time.
>
> (d)  The network company does not restrict the app-based driver
>       from working in any other lawful occupation or business.

23  Cal. Bus. & Prof. Code. § 7451.

24          Under section 7453 of the same code, Uber is required to guarantee a "net earnings floor,"

25  comprised of 120% the minimum wage for "engaged hours" plus a $.30 per-mile compensation

---

[6] Prop 22, Exempts App-Based Transportation and Delivery Companies from Providing Employee
Benefits to Certain Drivers, California General Election November 3, 2020, Official Voter
Information Guide, https://voterguide.sos.ca.gov/propositions/22/ (last visited Jan. 15, 2020).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    for vehicle expenses (based on number of "engaged" miles).  *See id.* § 7453.  Prop 22 took effect

2    on December 16, 2020.

3           2.    Effect On This Litigation

4           As a preliminary matter, the Court concludes that Prop 22 does not apply retroactively.

5    The Supreme Court and the California Supreme Court have long  held that statutes are

6    presumptively prospective absent a clear intent that the statute be applied retroactively.  *See*

7    *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) ("The presumption against retroactive

8    legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older

9    than our Republic."); *United States v. Sec. Indus. Bank* 459 U.S. 70, 79–80 (1982) ("The principle

10   that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar

11   to every law student . . .  retrospective operation will not be given to a statute which interferes with

12   antecedent rights . . .  unless such be the unequivocal and inflexible import of the terms, and the

13   manifest intention of the legislature."); *Evangelatos v. Sup. Ct.*, 753 P.2d 585, 597 (Cal. 1988)

14   ("[There is a] common understanding that legislative provisions are presumed to operate

15   prospectively, and that they should be so interpreted 'unless express language or clear and

16   unavoidable implication negatives the presumption.'" (quoting *Glavinich v. Commonwealth Land*

17   *Title Ins. Co.*, 209 Cal. Rptr. 266, 272 (Cal. App. 1984)).  This same principle applies to ballot

18   initiatives.  *See, e.g., Robert L. v. Sup. Ct.*, 69 P.3d 951, 900-01 (Cal. 2003) ("In interpreting a

19   voter initiative . . . , we apply the same principles that govern statutory construction.") (quoting

20   *Horwich v. Sup. Ct.*, 980 P.2d 927 (Cal. 1999)); *Evangelatos*, 753 P.2d at 598 (same); *Strauss v.*

21   *Horton*, 207 P.3d 48, 120-21 (Cal. 2009) (same).  Unlike A.B. 5, Prop 22 does not contain any

22   statement that it is a declaration of current existing law, or any express retroactivity provision.[7]

23   Therefore, Proposition 22 does not apply retroactively.

24          Because Prop 22 does not apply retroactively, at most it forecloses damages in this case for

25

26   [7] The text of Proposition 22 may be found at https://vig.cdn.sos.ca.gov/2020/general/pdf/topl-
     prop22.pdf. The official title and summary of Proposition 22, "*Changes* Employment
27   Classification Rules for App-Based Transportation and Delivery Drivers", issued by Attorney
     General of California Xavier Becerra, on January 2, 2020, may be found at
28   https://oag.ca.gov/system/files/initiatives/pdfs/Title%20and%20Summary%20%2819-
     0026A1%29_0.pdf.

1    conduct that occurred after December 16, 2020.  That is to say, Prop 22 limits the class period.

2         Plaintiffs nonetheless argue that the passage of Prop 22 does not necessarily limit the class

3    period in this case because "it remains to be seen whether Proposition 22 will apply to Uber."  *See*

4    Docket No. 136 ("Plaintiffs' Supp. Br.") at 4.  Indeed, the statute is written so that Uber has to

5    first show that it complies with section 7451's requirements before its drivers can be classified as

6    independent contractors.  This showing, according to Plaintiffs, "will be a fact-based question

7    common to the class."  *Id.* at 4.  Accordingly, Plaintiffs ask the Court to add whether Uber

8    satisfies section 7451's requirements to the list of questions that can be decided in this case on a

9    class-wide basis.  But the amended complaint, as currently written, contains no allegations that

10   Uber does not comply with section 7451's requirements, which is what Plaintiffs must allege (and

11   eventually prove) in order to reclassify Uber's drivers as employees and be able to bring wage and

12   hour claims against Uber after December 16, 2020.  Therefore, it would be premature for the

13   Court to certify that question for determination on a class-wide basis.

14        Accordingly, the Court will end the class period on December 16, 2020, as Plaintiffs have

15   conceded that, assuming Uber complies with section 7451's requirements, they will not be able to

16   show that Uber drivers are employees after that date.  In deciding whether Uber misclassified

17   drivers as independent contractors between February 28, 2019 and December 16, 2020, the court

18   or the jury can apply the ABC test because Prop 22 was not yet the law of the land.

19                        **IV.    CONCLUSION**

20        For the foregoing reasons, the Court **GRANTS in part** Plaintiffs' Rule 23(b)(3) motion to

21   certify a class of Uber drivers who drove for Uber in the State of California between February 28,

22   2019 and December 16, 2020, and who opted out of Uber's arbitration agreement.  The trier of

23   fact will first consider on a class-wide basis whether this class of drivers satisfies prongs A and B

24   of the ABC test.  If these drivers do not satisfy either prong, then the trier of fact will proceed to

25   consider, also on a class-wide basis, this class's expense reimbursement and itemized wage

26   statement claims.

27        The Court also **DENIES in part** Plaintiff's Rule 23(b)(3) motion as it pertains to prong C

28   of the ABC test and Plaintiffs' minimum wage, overtime, and paid sick leave claims.

United States District Court
Northern District of California

The parties are ordered to meet and confer regarding the contents and logistics of class notice and other relevant procedural details in advance of the next case management conference, to be held at 10:30 a.m., February 18, 2021.  At that conference, the parties shall be prepared to discuss any proposal regarding further class certification.  A joint case management statement is due by February 11, 2021.

This order disposes of Docket No. 56.


**IT IS SO ORDERED**.


Dated: January 26, 2021

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California