1    SHANNON LISS-RIORDAN, SBN 310719
     (sliss@llrlaw.com)
2    ANNE KRAMER, SBN  315131
     (akramer@llrlaw.com)
3    LICHTEN & LISS-RIORDAN, P.C.
     729 Boylston Street, Suite 2000
4    Boston, MA 02116
     Telephone:    (617) 994-5800
5    Facsimile:    (617) 994-5801

6    Attorneys for Plaintiffs

7

8                 UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10

11   CHRISTOPHER JAMES, et al., individually and     CASE NO. 19-cv-06462-EMC
     on behalf of all others similarly situated,
                                                      **DECLARATION OF SHANNON**
12                                                    **LISS-RIORDAN IN SUPPORT OF**
                        Plaintiffs,                   **PLAINTIFFS' MOTION FOR**
13                                                    **PRELIMINARY APPROVAL OF**
            v.                                        **CLASS ACTION SETTLEMENT**
14
                                                      Hon. Edward M. Chen
15   UBER TECHNOLOGIES, INC.,
                                                      Hearing:    March 24, 2022
16   Defendant.                                       Time:       1:30 p.m.
                                                      Courtroom:  5
17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SHANNON LISS-RIORDAN

I, Shannon Liss-Riordan, declare as follows:

1.     I am a partner at the law firm of Lichten & Liss-Riordan, P.C., and am lead attorney and class counsel for the settlement class in the above-captioned matters.  I submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement.  I have personal knowledge of the information set forth herein.

### Litigation History

2.     The James case has now been pending for more than two years, since the case was originally filed in October 2019 (originally under the caption Colopy v. Uber Technologies Inc.).[1]  During that time, the parties have engaged in extensive discovery and motion practice, as described below.  My firm also filed Hassell v. Uber Technologies Inc., Case No. 4:20-cv-04062-PJH (N.D. Cal.), on June 18, 2020, asserting similar claims against Uber on behalf of a proposed class of UberEats drivers who opted out of arbitration.  There, the Parties litigated Uber's Motion to Dismiss (including its defense that Prop 22 would apply retroactively to Plaintiffs' claims), and thereafter, my firm filed an Amended Complaint in January 2021.

---

[1]     Plaintiff Thomas Colopy filed the original class action complaint in this case, alleging that Uber drivers were misclassified as independent contractors under California law, and, as a result of their misclassification, drivers were owed expense reimbursement, minimum wage, overtime, and had not received itemized wage statements as required by California law. On January 3, 2020, Colopy filed an amended complaint that added two additional plaintiffs, Christopher James, and Spencer Verhines. See Dkt. 33.

On March 12, 2020, I filed a separate complaint in California state court on behalf of Spencer Verhines, which was subsequently removed to this court and captioned Verhines v. Uber Techs. Inc., Civ. A. No. 3:20-cv-01886 (N.D. Cal.).  This complaint focused on Uber's failure to provide paid sick leave during the pandemic.

On April 16, 2020, I filed an amended consolidated complaint that combined both the original case, Civ. A. No. 19-cv-06462, and the Verhines sick leave case, Civ. A. No. 3:20-cv-01886, with only Christopher James and Spencer Verhines serving as named plaintiffs.  See Dkt. 47.  This amended consolidated complaint contained new allegations regarding Uber's failure to provide paid sick leave during the pandemic.

3.      With respect to discovery in this case, Plaintiffs propounded multiple sets of written discovery (totaling more than 50 requests) and received and reviewed more than 19,550 pages of documents produced by Uber.  Uber likewise propounded multiple sets of written discovery (totaling more than 180 requests) and reviewed nearly 1,500 pages of documents produced by the two Named Plaintiffs, Verhines and James.  Uber deposed Christopher James and Spencer Verhines, and I deposed a Rule 30(b)(6) witness from Uber. The Parties engaged in a protracted meet and confer process regarding various discovery disputes and planned to engage in more discovery before they reached the proposed settlement.

4.      In addition to in-depth discovery, the parties have engaged in aggressive motion practice regarding class certification issues and the substantive merits of Plaintiffs' claims. Plaintiff filed a Motion for Preliminary Injunction in this case in October 2019 as well as a second Motion for Preliminary Injunction and Emergency Motion for Preliminary Injunction in the Verhines sick pay case.  Defendant also filed a Motion to Dismiss, which the Court granted in part and denied in part in December 2019. See Dkt. 30.

5.      The Parties engaged in extensive negotiations before Judge Spero (spanning nine sessions and many hours) in connection with the Verhines sick pay case, ultimately resulting in Uber's rollout of a program to provide a financial assistance program to eligible drivers during the pandemic.[2]  My firm received no attorneys' fees in connection with negotiating this extremely hard-fought settlement, and we performed extensive additional work to make sure Uber followed through on its commitment and to make sure drivers were able to easily access the benefits we had negotiated for them.  This settlement resolved some of the

---

[2]      Drivers who used Uber's Apps in the state of California to drive for at least 20 hours each workweek for any non-consecutive eight workweeks between November 4, 2019, and March 2, 2020, and who drove at least 360 hours across the 52 workweeks preceding March 2, 2020, were eligible to receive up to $360 (24 hours of leave at $15/hour) to allow them to self-quarantine during the pandemic.

issues in the litigation, but my firm proceeded forward to litigate the merits of the other allegations in this case.

6.      Thereafter, the Parties briefed and argued class certification. On January 26, 2021, the Court issued an order granting in part and denying in part Plaintiffs' motion for class certification, certifying a class of "Uber drivers who drove for Uber in the State of California between February 28, 2019 and December 16, 2020, and who opted out of Uber's arbitration agreement," on their misclassification claims (under Prongs A and B of the ABC test) and on their claims for expense reimbursement pay statements, but not on their claims for minimum wage, overtime, and paid sick leave. See Dkt. 143.  Uber filed a petition for review to the Ninth Circuit Court of Appeals pursuant to Fed. R. Civ. P. 23(f), which Plaintiffs opposed. See James v. Uber, Ninth Cir. No. 21-80006, Dkt. No. 1, Dkt. No. 2. That petition as subsequently denied. James v. Uber, Ninth Cir. No. 21-80006, Dkt. No. 4 (9th Cir. April 13, 2021).

7.      The Parties commenced briefing summary judgment. On August 12, 2021, we filed a motion for summary judgment against Uber "on its affirmative defense that the certified class members are properly classified as independent contractors." See Dkt. 174. Uber requested and was granted an extension of time to file its response, but the Parties were scheduled to complete briefing and argue summary judgment before the Court on February 3, 2022, had they not reached this settlement.

8.      Pursuant to the Court's order, the Parties mediated on October 4, 2021, with professional mediator Martin Scheinman.  These negotiations continued after the session on October 4, with the assistance of the mediator.  The parties ultimately agreed to settle the misclassification and related wage-and-hour claims of drivers not bound to arbitrate in California for a payment on all miles driven, including both miles driven "on-trip" with a passenger in the car and miles driven to pick up passengers, as well as miles driven to pick up a food delivery and miles driven to deliver the food to the customer (described by the Parties

here as miles driven during "Occupied Time").  The parties calculate that amount to be $8,435,800.

## The Proposed Settlement

9.      Under the terms of the proposed settlement, the parties have agreed to settle the claims of drivers not bound to arbitrate in California (approximately 1,322 drivers in total) for a non-reversionary payment of approximately $8.43 million.  In exchange, Uber will obtain a release of wage-and-hour related claims through December 16, 2020 for Uber Rides drivers, while Uber EATS drivers will release claims between March 18, 2016 and October 7, 2021. These drivers who drove exclusively for Uber EATS comprise less than 10% of the overall Settlement Class.

10.      Assuming a 50% claim rate, the average net settlement share per claiming class member (after deduction of attorneys' fees, administration costs and incentive payments) in this settlement would be roughly $9,500 per driver.

11.      This average settlement share per driver in this settlement is significantly higher than the average share in the 2019 O'Connor agreement (roughly $2,700), which was already approved by this Court as fair, reasonable, and adequate by this Court.

12.      I anticipate a claim rate of approximately 50% (or higher) based on my experience in other similar settlements.  These settlements include other cases which used a similar notice and distribution process to that included here: O'Connor, No. 13-CV-03826-EMC, 2019 WL 4394401, at *3 (claim rate of 67.3% of the fund claimed); Groves v. Maplebear Inc. dba Instacart, BC695401 (Los Angeles Super. Ct.) (final settlement approval granted on September 2, 2020) (claim rate of 59% of the fund claimed in settlement involving California Instacart drivers); Cotter v. Lyft, 3:13-cv-04065-VC (N.D. Cal.) (claim rate of 64%); Singer v. Postmates, 4:15-cv-01284-JSW (N.D. Cal.) (claim rate of 48%); and Marciano v. DoorDash, CGC-15-548102 (Cal. Super. Ct.) (claim rate of 46%).  I believe that these cases

provide a useful proxy for this case because they also involved so-called "gig economy" companies that utilize a similar business model to Uber, and the settlement class is made up of workers who fit a similar profile.  These cases utilized a similar notice and claims process, allowing workers to submit claims via an online portal or by paper.

13.    Projected administration costs for the settlement total $29,000.  I obtained proposals from three prospective administrators (using the same methods of notice and claims payment).  The first, Simpluris, agreed to a cap on settlement expenses of $29,000 (assuming that the expectations regarding the settlement administration do not change), which I believe is reasonable.  The second prospective administrator provided a quote that was substantially higher, which I did not believe to be competitive given the small class size. The third prospective administrator provided a quote that was somewhat lower than Simpluris; however, I believe that the third administrator underestimated the work that will be required to administer this settlement, and so I do not believe the estimate was an accurate estimate.  I know from experience that this is a very active group of class members who will have many questions and will require clear, consistent communication from the settlement administrator, and the bid for administration must take this into account.

14.    I have worked extensively with Simpluris on this and other cases, and I feel confident they are better able (and more realistically able) to predict the amount of work that would be involved in this settlement administration.  In particular, Simpluris has handled several other large settlements that my firm achieved in other so-called "gig economy" misclassification cases over the last several years (including settlements with Caviar, Postmates, and DoorDash). They have the added advantage of having already administered the notice process in this very case following class certification. Thus, they have already sent notice to this very group of drivers and have a team in place to handle the settlement. I believe it is important to use an administrator whom I have worked with in the past and trust will undertake their role with care and diligence and will not take shortcuts to save on costs. This

administrator is familiar with the types of issues that have arisen in these settlements with other "gig economy" companies and has helped us to improve upon the <u>O'Connor</u> settlement by offering additional services such as text message notice and digital payment options for drivers. Their staff have been committed to diligent follow-up with class members and providing good customer service.

15.     The settlement will use a claim process for settlement class members.  I believe that this is an appropriate method to distribute funds from this settlement.  Indeed, our firm typically uses a claim process for settlement distributions and used one successfully in the prior <u>O'Connor</u> settlement.  It will be extremely simple for settlement class members to submit claims, either through an online portal or through a paper claim form.  In order to submit a claim, settlement class members will only need to provide their name and their mailing address to which they want their settlement check mailed.  The claim process will also allow them to elect an electronic payment via Venmo, Zelle, or Paypal, which is a great benefit for this particular population, some of whom do not have bank accounts.  Allowing digital payments will provide convenient payment methods for drivers while also reducing administration costs associated with mailing checks.  My experience working with class members in cases such as this one, particularly "gig economy" workers, is that they move very frequently.  Based on my experience, a claims process is much better for ensuring that class members receive their payment because this process ensures that an up-to-date mailing address is used for settlement checks.  Because the settlement process involves a lot of follow-up to find class members, this process will likely allow more payments to reach class members than if checks were to be simply mailed, without requiring a claim form.  In my experience, sending checks without a claim form has resulted in extremely messy distribution processes because the checks often do not reach their intended recipients, they are often cashed by current residents of class members' former addresses, and it is difficult to track down and rectify the issue of checks being delivered to old addresses and cashed by non-class members.  Further, this process has also

resulted in 1099 tax forms sent to the IRS for class members who never actually received their checks. In one settlement I negotiated a number of years ago in which I agreed to allow checks to be sent without a claim form, I and the administrator spent years dealing with the issue of upset class members contacting us about notifications they had received from the IRS for unreported payments that they had never received.

16.     Under the terms of the proposed Settlement, my firm will seek attorneys' fees and costs totaling twenty-five (25%) of the Settlement Fund or $2,108,950. Records of my firm's hours worked on the James and Hassell show that based on a projected lodestar analysis, Plaintiffs will be requesting a multiplier of approximately 2.64. This multiplier is eminently reasonable in view of the tremendous results achieved, which are compensating drivers for their *full expense reimbursement damages*, in addition to the excellent result already achieved in the Verhines sick pay settlement, for which my firm received no compensation. Further, this case builds on thousands of hours of work that my firm has performed on other cases against Uber and Lyft (to say nothing of numerous other gig economy cases), which informed the briefing, discovery, and negotiations in this case.

| Attorney | Hours | Rate | Fees |
|---|---|---|---|
| Shannon Liss-Riordan | 400 | $950 | $380,000 |
| Adelaide Pagano | 200.2 | $600 | $120,120 |
| Anne Kramer | 146.3 | $425 | $62,177 |
| Anastasia Doherty | 223 | $375 | $83,625 |
| Law Clerks | 52 | $275 | $14,300 |
| Paralegal Staff | 500 | $225 | $112,500 |
| Costs | | | $24,152.19 |
| **TOTAL:** | | | **$796,875** |

17.     Plaintiffs are also requesting incentive payments for the named plaintiffs in this case. These include enhancements of $10,000 each for the three named plaintiffs who have been involved in the case and have participated actively (Christopher James, Spencer Verhines, and Kent Hassell). Their contributions to this litigation will be detailed further in Plaintiffs' forthcoming Motion for Attorneys' Fees, but I will summarize their hard work briefly here. Plaintiffs James and Verhines both sat for deposition and responded to multiple rounds of voluminous discovery requests in this case and were prepared to testify further as needed. Plaintiff Hassell also supplied extremely detailed records of his time driving with Uber, and worked closely with my firm on the First Amended Complaint in that case, which required an extensive level of detail. All three plaintiffs have been in close contact with my firm about their cases throughout the process, (including settlement negotiations of the sick pay settlement during the start of the pandemic). They have acted as a resource to their fellow drivers and have been willing to put their names in the public eye as part of this high-profile litigation. For all these reasons, I believe these requested incentive payments are fair and reasonable.

## Assessment of the Risks of Further Litigation

18.     In particular, in negotiating the settlement, I considered several key factors: with respect to the California Supreme Court's recent decision in Dynamex, codified in AB5, I believe that the decision poses a serious risk to Uber because it makes the standard for employment misclassification stricter and very difficult for Uber to justify classifying the drivers as independent contractors. I have considerable experience litigating under the "ABC" test for employment status in Massachusetts, which California adopted in the Dynamex decision. Thus, I believe that this decision represents a boon to workers. However, uncertainty remains regarding the precise scope of the Dynamex decision, including whether (prior to the adoption of AB5) it applied to the principal claim in this case, expense reimbursement. Compare Johnson v. VCG-IS, LLC, et al., Case No. 30-2015-00802813, Ruling on Motion in

Limine (Orange County Super. Ct. July 18, 2018) (finding expense reimbursement claims under § 2802 covered by the Dynamex decision), with Garcia v. Border Transportation Group, LLC, 28 Cal. App. 5th 558 (2018) (assuming that § 2802 claims are not covered by the "ABC" test even though there was no § 2802 claim at issue in that case); Karl v. Zimmer Biomet Holdings Inc., 2018 WL 5809428 *3 (N.D. Cal. Nov. 6, 2018) (finding plaintiff's claim for expense reimbursement did not arise under the Wage Orders and therefore Dynamex did not apply). Were the Borello test to apply to the expense reimbursement claim, I believe we faced considerable risk in bringing the employee-status question before a jury, particularly in view of the changes Uber made to its platform to at least create the appearance of independence on the part of drivers. Though we vigorously dispute that these superficial changes undercut Uber's liability, it is certainly conceivable that they would prove persuasive to a jury

19.     Further, as set forth further below, there was a risk that even if we won on liability, the damages award could be sharply reduced if the full IRS reimbursement rate were not utilized to measure expenses for vehicle reimbursement. If Uber's preferred variable rate were used to measure damages, then expense reimbursement would be decreased by more than 50%.

20.     Finally, I also took into account the delay associated with proceeding with this case on the merits. Plaintiffs were extremely confident in their ability to prove that Plaintiffs were Uber's employees under the "ABC" test, particularly in light of the decision in People v. Uber Techs., Inc., 56 Cal. App. 5th 266, 270 Cal. Rptr. 3d 290 (2020), as modified on denial of reh'g (Nov. 20, 2020), review denied (Feb. 10, 2021). However, Uber was likely to argue that People v. Uber was only a decision reviewing the grant of an injunction and did not decide the ultimate question of whether drivers are misclassified. Furthermore, even if Plaintiffs succeeded in proving that Uber could not satisfy all three parts of the ABC test, Uber would certainly appeal any decision against it, delaying any relief for drivers by as much as several years. Thus, I also took into account the value of a swift recovery at this time for the

settlement class in view of the fact that litigating this case to a judgment, and then appeal, would almost certainly take several more years at least.

### **Information Used to Assess the Fairness of This Settlement**

21.     I believe this settlement is fair, reasonable, and adequate based on the factors enumerated in Rule 23(e) and falls within the range of likely approval, and the Court should grant the settlement preliminary approval.

22.     The parties have exchanged extensive information necessary to make an informed evaluation of the case, including detailed damages discovery.  In particular, I have received information regarding which drivers are not covered by arbitration clauses and their mileage (broken down by calendar year) and number of workweeks, from which I have been able to derive estimates of their damages for the expense reimbursement and pay statement claims in this case.  Based on my extensive experience litigating these same claims in other gig economy cases, including the O'Connor case against Uber itself, I believe this settlement has produced an exceptional result.

23.     Paragraphs 24 to 54 below set forth Plaintiffs' analysis, based upon my review of extensive confidential data provided by Uber of the potential value of each claim asserted in this case, as well as some of Plaintiffs' considerations regarding the likelihood of establishing liability on these claims, were Plaintiffs to prevail on the threshold issue of whether Uber misclassified its drivers as independent contractors.

**Failure to Reimburse for Necessary Work-Related Expenses (Cal. Lab. Code § 2802)**

24.     Cal. Lab. Code § 2802 requires an employer to indemnify its employees for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties.

25.     If Plaintiffs were to prevail on the misclassification issue, I believe drivers' expenditures for their vehicles and cellular phone data plans were necessary business expenditures.

26.     However, Uber has informed me that it intended to defend the Cal. Labor Code § 2802 claim on the merits at trial by asserting, among other arguments, that Uber has, in fact, satisfied Section 2802 by structuring the fare to be an all-inclusive fare that takes into account things like expenses, see Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal. 4th 554, 558–59 (2007) ("[A]n employer may satisfy its statutory reimbursement obligation by paying employees enhanced compensation in the form of increases in base salary or increases in commission rates . . . ."). Although I disagree with this argument, because Uber did not expressly indicate that it was reimbursing for expenses, it is conceivable that this argument may gain traction, thus precluding recovery under § 2802.

27.     Based on data that Uber produced showing the number of miles that Plaintiffs drove in California while transporting riders, and applying the IRS fixed reimbursement rates that were in effect in 2019 and 2020 respectively, I calculated Plaintiffs' claim for unreimbursed vehicle expenses in California to be worth approximately $7.95 million.

28.     However, Uber has vigorously contested this calculation and made clear that it intended to argue at trial that Plaintiffs' use of the fixed IRS reimbursement rate did not provide a proper or accurate estimate of drivers' expenses and that instead the IRS "variable rate" should be used instead.[3]

---

[3]     The costs of owning and operating a vehicle fall into two categories: fixed and variable. Fixed expenses are those that do not vary over time from month to month, including depreciation and insurance, whereas variable expenses are costs that fluctuate month to month, such as the costs of gas, maintenance, and tires. Plaintiffs' use of the IRS fixed rates (which are actually called the IRS "Fixed and Variable Rates", but I refer to them here as the "fixed rates" for convenience) would compensate drivers for both types of costs, but Uber intended to argue at trial (had Plaintiffs succeeded on liability) that only variable costs attributable to driving for Uber should be used because drivers would have incurred the fixed expenses even if they did not use their cars for Uber. In other words, a driver using his own car would have

29.     The variable rate for mileage reimbursement (favored by Uber) varied from 17 to 20 cents per mile during the applicable timeframe, whereas the fixed and variable rate for mileage reimbursement (favored by Plaintiffs) varied from 57.5 to 58 cents per mile during the applicable timeframe.  If the lower rate were used (which Uber believed was more appropriate), this damages figure would be significantly lower by more than 50%.

30.     With respect to expense reimbursement for telephones, I received data from Uber regarding total number of workweeks worked by each settlement class member.  Assuming an expense of $10 per week per class member, the total damages for telephone reimbursement are $475,690.

**Failure to Furnish Accurate Wage Statements (Cal. Lab. Code § 226)**

31.     Plaintiffs briefed this claim, which was certified by the Court, in their Motion for Summary Judgment, filed on August 12, 2021.  See Dkt. 174 at pp. 23-24.

32.     To recover under § 226, an employee must also show injury.  Injury exists under § 226 when an employee is not provided with a pay statement at all, § 226(e)(2), or when there is a deficient wage statement *and* an employee cannot promptly and easily determine from the statement alone the information required by § 226(a)(2) (total hours worked), (a)(3) (piece rate units earned, if applicable), (a)(4) (all deductions), (a)(6) (inclusive

---

had to pay for insurance and depreciation whether or not he drove for Uber, whereas variable costs like gas and wear and tear are more directly attributable to driving for Uber.

Plaintiffs would have disputed Uber's reasoning because drivers cannot perform their job without a car, and Uber requires them to have cars of a certain make and model and to have insurance, meaning that they cannot do the job without having to pay these fixed expenses. Furthermore, many drivers do upgrade their cars or even buy a brand new car in order to meet Uber's standards, so Plaintiffs do not agree that all drivers were paying only these fixed costs regardless.  However, although Plaintiffs would have vigorously disputed Uber's argument, they recognize that there was a serious risk that Uber's argument could gain traction with the jury, and that if the variable rate were applied, the expense reimbursement claim would be worth far less than Plaintiffs had estimated.

dates of the pay period), and (a)(9) (all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee).  Courts have determined that this injury generally requires that the employee be unable to "quickly verify earnings when looking at the wage statements."  Holak v. K Mart Corp., 2014 WL 4930762, *7 (E.D. Cal. Sept. 30, 2014).

33.    Although we moved for summary judgment on this claim, I believe it would have been difficult for Plaintiffs to show injury here, including because Uber likely would argue that its pay statements set forth the information required by law insofar as they provide detailed information for each and every ride, including the duration and time of the ride and compensation for the ride.  Uber would likely argue that the statements are sufficient to allow drivers to "quickly verify earnings when looking at the wage statements."

34.    Moreover, even assuming that Plaintiffs could show injury arising from a violation of §226, such a violation of § 226 is actionable only if it is "knowing and intentional," and therefore courts have permitted employers to assert a good faith defense to the claim at or after trial.  Dalton, 2011 WL 1045107, *5 (finding that good faith dispute as to whether plaintiffs were independent contractors exempt from Section 226 precludes a finding that defendant acted "with the requisite scienter" of knowing and intentional); Hurst v. Buczek Enterprises, LLC, 870 F. Supp. 2d 810, 829 (N.D. Cal. 2012) ("when a party makes a good faith claim that a worker [has been properly classified as exempt], its failure to provide accurate wage statements is not knowing and intentional.")  Accordingly, Plaintiffs recognize they would face a challenge in overcoming Uber's defenses to this claim, including that it had a good faith belief that drivers were properly classified and therefore not subject to the requirements of § 226.

35.    The maximum possible verdict value of the pay statement claim is $3.75 million, which my firm calculated by using the data Uber provided for mediation purposes to calculate penalties per violation (capped at $4,000 per driver).  However, because of the issues

described above, I believe this claim would be entitled to a steep discount for purposes of valuing this case.

**Failure to Pay Overtime Wages (Cal. Lab. Code §§ 510, 1198, 1194) and Fair Labor Standards Act (29 U.S.C. §207(a)(1))**

36.     Plaintiffs also ascribed some value to the overtime claims released by drivers as part of the settlement, though they believe that value is minimal for the reasons explained below.  Cal. Lab. Code § 1198 and Wage Order 9 require employers to pay their employees at their overtime rate of pay for hours worked in excess of eight per day and/or 40 per week. Cal. Lab. Code § 1194 permits an employee receiving less than his or her overtime wages to recover the unpaid balance of such wages in a civil action.  Likewise, the Fair Labor Standards Act requires that an employer pay time-and-a-half an employee's regular rate of pay for all hours worked beyond forty in a workweek.  See 29 U.S.C. §207(a)(1).

37.     The Court declined to certify Plaintiffs' minimum wage and overtime claims in this case, which is a major obstacle to recovery on these claims.  See James v. Uber Techs. Inc., 338 F.R.D. 123, 140 (N.D. Cal. 2021).  In particular, the Court expressed concerns that it would be too difficult to determine whether "on call time" spent waiting to receive ride requests is compensable, and that individualized determinations would be required. See id. at 141.  The Court already dismissed Plaintiffs' overtime claims in the similar Yucesoy case, see Civ. A. No. 3:15-00262-EMC, Dkt. 194 at 9-10 (after several attempts at amendment), and it dismissed similar overtime claims under the FLSA in the Del Rio case, see Civ. A. No. 3:15-cv-03667-EMC Dkt. 84 at 4. The Court rejected this claim based upon the difficulty in proving what time would be compensable (on a classwide basis).  If so-called "on call" time is not counted, the number of drivers that have overtime claims is negligible.

38.     Given these problems of proof in showing that on-call time is compensable, and the small value of claims when such time is not included, Plaintiffs assigned negligible value to this claim.

**Failure to Pay Minimum Wages (Cal. Lab. Code §§ 1182.12, 1194, 1194.2, 1197, 1197.1) and FLSA (29 U.S.C. § 201, *et seq.*)**

39.    Cal. Lab. Code § 1194 permits an employee receiving less than the legal minimum wage to recover the unpaid balance of minimum wage in a civil action.  Section 1194.2 further provides for an award of liquidated damages in a minimum wage action unless an employer can show that the violation was in good faith and that it had reasonable grounds for believing it was not subject to minimum wage requirements.  Likewise, the federal Fair Labor Standards Act requires that employers pay at least the federal minimum wage of $7.25 per hour for all hours worked.  See 29 U.S.C. § 201, *et seq.*

40.    As with the overtime claims discussed above, this Court declined to certify a class on these claims, see James, 338 F.R.D. at 141, and the Court dismissed Plaintiffs' minimum wage claim in the similar Yucesoy case, Civ. A. No. 3:15-00262-EMC, Dkt. 194 at 9-10 (after several attempts to amend), and Del Rio case, see Civ. A. No. 3:15-cv-03667-EMC Dkt. 84 at 4.  In evaluating a proposed settlement in the O'Connor litigation, the Court previously expressed skepticism regarding the value of these claims, noting that "with respect to minimum wage and overtime, the primary question appears to be whether drivers would be entitled to compensation for time spent waiting to perform a task. … This Court previously dismissed with prejudice the minimum wage and overtime claims in Yucesoy, finding that Plaintiffs had failed to plead specific facts to support their claim that waiting time should be compensable. Yucesoy, Dkt. No. 194 at 10-11. For example, there Plaintiffs did not explain how often ride requests came in, how many requests they had to accept, and the magnitude of the risk of deactivation if requests were not accepted. … While the Court does not conclude that drivers could not prevail on this claim were sufficient allegations pleaded and evidence presented, there are significant risks." O'Connor, 201 F. Supp. 3d at 1125.

41.     For all the same reasons set forth above in my discussion of the overtime claim, I believe Plaintiffs faced large obstacles in proving that on-call time was compensable, and given the Court's skepticism of this claim, and the hurdles to its certification, I believe it would have been very difficult to achieve recovery on this claim for the plaintiff class.  This is particularly true given that Uber purports to have relaxed its requirements regarding drivers accepting rides or risking termination. Thus, for the reasons set forth above, I believe there would be a substantial risk of no recovery on this claim.

**Failure to Pay Wages When Due (Cal. Lab. Code §§ 201-203, 204, 210)**

42.     Cal. Lab. Code §§ 201 and 202 require employers to page wages earned and unpaid within a certain time frame if an employee quits (within 72 hours) or is discharged (immediately).  Cal. Lab. Code § 203 provides for "waiting time" penalties assessed only when such failure to pay wages when due is "willful," and a finding of willfulness is precluded when there is a "good faith dispute" as to whether a plaintiff is subject to the Labor Code provisions at all, *i.e.,* when there is a good faith dispute as to whether a plaintiff is in independent contractor rather than an employee.

43.     Wage Order 9 defines "hours worked" as "time during which an employee is subject to the control of an employer, [] includ[ing] all the time the employee is suffered or permitted to work, whether or not required to do so."  Cal. Code Regs. tit. 8, § 11090. "California courts considering whether on-call time constitutes hours worked have primarily focused on the extent of the employer's control," and have relied upon the same factors employed by the Ninth Circuit when interpreting whether time is compensable under the FLSA. See Mendiola v. CPS Sec. Sols., Inc., 60 Cal. 4th 833, 840-41 (2015), reh'g denied (Mar. 18, 2015) (quoting list of seven factors from Owens v. Local No. 169, 971 F.2d 347, 351 (9th Cir. 1992)).

44.     Even if Plaintiffs prevailed on the misclassification issue, I expect that it may

have been difficult for Plaintiffs to overcome Uber's good faith defense to liability with respect to this claim, which requires a finding of "willfulness."  Given the heated dispute regarding whether drivers are employees or independent contractors, and the lack of any definitive court rulings on this question, I believe it would have been challenging for the drivers to prevail on claims requiring a finding of "willfulness."  See, e.g., Dalton, 2011 WL 1045107, at *5 (granting summary judgment to defendant on Cal. Lab. Code § 203 claim, which requires a finding of willfulness, on grounds that there was a good faith dispute that plaintiff was an independent contractor); see also O'Connor, 201 F. Supp. 3d at n. 12 (noting that "Cal. Lab. Code § 203 … requires[s] a finding of willfulness"); O'Connor, No. 13-CV-03826-EMC, 2019 WL 1437101, at *11 n. 6 ("Several of the remaining claims required a finding of willfulness, and others faced problems of proof…. [including claims] under Cal. Lab. Code §§ 203…").

45.    Furthermore, employees still have to prove that the time at issue was compensable work time in order to recover damages for waiting time – the same inquiry that led the Court to refuse to certify the minimum wage and overtime claims in this case and to dismiss the minimum wage and overtime claims in Yucesoy.  Accordingly, I believe there would be a substantial risk of no recovery on this claim.

**Unlawful Deductions (Cal. Labor Code § 221-224, 227)**

46.    Cal. Labor Code §§ 221 and 224 provide that an employer may only lawfully withhold amounts from an employee's wages when (1) required or empowered to do so by state or federal law; (2) when a deduction is expressly authorized in writing by the employee to cover insurance premiums, benefit plan contributions, or other deductions not amounting to a rebate on the employee's wages; or (3) when a deduction to cover health, welfare or pension contributions is expressly authorized by a wage or collective bargaining agreement.  Here, Plaintiffs are not aware of Uber taking any unlawful deductions from drivers' pay beyond service fees described and agreed upon in drivers' contracts. Although Plaintiffs added this

claim for settlement purposes in an effort to give Uber global peace, Plaintiffs do not believe that this claim has any additional value.

**Failure to Provide Meal Periods and Failure to Authorize and Permit Rest Periods (Cal. Lab. Code §§ 226.7, 512, Wage Order 9)**

47.     Cal. Lab. Code §§ 226.7, 512 and Wage Order 9 generally require employers to provide all employees with one 30-minute duty-free meal period if such employee works more than five hours in a day.  Additionally, § 226.7 and Wage Order 9 generally require employers to provide all employees with one 10-minute duty-free rest period for every four hours worked each day, or major fraction thereof.  California courts have held that an employer satisfies its obligation under the meal and rest break laws "if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30–minute break, and does not impede or discourage them from doing so." Safeway, Inc. v. Superior Court, 238 Cal. App. 4th 1138, 1148 (2015), review denied (Oct. 21, 2015) (quoting Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1040 (2012)).  The California Supreme Court has acknowledged that "[w]hat will suffice may vary from industry to industry." Brinker, 53 Cal. 4th at 1040.

48.     If Plaintiffs were to prevail on the misclassification issue, I believe it would be very difficult to prove that Uber did not meet its obligation to provide meal and rest periods. While drivers might feel pressure to accept ride requests and therefore skip meal and rest periods, I believe that Uber will be able to argue that drivers can take breaks whenever they wish, including by not accepting a ride request or by logging out of the Uber App and going "off-line" whenever the driver wishes to take break.  For example, when drivers are not logged in to driver mode, they do not receive ride requests, and, therefore, cannot be punished by Uber for declining ride requests or be pressured into missing or cutting short their breaks.  Further, Uber alleges that drivers no longer suffer negative consequences for failing to accept ride requests when they are "online" in driver mode.  I believe that such facts would likely preclude

liability for meal and rest period violations.[4]  This Court agreed in finding the release of these claims fair and reasonable in <u>O'Connor</u>.  There, the Court noted that Plaintiffs' "meal and rest break claims were blunted by Uber's argument that its entire system can be understood to constitute a policy of 'permitting' or 'authorizing' breaks whenever a driver wants… [T]he Court is satisfied that Plaintiffs' counsel can reasonably attribute minimal value to these claims." <u>O'Connor</u>, 2019 WL 1437101, at *11 (N.D. Cal. Mar. 29, 2019) (internal citation omitted); <u>see also</u> <u>O'Connor</u>, 201 F. Supp. 3d at 1125; <u>Cotter v. Lyft, Inc.</u>, Civ. A. No. 3:13-cv-04065-VC (N.D. Cal.), Dkt. 246 (approving settlement that valued meal and rest break claims as having no value).  Thus, I believe that my negligible valuation of this claim is appropriate.

**Failure to Keep Accurate Records (Cal. Lab. Code §§ 1174.5, 353)**

49.    Cal. Lab. Code § 1174 requires employers to maintain payroll records pertaining to its employees, and Cal. Lab. Code § 1174.5 provides for penalties for willful failures to maintain such records.  A finding that an employer's failure to comply with § 1174 was in good faith precludes liability for the violation.  <u>Dalton</u>, 2011 WL 1045107, *6 (granting summary judgment on § 1174 claim because of a good faith dispute that employees were independent contractors).

50.    As set forth above, even if Plaintiffs were to prevail on the misclassification issue, I believe it would be difficult for Plaintiffs to show that Uber does not maintain all information required by §1174, and, even if it does not, it would be difficult for Plaintiffs to

---

[4]    In this sense, the situation presented by this case differs from a traditional workplace where the default is that an employee is working, except during recognized breaks. In such a workplace, unless an employer "affirmatively authorizes" a break (rather than merely allowing it), an employee may not feel comfortable taking a break whereas with Uber, the whole system is set up so that drivers log in and out whenever they want, so that there can never be any circumstance in which a driver might feel pressure (even implicitly) not to take a break. In other words, Uber's entire system can be understood to constitute a policy of "permitting" or "authorizing" breaks whenever a driver wants.

overcome Uber's good faith defense to liability with respect to this claim. This Court noted the same thing in its previous Preliminary Approval Order in <u>O'Connor</u>. <u>See</u> <u>O'Connor</u>, 2019 WL 1437101, at *11 ("Several of the remaining claims require[] a finding of willfulness, and others faced problems of proof… [including] claims under Cal. Lab. Code §§ 203, 226.8, 226(e)(1), 1174.5."); <u>see also</u> <u>O'Connor</u>, 201 F. Supp. 3d at n. 12. Accordingly, I believe there would be a substantial risk of no recovery on this claim.

**One in Seven Day's Rest (Cal. Labor Code §§ 551, 552, and 558)**

51.    Cal. Lab. Code § 551 provides that every person in every occupation is entitled to one day's rest in seven, and Cal. Lab. Code § 552 prohibits employers from requiring an employee to work more than six days out of seven. Here, some drivers worked seven days per week although based on data from Uber it appears that this was true only for a very small minority of drivers. In any case, Plaintiffs believe they would face difficult hurdles in proving this claim on a class-wide basis given that many drivers drove only occasionally and given that it is undisputed that drivers are able to sign on and off the app whenever they wish and can drive as much or as little as they wish. Accordingly, I believe there would be a substantial risk of no recovery on this claim.

**Failure to Provide Paid Sick Leave (Cal. Labor Code §§ 245-249)**

52.    Cal. Labor Code § 246 provides that an employer must provide any employee who, on or after July 1, 2015, works in California for the same employer for 30 days or more within a year from the start of employment, with paid sick days. If Plaintiffs succeed in proving employee status, then drivers who drove more than 30 days in a calendar year arguably accrued a certain number of paid sick days and were entitled to use these accrued paid sick days for purposes enumerated in Labor Code section 246.5(a)(l)-(2).

53.    However, Plaintiffs likely would face serious challenges on this claim. For one

thing, the Court already denied class certification of this claim, which presents a major barrier to recovery. <u>James v. Uber Techs. Inc.</u>, 338 F.R.D. 123, 142 (N.D. Cal. 2021).  In that decision, the court concluded that, "[a]s with Plaintiffs' minimum wage and overtime claims, [] the Court cannot determine if Uber denied Plaintiffs' paid sick leave on a class-wide basis because Plaintiffs insist that all of the time they spent on the application (including waiting time) should count towards determining their sick leave." <u>Id.</u>  The Court determined that this determination was "extremely difficult to make" for each driver. <u>Id.</u>[5] Moreover, because employees must be employed for at least 90 days before being able to use paid sick leave, a court may conclude that many of the drivers who use Uber infrequently may not be entitled to paid sick leave at all. <u>See</u> Cal. Labor Code § 246(c).  Indeed, roughly 25% of the settlement class worked fewer than 3 months during the class period.  Even if we assumed that every driver was entitled to the full three days of paid leave (which is plainly not the case), the total damages would be modest. Rates of pay vary across drivers, but assuming an hourly rate of $20/hour, full damages for every single member of the Settlement Class would come to less than $600,000.  Furthermore, because the Parties already achieved a partial recovery on this claim through their earlier settlement in the <u>Verhines</u> case, the amount of damages should be discounted accordingly.

**Failure to Pay Reporting Time (Wage Order 9)**

54.    Wage Order 9, § 5, requires that for each workday that a California employee is required to report for work and does report, but is either not put to work or is furnished less than half of that employee's usual or scheduled day's work, each such employee must be paid an amount equal to half of his or her usual or scheduled day's pay, or in any event must be paid an amount equal to 2 hours at the employee's regular rate of pay.  Here, the claim would

---

[5]    Indeed, proving liability under section 246 requires that Plaintiffs first prove the employees' hourly rate of pay, a figure that the Court might find to be incalculable.  <u>See</u> Cal. Labor Code § 246(k).

presumably apply where drivers signed onto the app but received no ride requests and gave no rides. I believe there is a substantial risk of no recovery on this claim because drivers can indisputably work as often as they like and are not required to "report" or sign onto the app at any particular time. Thus, because drivers are arguably never "required" to report for work, I do not ascribe any value to this claim.

### Benefits of the Settlement

55.     The allocation formula distributes the settlement funds among drivers on a proportional basis based on number of miles driven to pick up a passenger or with a passenger in the car. Because expense reimbursement is the greatest source of damages by far, this allocation is fair and reasonable. Moreover, the total amount of miles driven is also a good proxy for other sources of damages (such as minimum wage and overtime because drivers who drove a lot of hours also drove a lot of miles).

56.     The average settlement award is projected to be roughly $4,750 per driver after attorneys' fees, administration expenses, and incentive payments are deducted, and assuming a 100% claim rate. If the claim rate is 50%, average awards would be roughly $9,500 per driver.

57.     Attached hereto as **Exhibit 1** is a true and correct copy of the parties' proposed Settlement Agreement along with Exhibits A through H thereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 17, 2022, in Boston, Massachusetts.

By:  ___/s/ Shannon Liss-Riordan_____
       Shannon Liss-Riordan

DECLARATION OF SHANNON LISS-RIORDAN IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
Case No.: 19-cv-06462-EMC